**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

|  |  |
|---|---|
| DONALD J. TRUMP, the Forty-Fifth President of the United States, KELLY VICTORY, AND AUSTEN FLETCHER, INDIVIDUALLY AND ON BEHALF OF THE CLASS,<br><br>Plaintiffs,<br><br>v.<br><br>YOUTUBE, LLC., and SUNDAR PICHAI<br><br>Defendants. | **CLASS ACTION COMPLAINT FOR:**<br><br>**FIRST AMENDMENT VIOLATION**<br><br>**JURY TRIAL REQUESTED** |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

### INTRODUCTION

1.     Plaintiff, Donald J. Trump, the Forty-Fifth President of the United States, individually, and on behalf of those similarly situated Putative Class Members, by and through the undersigned counsel, brings this action against YouTube, LLC. ("YouTube"), and Sundar Pichai, the Chief Executive Officer of Google, Inc. and Alphabet, Inc. The allegations herein of Plaintiff and Putative Class Members are based upon personal knowledge and belief as to their own acts, upon the investigation of their counsel, and upon information and belief as to all other matters.

2.     Defendant YouTube has accumulated an unprecedented concentration of power, market share, and ability to dictate our nation's public discourse. YouTube generated $19.7

1

billion in revenue in 2020, up from $80 million in 2010.  Over 2.3 billion people access YouTube at least once every month.  YouTube's owner is Alphabet, which is also the parent of Google.  YouTube ranks second in global engagement behind Facebook.  YouTube could be worth $140-300 Billion if "spun into" its own company, according to Business of Apps, citing VentureBeat.

3.      Defendant YouTube has increasingly engaged in impermissible censorship resulting from threatened legislative action, a misguided reliance upon Section 230 of the Communications Act, 47 U.S.C. § 230, and willful participation in joint activity with federal actors. Defendant YouTube's status thus rises beyond that of a private company to that of a state actor. As such, Defendant is constrained by the First Amendment right to free speech in the censorship decisions it makes regarding its Users.

4.      Legislation passed twenty-five (25) years ago intended to protect minors from the transmission of obscene materials on the Internet, and to promote the growth and development of social media companies, has enabled Defendant YouTube to grow into a commercial giant that now censors (flags, demonetization, bans, etc.) and otherwise restricts with impunity the constitutionally protected free speech of the Plaintiff and the Putative Class Members.

5.      The immediacy of Defendants' threat to its Users' and potentially every citizen's right to free speech, cannot be overstated. Defendants' callous disregard of its Users' constitutional rights is no better exemplified than in the matter currently before the Court.

6.      On January 12, 2021, Defendants indefinitely banned the sitting President of the United States from its platform for exercising his constitutional right of free speech on his YouTube channel.

7.      Censorship runs rampant against the Putative Class Members, and the result is a chilling effect cast over our nation's pressing political, medical, social, and cultural discussions.

8.     Plaintiff, a sitting President of the United States, was banned by the Defendants, as were Putative Class Members, using non-existent or broad, vague, and ever-shifting standards. While YouTube's ban and prior restraint of Plaintiff are well-documented, the untold stories of Putative Class Members are now stirring the public conscience.

9.     Using the unconstitutional authority delegated to them by Congress, Defendants have also mounted an aggressive campaign of censorship against a multitude of Putative Class Members through censorship (flagging, demonetizing, banning, etc.) resulting from legislative coercion.

10.     Defendants deplatformed Plaintiff, and Putative Class Members, at the behest of, with cooperation from, and the approval of, Democrat lawmakers.

11.     Akin to forcing a round peg into a square hole, YouTube declared that specific uploads of Plaintiff had violated YouTube's self-imposed "Community Guidelines." Countless other YouTube Users have not been as fortunate, with YouTube taking detrimental action against their entire video library with no explanation whatsoever.

12.     If Defendants reliance on an unconstitutional delegation of authority to regulate free speech and under pressure from Congress, can effectively censor, and impose a prior restraint on the protected political speech of a sitting President of the United States, then the threat to Putative Class Members, our citizens, and  our United States Constitution and form of government, is imminent, severe, and irreparable.

13.     Plaintiff respectfully asks this Court to declare that Section 230 on its face is an unconstitutional delegation of authority and that the Defendants' actions directed at the Plaintiff and the Putative Class Members are a prior restraint on their First Amendment right to free speech, to order the Defendants to restore the YouTube channel of Plaintiff, as well as those deplatformed Putative Class Members, and to prohibit Defendants from exercising censorship,

editorial control or prior restraint in its many forms over the uploads of President Trump, and Putative Class Members.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 1332, 28 U.S.C. §§ 2201-2202, and the Constitution of the United States for the unconstitutional violation of the First Amendment right to free speech as pleaded below.

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332.

16.     Jurisdiction is also proper in this Court pursuant to the Class Action Fairness Act 28 U.S.C. § 1332(d) ("CAFA"), because: (i) the proposed class consists of well over 1,000,000 Members; (ii) the Members of the proposed Class, including the Plaintiff, are citizens of states different from Defendant's home states; and (iii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

17.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2), (d), and (e)(1). A substantial part of the events giving rise to this claim occurred in this District, and Plaintiff brings this suit for actions taken by Defendants that occurred while Plaintiff was serving in his capacity as President of the United States, and the Defendants' prior restraint of Plaintiff's speech continues to this day.

## PARTIES

### Plaintiff

18.     Donald J. Trump ("Plaintiff"), the 45th President of the United States, is a private citizen and is domiciled in Palm Beach, Florida.

4

19.     Kelly Victory ("Plaintiff"), a United States citizen, domiciled in the state of Colorado.

20.     Austen Fletcher ("Plaintiff"), a United States citizen, domiciled in the state of Florida.

**Class**

21.     All YouTube platform Users ("Putative Class Members") who have resided in the United States between June 1, 2018, and today and had their YouTube channels censored by Defendants and were damaged thereby.

**Defendants**

22.     Defendant, YouTube, LLC ("YouTube"), is a foreign limited liability company with its principal place of business located at 901 Cherry Avenue, San Bruno, California, and conducts business in the State of Florida, throughout the United States, and internationally.

23.     Defendant, Defendant, Sundar Pichai ("Pichai"), is the Chief Executive Officer of Google, Inc. and Alphabet, Inc. and is responsible for the acts alleged herein of YouTube.

## STATEMENT OF FACTS

**I.      DEFENDANTS YOUTUBE AND PICHAI**

**A. Defendant YouTube**

24.     YouTube was conceived as a dating site but quickly became a video streaming service.  The site went live in 2005 and had its first one (1) million videos viewed that same year.

25.     By 2006, YouTube was one of the fastest-growing sites on the Internet.  In less than one year, the platform went from 4.9 million to 19.6 million users.  In October 2006, Google acquired the video-sharing platform for $1.65 billion.

26.     YouTube operates as a wholly-owned subsidiary of Google and Alphabet.

27.     In 2020, YouTube boasted 37 million channels and 1.3 billion users, with three hundred (300) hours of video uploaded every minute and five (5) billion videos launched every day.  It is one of the largest and most popular video distribution platforms on the Internet.  It has more than four (4) billion hours of videos viewers every month, and an estimated five hundred (500) hours of video content are uploaded to YouTube every passing minute.

28.     As of 2018, YouTube's estimated worth was $160 billion.

29.     YouTube's Community Standards Guidelines regarding hate speech, incitement, or praise of violence are vague, broad, ill-defined, or not defined at all.

30.     YouTube's Community Standards Guidelines on Hate Speech provide:

Hate speech is not allowed on YouTube. We remove content promoting violence or hatred against individuals or groups based on any of the following attributes: Age, Caste, Disability, Ethnicity, Gender Identity and Expression, Nationality, Race, Immigration Status, Religion, Sex/Gender, Sexual Orientation, Victims of a major violent event and their kin, Veteran Status.

31.     Community Standards Guidelines on Incitement of Violence:

Violent or gory content intended to shock or disgust viewers is not allowed on YouTube. Also, content that encourages others to commit violent acts is not allowed….

What this Policy means for you… If you're posting content, Violent acts:

- Inciting others to commit violent acts against individuals are a defined group of people…

**B. Defendant Sundar Pichai**

32.     Defendant Sundar Pichai is the Chief Executive Officer of Google, Inc. and the Chief Executive Officer of Alphabet, Inc., the parent company of Google.

33.     Defendant Pichai exercises control over and implementation of the content and policy of YouTube and has spoken on behalf of and represented YouTube at Congressional hearings.

## II.  PLAINTIFF'S USE OF YOUTUBE CHANNEL

### A.  The Donald J. Trump YouTube Channel

34.     Plaintiff established his official YouTube channel in May of 2015 and initially used the channel to engage with the public. After he announced his campaign for the presidential nomination of the Republican Party, Plaintiff used his YouTube channel to speak directly to his followers and the public at large. By using social media, including YouTube, President Trump strategically circumvented what he saw as a mainstream media that was biased against him.

35.     Similarly, members of the Class use their YouTube channels to share information, opinions, and news with their network ranging from family and friends to larger public audiences.  YouTube channels can also be monetized, providing an avenue for users to earn income.

36.     After his inauguration as President in January of 2017, Plaintiff's YouTube channel became an instrument of his presidency. By virtue of the way he used his channel, Plaintiff's messages became an important source of news and information about the government, as did his followers' comments associated with Plaintiff's posts. Plaintiff's channel became a public forum for speech by, to, and about government policy.

37.     When Plaintiff utilized his YouTube channel in his official capacity as President: (a) it became an important outlet for news organizations and the U.S. government; and (b) his YouTube account operated as a public forum, serving a public function.

38.     The comments generated by Plaintiff's YouTube uploads also gave rise to important public discussion and debate about government policy. Typically, his uploads would generate thousands of replies posted by other Users, some of which would generate hundreds or thousands of replies in turn. President Trump's channel was a digital town hall in which the President of the United States communicated news and information to the public directly.

Members of the public used the comment function to respond directly to President Trump and his office and to exchange views with one another.

39.     Plaintiff used his YouTube channel to interact on a myriad of subjects with the public at large. Supporters and critics alike were welcome on Plaintiff's YouTube channel. No one was excluded, regardless of their views.

40.     Plaintiff used YouTube and other social media platforms to communicate directly with American citizens more than any other President in history.

41.     Not only were Plaintiff's YouTube uploads accessible to his subscribers, but other members of the public could, and did, access his posts at any time on the Internet.

42.     The Putative Class Members used their YouTube channels in a similar fashion, sharing information, opinions, photographs, videos, and news with their networks, ranging from friends and family to larger public audiences.

43.     The Putative Class Members on YouTube can monetize the uploads on their channel, and some depend on income generated from subscribers for a living. Censorship actions taken by YouTube against the Putative Class Members resulted in financial damages for those Putative Class Members.

### III. DEMOCRAT LEGISLATORS COERCED DEFENDANTS TO CENSOR THE PLAINTIFF AND PUTATIVE CLASS MEMBERS

44.     Democrat legislators feared Plaintiff's skilled use of social media as a threat to their own re-election efforts. These legislators exerted overt coercion, using both words and actions, to have Defendants censor the views and content with which Democrat Members of Congress disagreed, of both the Plaintiff and the Putative Class Members.

45.     Not only did Democrat legislators openly voice their displeasure with Defendants for providing a platform to Plaintiff and Putative Class Members, but they also spoke publicly of

the steps they would take against Defendants if Defendants continued to provide a platform for the expression of views and content contrary to the legislators' own agendas.

46.    Legislators (and in one instance Michelle Obama, the former First Lady) made it increasingly clear that they wanted Plaintiff and the Putative Class Members, and the views and content they espoused, to be banned from Defendants' platform.

47.    With Defendants shielded from liability for engaging in censorship by Section 230, the Democrat legislators then wielded that immunity, combined with threats to revoke that immunity or otherwise to regulate Defendants, to use Defendants as a tool to effect censorship and viewpoint discrimination against Plaintiff and the Putative Class Members that the Democrat legislators knew they could not accomplish on their own.

48.    Below are just some examples of Democrat legislators threatening new regulations, antitrust breakup, and removal of Section 230 immunity for Defendants and other social media platforms if YouTube did not censor views and content with which these Members of Congress disagreed, including the views and content of Plaintiff and the Putative Class Members:

- "But I do think that for the privilege of 230, there has to be a bigger sense of responsibility on it.  And it is not out of the question that that could be removed."  (Rep. Nancy Pelosi, Speaker of the House, April 12, 2019);

- "The idea that it's a tech company is that Section 230 should be revoked, immediately should be revoked, number one.  For Pichai and other platforms."  (Joe Biden/Interview in December of 2019 and published January 2020);

- "We can and should have a conversation about Section 230. – and the ways in which it has enabled platforms to turn a blind eye as their platforms are used to . . . enable domestic terrorist groups to organize violence in plain sight."  (Statement of US Sen. Mark Warner on Section 230 Hearing on October 28, 2020.);

- "It's long past time to hold the social media companies accountable for what's published on their platforms."  (Bruce Reed, Biden's Top Tech Advisor/December 2, 2020);

- @jack (Jack Dorsey) Time to do something about this Tweet.  (Sen. Kamala Harris' Tweet, October 2, 2019);

- 2020 Presidential candidate Sen. Kamala Harris calls on Twitter to suspend President Trump's account – (ABC News (go.com) October 2, 2019);

- If the president goes on Facebook and encourages violence, that you will make sure your company's algorithms don't spread that content and you will immediately remove those messages?  (Sen. Markey October 28, 2020 (Zuckerberg Senate Testimony));

- "Senator, yes.  Incitement of violence is against our policy and there are not exceptions to that, including for politicians." Mark Zuckerberg response, (November 17, 2020, Mark Zuckerberg and Jack Dorsey, Senate Tech Hearing);

- "…Daily, the president shocks our conscience and shakes the very foundations of our democracy using a powerful megaphone, social media.  The President has used this microphone to spread vicious falsehoods and an apparent attempt to overturn the will of voters…  Now, Mr. Zuckerberg and Mr. Dorsey, you have built terrifying tools of persuasion and manipulation with power far exceeding the robber barons of the last Gilded Age." (Sen. Blumenthal (13:35) October 23, 2020: Tech CEO's Senate Testimony)

- I have urged, in fact, a breakup of tech giants because they've misused their bigness and power.  And indeed Section 230 reform, meaningful reform, including even possible repeal in large part because their immunity is way too broad and victims of their harms deserve a day in court.  (Sen Blumenthal (14:48) October 23, 2020: Tech CEO's Senate Testimony);

- "Now is the time for Silicon Valley companies to stop enabling this monstrous behavior and go even further than they have already by permanently banning this man (Trump) from their platforms.  (Michelle Obama on Twitter, January 7, 2021);

- "The law (230) acts as a shield allowing them (Internet platforms) to turn a blind eye.  The SAFE TECH ACT brings 230 into the modern age and makes platforms accountable for the harm they cause." (Sen. Mazie Hirono's Tweet, February 5, 2021);

- Before the hearing the following statement was issued by the respective Democrat Chairmen. "This hearing will continue the Committee's work of holding online platforms accountable for the growing rise of misinformation and disinformation.  Industry self-regulation has failed.  We must begin the work of changing incentives driving social media companies to allow and even promote misinformation and disinformation." (March 2021 Joint Hearing of the Communications and Technology Subcommittee); and

- "There's no Constitutional protection for using social media to incite an insurrection.  Trump is willing to do anything for himself no matter the danger to our country.  His big lies have cost America dearly.  And until he stops, YouTube must ban him.  Which is to say, forever." (Rep. Adam Schiff's Tweet, May 5, 2021).

49.     Democrat Legislators not only voiced their threats (e.g., new regulations and removing Section 230 immunity) to social media platforms, but they also employed additional measures to deliver their unmistakable message that they were prepared to act against the social media platforms if Defendants did not increase their censorship of disfavored views and content of Plaintiff, and Putative Class Members.

50.     These additional measures included convening public hearings, issuing subpoenas, dragging in the CEOs of the largest social media companies to testify publicly before Congress, and subjecting these CEOs to lengthy, embarrassing questioning.

51.     Some specific examples of these coercive actions were extended on Defendants:

On July 29, 2020, Four Big Tech CEOs testified before the House in an antitrust hearing. Amazon Founder and CEO Jeff Bezos, Facebook Founder and CEO Mark Zuckerberg, Apple CEO Tim Cook, and Pichai attempted to defend their companies against accusations of anticompetitive practices. (Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google | U.S. House of Representatives Judiciary Committee); and

On October 23, 2020, Mark Zuckerberg Testimony Transcript: Zuckerberg Testifies on Facebook Cryptocurrency Libra and Is Confronted on Child Exploitation on Facebook. (Zuckerberg Testifies on Facebook Cryptocurrency Libra | October 23, 2019); and

On November 17, 2020, Facebook CEO Mark Zuckerberg and Twitter CEO Jack Dorsey testified before the Senate Judiciary Committee on November 17. They were questioned on speech moderation policies. (Censorship, Suppression, and the 2020 Election | Hearings | November 17, 2020); and

On March 25, 2021, Facebook's Mark Zuckerberg, Twitter's Jack Dorsey, and Pichai appeared virtually before the House Energy and Commerce Committee. (House Hearing on Combating Online Misinformation and Disinformation | March 25, 2021); and

52.     With this coercion directed at Defendants by repeatedly requiring their appearance at hearings, and reinforcing their potential to impose regulations, and strip them of

230 immunity, Democrat legislators were intended to force Defendant into permanently banning Plaintiff's access to his YouTube channel, his subscribers, and the public at large. The ancillary benefit was to deny the public access to Plaintiff's content and views.

53.     The message conveyed by Democrat legislators to Defendants was clear: use the authority of Section 230 to ban Plaintiff and those Putative Class Members who uploaded content and views contrary to those legislators' preferred points of view or lose the competitive protections of Section 230 and tens of billions of dollars of market share altogether.

54.     The legislators who pressured Defendants to censor Plaintiff and Putative Class Members who supported his views employed social media themselves extensively to communicate with their own constituents, promote their accomplishments in office, and fundraise and campaign.

55.     With Plaintiff removed from YouTube, it is considerably more difficult for Plaintiff to act as head of the Republican Party, campaign for Republican candidates, fundraise, and lay the groundwork for his own potential campaign run for the 2024 Republican Party nomination for President of the United States.

56.     Likewise, with Plaintiff now removed from YouTube and other social media platforms, it has ended balanced, direct public discussions between competing political views on national and local issues.

57.     By banning Plaintiff, Defendants have made it more difficult for Plaintiff to communicate directly with the American public. Our national discourse is becoming immeasurably more altered and one-sided on race, medicine, the election process, the economy, immigration, etc.

## IV. CONGRESSIONAL LEGISLATION SIGNIFICANTLY ENCOURAGED DEFENDANTS' CENSORSHIP OF PLAINTIFF AND THE PUTATIVE CLASS MEMBERS

58.     YouTube is currently one of the largest social media platforms. Its very existence and growth have been directly fueled by Congressional legislation.

59.     In 1996, Congress passed the Communications Decency Act of 1996, which amended the Telecommunications Act of 1934 Section 230(c) intending to promote the growth and development of social media platforms, as well as protect against the transmission of obscene materials over the Internet to children.

60.     It is Congressional legislation commonly referred to as simply Section 230, or the "Good Samaritan" provision, that YouTube relies on to censor constitutionally permissible free speech on Plaintiff and the Putative Class Members.

61.     Section 230(c) provides:

(1).   TREATMENT OF PUBLISHER OR SPEAKER

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

(2).   CIVIL LIABILITY

No provider or user of an interactive computer service shall be held liable on account of—

    A. any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers being obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

    B. any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

62.     Section 230(c) has accomplished and exceeded its original purpose in terms of promoting the growth and development of social media platforms.

63.     For example, YouTube is one of the largest and most popular video distribution platforms on the Internet. It has more than four (4) billion hours of video views every month, and an estimated five (500) hours of video content are uploaded to YouTube every passing minute.

64.     In 2020 alone, YouTube boasted thirty-seven (37) million channels, 1.3 billion people used YouTube, three hundred (300) hours of video were uploaded every minute, and five (5) billion videos were uploaded every day.

65.     As recently as this week, Defendant has been actively censoring any coverage, direct or indirect, of Plaintiff. Right Side Broadcasting Network (RSBN) was suspended for seven (7) days from YouTube's platform, preventing it from livestreaming a rally held by Plaintiff in Sarasota, Florida.

66.     Defendant also removed  several of Plaintiff's rally videos from RBSN's account, in addition to the suspension.

67.     RBSN reported it was suspended from YouTube and noted remarks from the Plaintiff that caused the deletion and suspension. YouTube provided the below explanation:

 **1 of 3 Community Guidelines strikes**

- Your content was removed due to a violation of our Community Guidelines.
- You won't be able to do things like upload, post, or live stream for 1 week (7 days left).

**Strike on July 2, 2021** <span style="color:red">Expires Sep 30</span>

| Type | Content | Policy | Actions |
|------|---------|--------|---------|
| ((•)) | 🔴 LIVE: President Donald Trump, Others Speak at the 2021… <br> Saturday June 5, 2021: Please join RSBN at the North Carolina … | Spam, deceptive practices and scams | APPEAL |
| ((•)) | President Trump Full Speech at Wellington, OH Rally 6/26/2… <br> Note: Video will be in full quality once it finishes processing. Ra… | Spam, deceptive practices and scams | APPEAL |
| ((•)) | 🔴 President Donald Trump Rally LIVE in Wellington, OH - 6/… <br> Saturday, June 26, 2021: Join the RSBN crew for all day LIVE c… | Spam, deceptive practices and scams | APPEAL |

68.     This is targeted censorship, including prior restraint, in its purest form.

69.     In terms of addressing the transmission of obscene materials, including terrorist activity, over the Internet, YouTube has failed.

70.     For example, on July 3, 2021, police arrested a group of eleven (11) heavily armed people who call themselves "The Rise of the Moors" after an armed standoff in the middle of a highway near Boston, Massachusetts. According to local police, the group claimed that they

did not recognize U.S. or Massachusetts law.  Yet this group has a YouTube account and spreads their message there without their account being taken down.

71.     As discussed in the Harvard Journal of Law & Public Policy, Leary, Mary Graw, *The Indecency and Injustice of Section 230 of the Communications Decency Act, Vol. 41, No. 2,* pg. 564, 565 (2018):

> Congress expressly stated that th[is] is the policy of the United States 'to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.'  That said, Congress appeared to recognize that unlimited tort-based lawsuits would threaten the then-fragile Internet and the 'freedom of speech in the new and burgeoning Internet medium.'

> Although these two goals required some balancing, it was clear from the text and legislative history of § 230 that it was never intended to provide a form of absolute immunity for any and all actions taken by interactive computer services.  Section 230 is not 'a general prohibition of civil liability for web-site operators and other content hosts.'  Rather, Congress sought to provide limited protections for limited actions.

72.     In passing 230(c), Congress permits, but does not mandate, action by social media platforms.

- Section 230(c) permits YouTube to take down or block speech deemed "objectionable… whether or not such material is constitutionally protected."

- Section 230(c) also pre-empts all conflicting state laws, preventing such censorship from being "made illegal… by any provisions of the laws of a State."

73.     In relying on the permissive language of Section 230 and statements and actions of Democrat legislators, those legislators made it clear that they had a "strong preference" for the censoring of the views and content of the Plaintiff and Putative Class Members regarding, for example:

- COVID-19 "misinformation," including the lack of safety and efficacy of hydroxychloroquine and the use of face masks.

16

- COVID-19 originated in the Wuhan province of China and was a transmission from scientists in a government.

- Questioning the integrity and results of the 2020 Presidential election.

74.     Neither Plaintiff nor Putative Class Members were "free to decline" the speech restrictions imposed by YouTube in its Terms of Service (TOS) if they wished to use the YouTube platform. Use of its platform was expressly conditioned on agreeing to these restrictions, or User access was denied.

75.     Federal actors are also sharing the fruits of YouTube censorship of Plaintiff and Members of the Class. These benefits include:

- The Centers for Disease Control and Prevention (CDC) and the White House have used Defendants to inexpensively and effectively promote their directives, messages, and policies concerning COVID-19; and suppress contradictory medical views and conten

- Suppression of information suggesting or showing flaws in CDC and/or other federal governmental policy;

- Increasing the number of visitors to the CDC's website;

- Boosting the CDC's highly questionable reputation as reliable and authoritative in its factual and policy determinations;

- Creating a false impression of unequivocal support in the scientific community for the CDC and other governmental directives;

- And suppression of opinions and information that might lead people to take actions contrary to the government's preferences.

## V.  DEFENDANTS WILLFUL PARTICIPATION IN JOINT ACTIVITY WITH FEDERAL ACTORS TO CENSOR PLAINTIFF AND THE PUTATIVE CLASS MEMBERS

76.    The CDC has publicly stated that it works with "social media partners," including YouTube, to "curb the spread of vaccine misinformation."  In a document dated October 11, 2019, the CDC expressly stated that it was "engaging . . . partners" to "contain the spread of [vaccine] misinformation" and specifically states that the CDC would "work with social media companies" to that end.

77.    YouTube is among the social media "partners" referred to by the CDC.



78.    As is often the case within the medical community, experts disagree.  Leading experts within the CDC have had sharp disagreements with the CDC policy.

79.    For example, Martin Kulldorff, nationally renowned infectious disease epidemiologist and biostatistician of Harvard Medical School, was part of the CDC's vaccine safety advisory committee but was removed from it as soon as he publicly disagreed with the agency's pause of the Johnson and Johnson COVID vaccine. The committee accused him of "bias."

80.    Four days after he was removed, the CDC once again allowed the Johnson and Johnson vaccine to be administered, effectively adopting Kuldorff's stated position for which he was punished.

81.     Pierre Kory, MD, was the medical director for the Trauma and Life Support Center, in the outpatient pulmonary medicine clinic, at UW Health at the University of Wisconsin, where he performed bronchoscopy and pleural procedures. Kory is an expert in critical care ultrasonography, winning the British Medical Association's 2015 President's Choice award in medical textbooks for his work on Point of Care Ultrasound, along with his co-editors.

82.     Kory is also the president of the Front Line COVID-19 Critical Care (FLCCC) Alliance.  The FLCCC Alliance describes itself on its website as the following:

> [A] group of highly published, world renowned Critical Care physician/scholars – with the academic support of allied physicians from around the world – to research and develop lifesaving protocols for the prevention and treatment of COVID-19 in all stages of illness.

83.     In December, Kory was called to testify before the Senate Homeland Security Committee and spoke about Ivermectin, which the FLCCC Alliance describes as an "FDA-approved anti-parasitic agent" that "had been shown in numerous controlled trials around the world to prevent and treat COVID-19." YouTube banned Kory's Congressional testimony because he promoted Ivermectin.

84.      The FLCCC Alliance condemned YouTube's censorship in a press release. It is more dangerous for social media giants like YouTube to indiscriminately discredit and summarily remove official government information given under oath by world-renowned medical experts. Kory told Fox News that, "[This is] not only a slippery slope but in contradiction to one of our most valued founding principles as a country."

85.     The FLCCC Alliance has written extensively about Ivermectin.  It has, in part, stated as follows:

[The FLCCC Alliance] discovered that Ivermectin, an anti-parasitic medicine, has highly potent anti-viral and anti-inflammatory properties against COVID-19…

Fortunately, it now appears that Ivermectin, a widely used anti-parasitic medicine with known anti-viral and anti-inflammatory properties is proving a highly potent and multi-phase effective treatment against COVID-19. (FLCCC Ivermectin in the prophylaxis and treatment of COVID-19 | Page 1)

86.     Another example of Defendants working directly with government actors to censor free speech was when Plaintiff and Putative Class Members supported the view that hydroxychloroquine might be an effective, preventative option to protect against the coronavirus.

87.     Plaintiff and Putative Class Members' uploads about hydroxychloroquine were censored by YouTube, as only the narrative crafted by Dr. Fauci, National Institute of Allergy and Infectious Diseases, and CDC was allowed on YouTube regarding best practices for treating COVID-19.

88.     Well-known American journalist Sharyl Attkisson from CBS states that she was censored: "YouTube has removed the 'Full Measure' investigation that followed the money regarding hydroxychloroquine and the IV medicine Remdesivir, calling the story 'dangerous.'  It is chilling to see third parties with so much control respond to the behest of propagandists who are desperate to control the message and keep certain facts hidden."

89.     The following is her lead-in to her interview with Plaintiff: "If you've watched the news lately, you might be under the impression that a medicine President Trump touted as a possible game-changer against coronavirus—has been debunked and discredited. Two divergent views of the drug hydroxychloroquine have emerged: the negative one widely reported in the press and another side you've probably heard less about. Never has a discussion about choices of medicine been so laced with political overtones. Today, how politics, money, and medicine intersect with coronavirus."  (Sharyl Attkisson Website)

20

90.     The following is an excerpt of her interview:

President Trump: Now, it may not work, in which case, hey, it didn't work.

Sharyl: Studies from China and France sparked early hope that a malaria drug—hydroxychloroquine— might work against coronavirus.

President Trump: And it may work, in which case it's going to save a lot of lives.

Sharyl: But with President Trump's first endorsement, there was a major media-driven effort to portray hydroxychloroquine as dangerous quackery. The campaign was assisted by an online report in mid-April. It said for sick coronavirus patients treated by the Veterans Administration, hydroxychloroquine did not help and was linked to increased deaths.  She has placed her interview and report on her own website to prevent a total silencing.  It is, (Full Measure News)

91.     Plaintiff also expressed the view on YouTube that COVID-19 originated in the Wuhan laboratory in China and would specifically refer to it as the "China virus."

92.     Subsequently, YouTube Users posting comments discussing the Wuhan laboratory in China as the origin of COVID-19 or referring to COVID-19 as the "China virus" were similarly censored (flagged, demonetized, banned, etc.)

93.     For example, Jennifer Zeng, who blogged about the now widely accepted Wuhan lab leak theory and posted about it on YouTube, was censored. YouTube sent her a message stating, "We've determined that your channel is no longer eligible for monetization."

94.     Uploads concerning a lack of integrity in the 2020 Presidential election were then similarly censored.

95.     For example, Right Side Broadcasting Network was censored for posting one of Plaintiff's speeches.  Additionally, Right Side Broadcasting Network's channel was suspended earlier on February 28, 2021, for streaming the Plaintiff's speech from the Conservative Political Action Committee, often called "C-PAC."  The channel was suspended for two weeks.

96.     Defendants' ban on Plaintiff and Putative Class Members continues to this day. The ban has directly impacted Plaintiff's ability to communicate with family and friends and politically, including (1) daily communications necessitated by his unquestioned position as head of the Republican Party; (2) campaigning for Republican 2022 candidates; (3) fundraising for the Republican Party; (4) laying a foundation for a potential 2024 Presidential campaign.

## VI. PRESIDENT TRUMP AND THE CLASS DEPLATFORMED

### Plaintiff President Trump

97.     On February 28, 2011, Trump began posting videos titled "From the Desk of Donald Trump," expressing his views on then-current news and various pop culture and political items. There were anywhere from 83-96 videos posted until around 2013.

98.     On March 16, 2015, the new Donald Trump YouTube, the one used until January 12, 2021, was created.

99.      On December 2, 2019, YouTube confirmed it had removed Trump Campaign ads. YouTube prevented President Trump from running a number of ads on its platform during the election. The exact reasons for that decision unclear. As a result, over three hundred (300) ads were taken down.

100.    On January 6, 2021, YouTube removed Plaintiff's video addressing the Capitol attack. The video was removed because Plaintiff allegedly "repeats false information about the outcome of the election." The removal came after YouTube instituted a new policy update in December of 2020 that forbids any type of content that alleges widespread voter fraud impacted the results of the 2020 presidential election.

101.    On January 12,  2021, another upload of Plaintiff to his YouTube channel was taken down. YouTube removed content off of Plaintiff's channel for violating its policies against

inciting violence. Two videos that were on the White House's official YouTube page—one where Plaintiff was speaking to reporters, and another where he was making remarks at the border wall, were both removed.

102.    YouTube also has indefinitely disabled comments on Plaintiff's channel due to "ongoing concerns about violence," which it says it has done in the past to other channels with "safety concerns found in the comments section."

103.    On January 13, 2021, YouTube gave the following statement to Axios, a news organization:

> "After careful review, and in light of concerns about the ongoing potential for violence, we removed new content uploaded to the Donald J. Trump channel and issued a strike for violating our policies for inciting violence," YouTube said in a statement to Axios." As a result, in accordance with our long-standing strikes system, the channel is now prevented from uploading new videos or livestreams for a minimum of seven days—which may be extended."

104.    On January 26, 2021, Google extended the suspension of President Trump's channel. In USA Today, YouTube stated:

> In light of concerns about the ongoing potential for violence, the Donald J. Trump channel will remain suspended… "Our teams are staying vigilant and closely monitoring for any new developments."

105.    The suspension of Plaintiff prevents the uploading of new videos or livestreams to the channel. Comments on the channel, which had nearly 2.8 million subscribers, were also disabled indefinitely.

106.    On February 20, 2021, YouTube deleted a Newsmax interview with President Donald Trump. The video was deleted because it "violated YouTube's community guidelines."

107.    While YouTube's censoring of Plaintiff was the most widely publicized action taken by Defendants, countless other Putative Class Members have had their views or content similarly deplatformed or censored by Defendants for arbitrary reasons or no reason at all.

108.    These Putative Class Members censored by Defendants lost not only a primary means of income but also their ability to access wide-ranging views and content on the most pressing issues of the day.

**B.  Plaintiff Dr. Kelly Victory, M.D.**

109.    Plaintiff, Colleen ("Dr. Victory") Victory is a United States citizen residing in Colorado.

110.    Dr. Victory is a residency-trained trauma and emergency specialist and has worked as a hospital-based physician for more than 15 years.

111.    Dr. Victory subsequently served as the Chief Medical Officer of the company that provided healthcare services for employees (and their families) of multiple Fortune 100 and Fortune 500 companies, including Continental Airlines, Nissan Automotive, Harrah's Entertainment, Gannett-USA Today, Scott's Miracle-Gro, and many others, as well as more than a dozen federal agencies. Plaintiff managed the healthcare services for these companies' employees during the SARS epidemic in 2003 and the Avian Flu epidemic in 2006-2007.  Her specialty work in mass casualty situations includes pandemic planning and response.

112.    Dr. Victory is an alumnus of the National Preparedness Leadership Initiative (NPLI), a combined program of the Harvard School of Public Health and the Kennedy School of Government to train "meta-leaders" for times of national crisis.

24

113.    In June of 2020, Dr. Victory opened an account on the Defendants platform. Dr. Victory's account, Victory Health, Inc., was intended to share information relating to COVID-19 including, video interviews recorded with television stations and other media/reporters.

114.    Dr. Victory's first form of social media censorship took place before she started an account. In April of 2020, Dr. Victory was asked by the Pastor of a large evangelical church in Texas to create a video for his parishioners explaining COVID-19, how to mitigate risks, and to give assurances that once risks were mitigated, it would be safe to attend church services and get children back to school.  The video was filmed and shared by many parishioners.  The video "went viral" and received over 17 million views worldwide in six (6) weeks.  The Defendant, YouTube, started deleting the video from their platforms and sanctioning platform users who posted the entire video or segments of the video.

115.    When Dr. Victory opened her personal account in June of 2020, she posted the video. Within six (6) hours of posting, the Defendants deleted the video. Dr. Victory was sent an email stating that "the video violated community standards."

116.    Despite the strong medical background and extensive experience of Dr. Victory, the Defendants took a position on the novel coronavirus and did not allow professionals in the medical field to discuss the pathophysiology of respiratory viral transmission, the basics of the immune response, the efficacy of face masks, the concept of social distancing, the safety and efficacy of existing medications, or their experience with other pandemics (such as SARS).

117.    The Defendants have also made it clear in their TOS that sharing opinions on the different treatment methods and their success rate would not be tolerated.

**C. Plaintiff Austen Fletcher**

118.   Plaintiff Austen Fletcher ("Mr. Fletcher") is a United States citizen residing in St. Petersburg, Florida.

119.   In 2012, Mr. Fletcher opened a personal YouTube account. In 2017 the Plaintiff created Fleccas Talks, where he regularly posts videos that are conservative-leaning and investigate a wide variety of topics. Fleccas Talks currently has over 569,000 subscribers.

120.   In 2018, the Plaintiff began noticing increased censorship taking place, mostly in the form of demonetization and shadow banning. Many videos were immediately demonetized upon upload.  "Fleccas Talks" demonetizations would sometimes be overturned following an "appeal." By the time monetization was reinstated, the Plaintiff had already accumulated a majority of their views, missing approximately 40-60% of the potential ad revenue. This happened many times between 2018-2021 and allowed YouTube to, in effect, slow down Mr. Fletcher's ability to make money.

121.   "Fleccas Talks" demonetization by Defendants would take his viewership from 50,000-100,000 down to 15,000. When demonetization took place, the Defendants sent a notice that the Plaintiff's account was passing along misinformation.

122.   When the Defendants would shadow ban the Plaintiff's account, they would not notify him, but he knew his post had been manipulated by the Defendant because his viewership decreased.

123.   Mr. Fletcher used the Defendants platform as a way to make an income. Mr. Fletcher lost more than $50,000+ over the course of the past four years due to the biased demonetization.

124.   One example of the biased demonetization that took place against Mr. Fletcher's account is attached:



## Terms and policies  

This video has been removed.
Inappropriate content

### APPEAL

### Ad suitability 💲

This video is running limited or no ads due to content identified as not suitable for most advertisers.
It remains fully playable and is eligible to earn subscription revenue from YouTube Premium.



**Video details**

UNDO CHANGES    SAVE    ⋮

Title (required) ⓘ
ER Physician Debunks the MSM's Corona Narrative and Lockdown

Description ⓘ
PLEASE SHARE THIS VIDEO! This week I attended the open California rally where we heard speeches by Dennis Prager and Dr. Jeff Barke as well as an extended interview with Dr. Simone Gold (MD/Stanford Law). She pushed back on the MSM's fake Corona Virus narrative and explained the effectiveness of hydroxychloroquine.

DR. SIMONE GOLD
There are nearly one MILLION licensed physicians in the country.
Do you REALLY believe there is only ONE opinion?
THOUSANDS of physicians have something to tell you.
AMERICA needs a SECOND opinion.
https://www.adoctoraday.com/
https://twitter.com/drsimonegold
*************************************************

PRAGER U
https://www.prageru.com/coronavirus-series/
https://www.youtube.com/user/PragerUniversity

DR. BARKE
https://twitter.com/RX_forLiberty
https://www.instagram.com/rxforliberty/?igshid=hejv6i26h1ax
**FOR SPEAKING INQUIRIES FOR DR. BARKE CONTACT: AUSTEN@FLECCASTALKS.COM

Keep Fleccas Talks Independent by helping fight demonetization!
Please consider supporting me via the links below. Anything helps!
https://www.paypal.me/fleccastalks
https://venmo.com/fleccas

PATREON (Fleccas Talks: THE SHOW):
www.patreon.com/fleccas

KROCS ON:
https://www.youtube.com/channel/UCyqYFDkLbGfjiw0zPmkIITQ
https://www.instagram.com/krocs_on/

▶  🔊  0:00 / 8:41        ⚙  ⛶

Video link
https://youtu.be/bZVZqspG_2o

Filename
LA OPEN CALIFORNIA PART 2 FLECCAS TALK...

Video quality
SD  HD

Visibility
👁 Removed

Restrictions
Terms and policies

▦ Subtitles

▣ End screen

ⓘ Cards

28



Hi Fleccas Talks,

Our team has reviewed your content, and, unfortunately, we think it violates our **medical misinformation policy**. We've removed the following content from YouTube:

**Video:** dr mccullough youtube 1080



We know that this might be disappointing, but it's important to us that YouTube is a safe place for all. If content breaks our rules, we remove it. If you think we've made a mistake, you can appeal and we'll take another look. Keep reading for more details.

### How your content violated the policy

YouTube doesn't allow claims about COVID-19 vaccinations that contradict expert consensus from local health authorities or the World Health Organization (WHO). Learn more here.

**LEARN MORE**

### How this affects your channel

Your channel now has 1 strike. You won't be able to do things like upload, post, or live stream for 1 week. A second strike will prevent you from publishing content for 2 weeks. Three strikes in the same 90 day period will result in your channel being permanently removed from YouTube.

▶ YouTube

Hi Fleccas Talks,

As you may know, our Community Guidelines describe which content we allow – and don't allow – on YouTube. Your video ER Physician Debunks the MSM's Corona Narrative and Lockdown was flagged to us for review. Upon review, we've determined that it violates our guidelines and we've removed it from YouTube.

We know that this might be disappointing, but it's important to us that YouTube is a safe place for all. If content breaks our rules, we remove it. If you think we've made a mistake, you can appeal and we'll take another look. Keep reading for more details.

**Video content restrictions**

YouTube doesn't allow content that encourages or promotes violent or dangerous acts that have an inherent risk of serious physical harm or death. We also don't allow content that appears to be posted in a shocking, sensational, or disrespectful manner.

The only depictions of such activities that we may allow need to be educational or documentary in nature and shouldn't be designed to help or encourage others to imitate them. When uploading a video, make sure to post as much information as possible in the title and description to help us and your viewers understand the primary purpose of the video. Learn more here.

**Impact on your account**

This removal has **not** resulted in a Community Guidelines strike or penalty on your account. However, we still encourage you to review all of your content to make sure it's in line with our Community Guidelines. Additional violations could result in strikes against your account, or even lead to account termination.

**How you can respond**

If you believe this was a mistake, we'd like to hear from you. To appeal this removal, please submit this form. Our team will thoroughly review your appeal and will contact you again soon.

Sincerely,
- The YouTube Team

Help center • Email options • Report spam

©2020 YouTube, LLC 901 Cherry Ave, San Bruno, CA 94066, USA



Hi Fleccas Talks,

As you may know, our Community Guidelines describe which content we allow – and don't allow – on YouTube. Your video Doctors Break Down COVID Response and the Demonization of HCQ | DOCTORS TELL ALL was flagged to us for review. Upon review, we've determined that it violates our guidelines and we've removed it from YouTube.

We know that this might be disappointing, but it's important to us that YouTube is a safe place for all. If content breaks our rules, we remove it. If you think we've made a mistake, you can appeal and we'll take another look. Keep reading for more details.

**Video content restrictions**

YouTube doesn't allow content that explicitly disputes the efficacy of local health authorities' or World Health Organization (WHO) guidance on social distancing and self isolation that may lead people to act against that guidance. Learn more here.

**Impact on your account**

This removal has **not** resulted in a Community Guidelines strike or penalty on your account. However, we still encourage you to review all of your content to make sure it's in line with our Community Guidelines. Additional violations could result in strikes against your account, or even lead to account termination.

**How you can respond**

If you believe this was a mistake, we'd like to hear from you. To appeal this removal, please submit this form. Our team will thoroughly review your appeal and will contact you again soon.

Sincerely,
- The YouTube Team

Help center • Email options

©2020 YouTube, LLC 901 Cherry Ave, San Bruno, CA 94066, USA

125.   Besides demonetization, the plaintiff also had multiple videos removed entirely. These were opinions on COVID-19, the lockdown, and the vaccine from world-renowned doctors. This not only affected the monetization of Mr. Fletcher's content, but it also affected his credibility and reputation by removing the videos above and deeming them "misinformation" even though the information presented in the videos was eventually proven to be true. One of the removals resulted in the Plaintiff's channel receiving a strike, resulting in a one (1) week ban

from posting. Mr. Fletcher was not expressing his views on COVID-19 in these videos. Instead, it was the doctors whom he interviewed expressing their expert views.

## COUNT ONE

## VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION

126.    Plaintiff restates the allegations set forth in 1-125.

127.    Pursuant to Section 230, Defendants are encouraged and immunized by Congress to censor constitutionally protected speech on the Internet, including by and among its approximately 2.3 billion users that are citizens of the United States.

128.    Using its authority under Section 230 together and in concert with other social media companies, the Defendants regulates the content of speech over a vast swath of the Internet.

129.    Defendants are vulnerable to and react to coercive pressure from the federal government to regulate specific speech.

130.    In censoring the specific speech at issue in this lawsuit and deplatforming Plaintiff, Defendants were acting in concert with federal officials, including officials at the CDC and the (Biden) White House.

131.    As such, Defendants' censorship activities amount to state action.

132.    Defendants' censoring the Plaintiff's YouTube channel, as well as those Putative Class Members, violates the First Amendment to the United States Constitution because it eliminates the Plaintiffs and Class Member's participation in a public forum and the right to communicate to others their content and point of view.

133.    Defendants' censoring of the Plaintiff and Putative Class Members from their YouTube channels violates the First Amendment because it imposes viewpoint and content-

based restrictions on the Plaintiffs' and Putative Class Members' access to information, views, and content otherwise available to the general public.

134.   Defendants' censoring of the Plaintiff and Putative Class Members violates the First Amendment because it imposes a prior restraint on free speech and has a chilling effect on social media Users and non-Users alike.

135.   Defendants' blocking of the Individual and Class Plaintiffs from their YouTube channels violates the First Amendment because it imposes a viewpoint and content-based restriction on the ability of the Plaintiff and Putative Class Members to petition the government for redress of grievances.

136.   Defendants' censorship of the Plaintiff and Putative Class Members from their channels violates the First Amendment because it imposes a viewpoint and content-based restriction on their ability to speak and the public's right to hear and respond.

137.   Defendants' blocking the Plaintiff and Putative Class Members from their Facebook accounts violates their First Amendment rights to free speech.

138.   Defendants' censoring of Plaintiff by banning Plaintiff from his YouTube channel while exercising his free speech as President of the United States was an egregious violation of the First Amendment.

139.   Defendant Pichai is sued in his personal capacity and is liable in damages because he was personally responsible for YouTube's unconstitutional censorship of the Plaintiff and the Putative Class Members, including YouTube's deplatforming of Plaintiff and other Putative Class Members.

140.   Defendant Pichai is also sued in his official capacity, along with YouTube itself, for injunctive relief to and for the unconstitutional censorship of the Plaintiff and Putative Class Members, including YouTube's deplatforming of Plaintiff and other Putative Class Members.

**COUNT TWO**

**DECLARATORY JUDGEMENT OF UNCONSTITUTIONALITY OF SECTION 230
AND THE COMMUNICATIONS DECENCY ACT**

141.    Plaintiff reinstates the allegations set forth in 1-140.

142.    In censoring (flagging, demonetizing, etc.) Plaintiff and the Class, Defendants

relied upon and acted pursuant to Section 230 of the Communications Decency Act.

143.    Defendants would not have deplatformed Plaintiff or similarly situated Putative

Class Members but for the immunity purportedly offered by Section 230.

144.    Section 230(c)(2) purports to immunize social media companies from liability for

action taken by them to block, restrict, or refuse to carry "objectionable" speech even if that

speech is "constitutionally protected."  47 U.S.C. § 230(c)(2).

145.    In addition, Section 230(c)(1) also has been interpreted as furnishing an additional

immunity to social media companies for action taken by them to block, restrict, or refuse to carry

constitutionally protected speech.

146.    Section 230(c)(1) and 230(c)(2) were deliberately enacted by Congress to induce,

encourage, and promote social medial companies to accomplish an objective—the censorship of

supposedly "objectionable" but constitutionally protected speech on the Internet—that Congress

could not constitutionally accomplish itself.

147.    Congress cannot lawfully induce, encourage, or promote private persons to

accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 US

455, 465 (1973).

148.    Section 230(c)(2) is therefore unconstitutional on its face, and Section 230(c)(1) is

likewise unconstitutional insofar as it has been interpreted to immunize social media companies

for action they take to censor constitutionally protected speech.

149.   Section 230(c)(2) on its face, as well as Section 230(c)(1) when interpreted as described above, are also subject to heightened First Amendment scrutiny as content- and viewpoint-based regulations authorizing and encouraging large social media companies to censor constitutionally protected speech on the basis of its supposedly objectionable content and viewpoint. *See Denver Area Educational Telecommunications Consortium, Inc. v. FCC*, 518 U.S. 727 (1996).

150.   Such heightened scrutiny cannot be satisfied here because Section 230 is not narrowly tailored, but rather a blank check issued to private companies holding unprecedented power over the content of public discourse to censor constitutionally protected speech with impunity, resulting in a grave threat to the freedom of expression and to democracy itself; because the word "objectionable" in Section 230 is so ill-defined, vague and capacious that it results in systematic viewpoint-based censorship of political speech, rather than merely the protection of children from obscene or sexually explicit speech as was its original intent; because Section 230 purports to immunize social media companies for censoring speech on the basis of viewpoint, not merely content; because Section 230 has turned a handful of private behemoth companies into "ministries of truth" and into the arbiters of what information and viewpoints can and cannot be uttered or heard by hundreds of millions of Americans; and because the legitimate interests behind Section 230 could have been served through far less speech-restrictive measures.

151.   Accordingly, Plaintiff, on behalf of himself and the Class, seeks a declaration that Section 230(c)(1) and (c)(2) are unconstitutional insofar as they purport to immunize from liability social media companies and other Internet platforms for actions they take to censor constitutionally protected speech.

## CLASS ACTION ALLEGATIONS

152.    Plaintiff and the Class brings this lawsuit pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure on behalf of the following proposed class (the "Class"):

*All YouTube platform Members who reside in the United States, and between June 1, 2018, and today, had their access to their social media accounts wrongly restricted or curtailed by these Defendants and who were damaged thereby.*

153.    Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint.

154.    Specifically excluded from the Class are Defendants, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or any entities controlled by defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

155.    *Numerosity*. The Members of the Class are so numerous that individual joinder is impracticable. Upon information and belief, Plaintiff and the Class alleges that the Class contains hundreds of thousands of Members. Although the precise number of Putative Class Members is unknown to Plaintiff and the Class, the true number of Putative Class Members is known by defendants, and thus, may be notified of the pendency of this action by first class mail, electronic mail, social media, and/or published notice.

156.   ***Existence and predominance of common questions of law and fact***. Common

questions of law and fact exist as to all Members of the Class and predominate over any

questions affecting only individual Putative Class Members. These common legal and factual

questions include, but are not limited to, the following:

(a)whether  the Defendant's conduct violated the First Amendment of the Constitution of

the United States

(b) whether Section 230 is an unconstitutional delegation of power Congress cannot

exercise.

(c)  whether the Defendants conduct violates any other state or federal statutes.

157.   ***Typicality***.  Plaintiff and the Class's claims are typical of the claims of the other

Members of the Class in that Defendants arbitrarily prevented Plaintiff and the Class and

Putative Class Members from using their social media accounts or curtailed or limited Plaintiff

and the Class and the Class' use of their accounts to inhibit or prevent Plaintiff and the Class

from engaging in speech that Defendants disliked or contrary to Defendants' opinions or beliefs,

in violation of the First Amendment of the U.S. Constitution.

158.   ***Adequacy of representation***. Plaintiff and the Class will fairly and adequately

protect the interests of the Class. Plaintiff and the Class have retained counsel highly experienced

in complex consumer class action litigation, and Plaintiff and the Class intend vigorously to

prosecute this action. Further, Plaintiff and the Class have had no interests that are antagonistic to

those of the Class.

159.   ***Superiority***. A class action is superior to all other available means for the fair and

efficient adjudication of this controversy. The damages or other financial detriment suffered by

individual Putative Class Members is relatively small compared to the burden and expense that

would be entailed by individual litigation of their claims against Defendant. It would thus be

virtually impossible for the Class, on an individual basis, to obtain effective redress for the wrongs committed against them. Furthermore, even if Putative Class Members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court and presents no unusual management difficulties under the circumstances here.

89.    The Class may also be certified because:

(a)    the prosecution of separate actions by individual Putative Class Members would create
a risk of inconsistent or varying adjudication with respect to individual Putative Class Members that would establish incompatible standards of conduct for the Defendant;

(b)    the prosecution of separate actions by individual Putative Class Members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the  interests of other Putative Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c)    Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the Members of the Class as a whole.

## DEMAND FOR JURY TRIAL

90.    Plaintiff and the Class demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Donald J. Trump and the Class respectfully requests that the Court enter an Order certifying this case as a class action, appointing Plaintiff as Class Representative and appointing Plaintiff's counsel as Lead Class Counsel and that the Court Order, adjudge, and decree in favor of Plaintiff and the Class against the Defendants for:

A. An award of Compensatory and Punitive damages to the Plaintiff and the Class in an amount to be determined at trial;

B. An injunction and declaratory judgment ordering YouTube to immediately reinstate access of Plaintiff and Putative Class Members to their YouTube account;

C. An injunction and declaratory judgment ordering YouTube to remove its warning labels and misclassification of all content of the Plaintiff and the Class and to desist from any further warnings or classifications;

D. Adjudgment declaring Sections 230(c)(1) and (c)(2) of the Communications Decency Act of 1996 unconstitutional;

E. An award of attorneys' fees and costs to Plaintiff and the Class in an amount to be determined at trial; and

F. An award of punitive damages to Plaintiff and the Class in an amount to be determined at trial.

G. An award of such other and further relief as the Court may deem just and proper.

Date: July 7, 2021

*/s/ Matthew Lee Baldwin*
Matthew L. Baldwin, Esq.
Florida Bar No. 27463

VARGAS GONZALEZ
BALDWIN DELOMBARD, LLP
815 Ponce De Leon Blvd.,
Third Floor
Coral Gables, FL  33134
Tel: 305.631.2528
E-mail: Matthew@VargasGonzalez.com
E-service: Service8@VargasGonzalez.com


JOHN P. COALE
(*Pro Hac Forthcoming*)
2901 Fessenden St. NW
Washington, D.C.  20008
johnpcoale@aol.com
Telephone: (202) 255-2096

THE DUDENHEFER LAW FIRM L.L.C
FRANK C. DUDENHEFER, JR.
(*Pro Hac Vice Forthcoming*)
fcdlaw@aol.com
2721 St. Charles Ave, Suite 2A
New Orleans, LA  70130
Telephone: (504) 616-5226


IVEY, BARNUM & O'MARA
JOHN Q. KELLY
(*Pro Hac Vice Forthcoming*)
jqkelly@ibolaw.com

MICHAEL J. JONES
(*Pro Hac Vice Forthcoming*)
mjones@ibolaw.com

ROLAND A. PAUL
(*Pro Hac Vice Forthcoming*)
rpaul@ibolaw.com

RYAN S. TOUGIAS
(*Pro Hac Vice Forthcoming*)
rtougias@ibolaw.com

SEAN M. HAMILL
(*Pro Hac Vice Forthcoming*)
shamill@ibolaw.com

170 Mason Street
Greenwich, CT  06830
Telephone: (203) 661-6000
Facsimile: (203) 661-9462