**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

|  |  |
|---|---|
| DONALD J. TRUMP, the Forty-Fifth President of the United States, KELLY VICTORY, AUSTEN FLETCHER, AMERICAN CONSERVATIVE UNION, ANDREW BAGGIANI, MARYSE VERONICA JEAN-LOUS, NAOMI WOLF, AND FRANK VALENTINE INDIVIDUALLY AND ON BEHALF OF THOSE SIMILARLY SITUATED,<br><br>Plaintiffs,<br><br>v.<br><br>YOUTUBE, LLC., and SUNDAR PICHAI,<br><br>Defendants. | Civil Action No. 1:21-cv-22445-KMM-LFL<br><br>**AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>**FIRST AMENDMENT VIOLATION**<br><br>**DECLARATORY JUDGEMENT OF UNCONSTITUTIONALITY OF**<br><br>**SECTION 230 AND THE COMMUNICATIONS DECENCY ACT**<br><br>**FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLORIDA STATUTES § 501.201 et seq. (INJUNCTIVE RELIEF, FLORIDA STATUTES § 501.211(1))**<br><br>**FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLORIDA STATUTES § 501.201 et seq. (INCONSISTENT APPLICATION OF STANDARDS, FLORIDA STATUTES § 501.2041)**<br><br>**JURY TRIAL REQUESTED** |

**<u>AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF</u>**

Plaintiff, Donald J. Trump, the Forty-Fifth President of the United States, and Putative Class Members Kelly Victory, Austen Fletcher, American Conservative Union, Naomi Wolf, Alex Berrara, Amparo Ochoa O'Connell, Andrew Baggiani, Frank Valentine, Maryse Veronica Jean-Louis individually, and on behalf of those similarly situated, pursuant to Fed. R. Civ. P. 15(a)(1)(A), files this Amended Complaint as a matter of right prior to service of the Complaint [D.E. 1], and states:

## **INTRODUCTION**

1.      Plaintiff, Donald J. Trump, the Forty-Fifth President of the United States, and Putative Class Members Kelly Victory, Austen Fletcher, American Conservative Union, Naomi Wolf, Alex Berrara, Amparo Ochoa O'Connell, Andrew Baggiani, Frank Valentine, Maryse Veronica Jean-Louis individually, and on behalf of those similarly situated, by and through the undersigned counsel, brings this action against Defendant YouTube, LLC ("YouTube"), and Defendant Sundar Pichai ("Pichai"), the Chief Executive Officer of Google, Inc. ("Google") and Alphabet, Inc. ("Alphabet"). The allegations herein of Plaintiff and the Putative Class Members are based upon personal knowledge and belief as to their own acts, upon the investigation of their counsel, and upon information and belief as to all other matters.

2.      YouTube has accumulated an unprecedented concentration of power, market share, and ability to dictate our nation's public discourse. YouTube's owner is Alphabet, which is also the parent company of Google. YouTube ranks second in global engagement behind Facebook, Inc., and is one of the largest and most popular video distribution platforms on the Internet. It has more than four (4) billion hours of video views every month, and an estimated five hundred (500) hours of video content are uploaded to YouTube every minute.

3.       YouTube has increasingly engaged in impermissible censorship in response to coercive measures of congressional legislators and the Executive Branch, a misguided reliance upon Section 230 of the Communications Decency Act of 1996, 47 U.S.C. § 230, and willful participation in joint activity with federal actors. Defendant YouTube's status regarding the regulation of speech thus rises beyond that of a private company to that of a state actor. As such, Defendant is constrained by the First Amendment right to free speech in the censorship decisions it makes regarding its Users.

4.       Legislation passed twenty-five (25) years ago intended to protect minors from the transmission of obscene materials on the Internet, and to promote the growth and development of Internet companies, has enabled YouTube to grow into a commercial giant that now censors (flags, demonetizes, bans, etc.) and otherwise restricts with impunity the constitutionally protected free speech of the Plaintiff and the Putative Class Members.

5.       The immediacy of Defendants' threat to their Users' and potentially every citizen's right to free speech cannot be overstated. Defendants' callous disregard of its Users' constitutional rights is no better exemplified than in the matter currently before the Court.

6.       On January 12, 2021, Defendants indefinitely banned the sitting President of the United States from their platform for exercising his constitutional right to free speech on his YouTube channel.

7.       The Plaintiff was banned by YouTube, as were the Putative Class Members, using non-existent or broad, vague, and ever-shifting standards. While YouTube's ban and prior restraint of the Plaintiff are well-documented, the untold stories of the Putative Class Members are now stirring the public conscience.

8.      Using the unconstitutional authority delegated to them by Congress, Defendants have also mounted an aggressive campaign of censorship against a multitude of the Putative Class Members through censorship (flagging, demonetizing, banning, etc.) resulting from legislative coercion and collusion with federal actors

9.      Defendants de-platformed the Plaintiff, and the Putative Class Members, at the behest of, in cooperation with, and the approval of, Democrat lawmakers.

10.     Akin to forcing a round peg into a square hole, YouTube declared that specific uploads of the Plaintiff's speech violated YouTube's self-imposed "Community Guidelines." Countless other YouTube Users that have been banned have not been as fortunate, with YouTube taking detrimental action against their entire video libraries with no explanation whatsoever.

11.     If Defendants can effectively censor and impose a prior restraint on the protected political speech of a sitting President of the United States, then the threat to the Putative Class Members, our citizens, and our United States Constitution is imminent, severe, and irreparable.

12.     The Plaintiff respectfully asks this Court to declare that Sections 230(c)(1) and (c)(2) of the Communications Decency Act of 1996 are an unconstitutional delegation of authority on their face and as applied in the instant matter and that the Defendants' actions directed at the Plaintiff and the Putative Class Members are a prior restraint on their First Amendment right to free speech. The Plaintiff also respectfully asks the Court to order the Defendants to restore the Plaintiff's access to his YouTube channel, as well as those de-platformed Putative Class Members, and to prohibit Defendants from exercising any censorship or prior restraint in its many forms over the speech uploaded by the Plaintiff or the Putative Class Members.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 1332, 28 U.S.C. §§ 2201-2202.

14.     Jurisdiction is also proper in this Court pursuant to the Class Action Fairness Act 28 U.S.C. § 1332(d) ("CAFA"), because: (i) the proposed class consists of well over one (1) million Members; (ii) the Members of the proposed Class, including the Plaintiff, are citizens of states different from Defendants' home states; and (iii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

15.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2), (d), and (e)(1). A substantial part of the events giving rise to this claim occurred in this District, and the Plaintiff brings this suit for actions taken by Defendants that occurred while the Plaintiff was serving in his capacity as President of the United States. Also, the Defendants' prior restraint of the Plaintiff's and the Putative Class Members' speech continues to this day.

## PARTIES

### A.     Plaintiff And The Putative Class Members

16.     Donald J. Trump ("Plaintiff"), the Forty-Fifth President of the United States, is a private citizen and is domiciled in Palm Beach, Florida.

17.     Putative Class Member Andrew Baggiani is a United States citizen residing in Venice, Florida.

18.     Putative Class Member Maryse Veronica Jean-Louis is a United States citizen residing in Miami-Dade County, Florida.

19.     Putative Class Member Dr. Naomi Wolf is a United States citizen residing in Millerton, New York.

20.     Putative Class Member Frank Valentine is a United States citizen residing in Lee County, Florida.

21.     Putative Class Member Colleen Victory is a United States citizen, is domiciled in the state of Colorado.

22.     Putative Class Member Austen Fletcher is a United States citizen, is domiciled in the state of Florida.

23.     Putative Class Member American Conservative Union ("ACU") is a social welfare organization organized under section 501(c)(4) of the Internal Revenue Code and was established in 1964 in the District of Columbia.

24.     Putative Class Member Alex Barerra is a United States citizen, domiciled in Miami-Dade County, state of Florida.

25.     Putative Class Member Amparo Ochoa O'Connell is a United States citizen, domiciled in Miami-Dade County, state of Florida.

**B.     The Class**

26.     All YouTube platform Users ("The Class") who have resided in the United States between June 1, 2018, and today that had their YouTube channels censored by Defendants and were damaged thereby.

**C.     Defendants**

27.     Defendant YouTube is a foreign limited liability company and a wholly-owned subsidiary of Google and Alphabet, with its principal place of business located at 901 Cherry Avenue, San Bruno, California, and conducts business in the State of Florida, throughout the United States, and internationally.

28.     Defendant Pichai is the Chief Executive Officer of Google and Alphabet and is responsible for the acts alleged herein of YouTube.

**STATEMENT OF FACTS**

I.      **DEFENDANTS YOUTUBE AND PICHAI**

   A. **Defendant YouTube**

29.     YouTube was conceived as a dating site but quickly became a video streaming service.  The website went live in 2005 and had its first one (1) million videos viewed that same year.

30.     By 2006, YouTube was one of the fastest-growing websites on the Internet.  In less than one year, the platform went from 4.9 million to 19.6 million Users.  In October of 2006, Google acquired YouTube for $1.65 billion.

31.     Since 2006, YouTube has operated as a wholly-owned subsidiary of Google and Alphabet.

32.     YouTube allows Users to create channels and upload content. A YouTube channel is visible to both YouTube Users and the general public. Users are encouraged to subscribe to YouTube channels and receive updates when new videos are posted. Users may post comments to the videos and engage in discussions with other commentators over the content of the videos. Content on YouTube varies from short clips to long-form programs.

33.     YouTube uses machine learning technologies to read and understand text to gauge and evaluate comments/responses to uploads. YouTube uses User comments as input to extract insight on brands, creators, actors, themes, and products.

34.     YouTube can also define sub-divisions of Users (i.e., religious, women, military, race) to measure sentiment/responses to given uploaded videos.

35.     As of 2018, YouTube's estimated value was $160 billion.

36.     YouTube's mission statement, as stated on its website, is to "give everyone a voice and show them the world." It believes that "everyone deserves to have a voice, and that the world is a better place when we listen, share and build community through our stories."

37.     In order to ensure that YouTube's mission is protected, YouTube has a set of "Community Guidelines" referred to in its Terms of Service ("TOS"). These "Community Guidelines" are said to apply to all types of content on the platform, including videos, comments, links, and thumbnails.

38.     YouTube's Community Guidelines regarding hate speech, incitement, or praise of violence are vague, broad, ill-defined, or not defined at all.

39.     YouTube's Community Standards Guidelines on Hate Speech provide:

Hate speech is not allowed on YouTube. We remove content promoting violence or hatred against individuals or groups based on any of the following attributes: Age, Caste, Disability, Ethnicity, Gender Identity and Expression, Nationality, Race, Immigration Status, Religion, Sex/Gender, Sexual Orientation, Victims of a major violent event and their kin, Veteran Status.

40.     YouTube's Community Guidelines on Incitement of Violence provide:

Violent or gory content intended to shock or disgust viewers is not allowed on YouTube. Also, content that encourages others to commit violent acts is not allowed….
What this Policy means for you… If you're posting content, Violent acts:

- Inciting others to commit violent acts against individuals are a defined group of people…

- Encouraging others to go to a particular place to commit violence, to perform violence at a particular time.

- Targeting specific individuals or groups with violence.

- Beatings or brawls outside the context of professional or professionally supervised sporting events.

- Fights involving minors.

- Actual school yard fights between minors. We may allow content if minors are pretend fighting and that is evident to viewers.

41.     For any User that violates YouTube's "Community Guidelines," there is a Strike/Enforcement Policy. One strike means a User will not be able to upload speech of content for one (1) week.

42.     If a second strike is issued for a violation within the same ninety (90) day period as a User's first strike, the User will not be allowed to upload speech or content for two (2) weeks. If there are no further issues, full privileges will be restored automatically after the two (2) week period. Each strike will not expire until ninety (90) days from the time it was issued.

43.     If a third strike is issued within the same ninety (90) day period, a User's channel is permanently removed from YouTube.

44.     Content may be removed for reasons other than Community Guidelines violations, e.g.,  a first-party privacy complaint or a Court order. In those cases, the uploader does not get a strike.

45.     YouTube also has an elaborate account termination policy for Users who fail to observe its Terms of Service and Community Guidelines. It states that "A YouTube channel is terminated if it accrues three Community Guidelines strikes in 90 days, has a single case of

severe abuse (such as predatory behavior), or is determined to be wholly dedicated to violating our guidelines (as is often the case with spam accounts)." When a User's channel is terminated, all of its videos are removed.

## B. Defendant Sundar Pichai

46.     Defendant Pichai is the Chief Executive Officer of Google and the Chief Executive Officer of Alphabet, the parent company of Google.

47.     Defendant Pichai exercises control over and implementation of the content and policy of YouTube and has spoken on behalf of and represented YouTube at congressional hearings on social media issues.

## II.  PLAINTIFF'S USE OF YOUTUBE CHANNEL

### A.  The Donald J. Trump YouTube Channel

48.     Plaintiff established his official YouTube channel in May of 2015 and initially used the channel to engage with the general public. After he announced his campaign for the presidential nomination of the Republican Party, the Plaintiff used his YouTube channel to campaign, addressing his followers and the public at large. By using social media, including YouTube, Plaintiff strategically circumvented what he saw as a mainstream media that was biased against his candidacy.

49.     The Plaintiff used YouTube significantly during his campaign for the presidency in 2016 and 2020.

50.     The Plaintiff's campaign launched "Trump War Room" as an online YouTube channel during the pandemic because Coronavirus safety restrictions prevented the President from having campaign rallies. The Trump War Room YouTube site included news and updates from his presidential campaign.

51.     The Plaintiff used online and digital strategies as a key component of his campaign, especially YouTube.

52.     After his inauguration as President in January of 2017, the Plaintiff's YouTube channel became an instrument of his presidency. By virtue of how he used his channel, the Plaintiff's messages became an important source of news and information about the government, as did his followers' comments associated with the Plaintiff's posts. The Plaintiff's channel became a public forum for speech by, to, and about government policy.

53.     No User was denied access to the Plaintiff's channel, no comments on the Plaintiff's uploads were deleted or censored in any way, and the public at large had access to the uploads.

54.     The Plaintiff used YouTube for both big and small announcements. He wanted to keep the public informed about his actions, statements, policies, positions, etc., as President.  For example, the screen capture below shows videos and content uploaded to the Plaintiff's YouTube User page in 2017, while he was the sitting President of the United States:



55.     When the Plaintiff utilized his YouTube channel in his official capacity as President: (a) it became an important outlet for news organizations and the U.S. government; and (b) his YouTube account operated as a public forum, serving a public function.

56.     The comments generated by the Plaintiff's YouTube uploads also gave rise to important public discussion and debate about government policy. Typically, his uploads would generate thousands of replies posted by other Users, some of which would generate hundreds or thousands of replies in turn. Plaintiff's channel was a digital town hall in which the President of the United States communicated news and information to the public directly. Users would

employ the comment function to respond directly to Plaintiff and his office and to exchange views with one another.

57.    The Plaintiff used YouTube and other social media platforms to communicate directly with American citizens more than any other President in history.

58.    Not only were the Plaintiff's YouTube uploads accessible to his subscribers, but other members of the public could, and did, access his posts at any time on the Internet.

59.    The Putative Class Members used their YouTube channels to share information, opinions, and news with their network ranging from family and friends to larger public audiences.

60.    The Putative Class Members can monetize their YouTube channels, and some depend on income generated from subscribers for a living. Censorship actions taken by YouTube against the Putative Class Members resulted in financial damages for those Putative Class Members.

61.    Independent journalist and activist Luke Rudkowski, who runs WeAreChange, told The Daily Caller that hundreds of his videos were demonetized by YouTube in a single day on August 10, 2017, effectively killing his ability to earn a living on YouTube:

> Having had 660 of my videos demonetized in one day left me a little stunned since this is the core for my income but left me with the impression that this was done on purpose . . . [T]his was videos from years ago predominately targeting the most viewed videos which has eviscerated my income."

62.    Google, on behalf of YouTube, issued a warning on June 16, 2020, to The Federalist, a web magazine, over comments on articles related to recent protests. In an email on June 15, 2020, a Google spokesperson said that it demonetized the channels after determining they violated its policies on content related to race.

We have strict publisher policies that govern the content ads can run on and explicitly prohibit derogatory content that promotes hatred, intolerance, violence or discrimination based on race from monetizing . . . . When a page or site violates our policies, we take action. In this case, we've removed both sites' ability to monetize with Google.

### III. DEMOCRAT LEGISLATORS COERCED DEFENDANTS TO CENSOR THE PLAINTIFF AND PUTATIVE CLASS MEMBERS

63.     Democrat legislators feared the Plaintiff's skilled use of social media as a threat to their own re-election efforts. These legislators exerted overt coercion of both the Plaintiff and the Putative Class Members, using both words and actions, to have Defendants censor the views and content with which Democrat Members of Congress disagreed.

64.     Not only did Democrat legislators openly voice their displeasure with Defendants for providing a platform to the Plaintiff and the Putative Class Members, but they also spoke publicly of the steps they would take against Defendants if they continued to provide a platform for the expression of views and content contrary to the legislators' own agendas.

65.     Legislators (and in one instance Michelle Obama, the former First Lady) made it increasingly clear that they wanted the Plaintiff and the Putative Class Members, and the views and content they espoused, to be banned from social media, including Defendants' platform.

66.     Democrat legislators then threatened to revoke the unconstitutional limited immunity for "good faith" censorship under Section 230 and coerced Defendants to act as their agent to exercise content and viewpoint censorship against the Plaintiff and the Putative Class Members that the Democrat legislators knew they could not accomplish on their own.

67.     Below are some examples of Democrat legislators threatening new regulations, antitrust breakup, and removal of Section 230 immunity for Defendants and other social media platforms if YouTube did not censor views and content with which these Members of Congress disagreed, including the views and content of the Plaintiff and the Putative Class Members:

- "But I do think that for the privilege of 230, there has to be a bigger sense of responsibility on it. And it is not out of the question that that could be removed." (Rep. Nancy Pelosi, Speaker of the House, April 12, 2019);

- "The idea that it's a tech company is that Section 230 should be revoked, immediately should be revoked, number one. For Zuckerberg and other platforms." (Joe Biden, Interview in December of 2019, and published January 2020);

- "We can and should have a conversation about Section 230. – and the ways in which it has enabled platforms to turn a blind eye as their platforms are used to . . . enable domestic terrorist groups to organize violence in plain sight." (Statement of U.S. Sen. Mark Warner on Section 230 Hearing on October 28, 2020);

- "It's long past time to hold the social media companies accountable for what's published on their platforms." (Bruce Reed, Biden's Top Tech Advisor, December 2, 2020);

- "Hey @jack (Jack Dorsey) Time to do something about this Tweet." [picture of Donald Trump Tweet] (Sen. Kamala Harris' Tweet, October 2, 2019);

- 2020 Presidential candidate Sen. Kamala Harris calls on Twitter to suspend President Trump's account – (ABCNews.go.com, October 2, 2019);

- If the president goes on Facebook and encourages violence, that you will make sure your company's algorithms don't spread that content and you will immediately remove those messages? (Sen. Markey on October 28, 2020, Zuckerberg Senate Testimony);

- "Senator, yes. Incitement of violence is against our policy and there are not exceptions to that, including for politicians." (Mark Zuckerberg response, November 17, 2020, Mark Zuckerberg and Jack Dorsey, Senate Tech Hearing);

- "…Daily, the president shocks our conscience and shakes the very foundations of our democracy using a powerful megaphone, social media. The President has used this microphone to spread vicious falsehoods and an apparent attempt to overturn the will of voters… Now, Mr. Zuckerberg and Mr. Dorsey, you have built terrifying tools of persuasion and manipulation with power far exceeding the robber barons of the last Gilded Age." (Sen. Blumenthal (13:35) October 23, 2020: Tech CEOs' Senate Testimony);

- I have urged, in fact, a breakup of tech giants because they've misused their bigness and power. And indeed Section 230 reform, meaningful reform, including even possible repeal in large part because their immunity is way too broad and victims of their harms deserve a day in Court. (Sen. Blumenthal (14:48) October 23, 2020: Tech CEOs' Senate Testimony);

- "Now is the time for Silicon Valley companies to stop enabling this monstrous behavior and go even further than they have already by permanently banning this man (Trump) from their platforms.  (Michelle Obama on Twitter, January 7, 2021);

- "The law (230) acts as a shield allowing them (Internet platforms) to turn a blind eye.  The SAFE TECH ACT brings 230 into the modern age and makes platforms accountable for the harm they cause."  (Sen. Mazie Hirono's Tweet, February 5, 2021);

- Before a joint hearing of the Communications and Technology Subcommittee in March of 2021, the following statement was issued by the respective Democrat Chairmen. "This hearing will continue the Committee's work of holding online platforms accountable for the growing rise of misinformation and disinformation.  Industry self-regulation has failed.  We must begin the work of changing incentives driving social media companies to allow and even promote misinformation and disinformation;" and

- "There's no Constitutional protection for using social media to incite an insurrection.  Trump is willing to do anything for himself no matter the danger to our country.  His big lies have cost America dearly.  And until he stops, Facebook must ban him.  Which is to say, forever."  (Rep. Adam Schiff's Tweet, May 5, 2021).

68.     Democrat legislators not only voiced their threats (e.g., new regulations and removing Section 230 immunity) to social media platforms, but they also employed additional measures to deliver their unmistakable message that they were prepared to act against the social media platforms if Defendants did not increase their censorship of disfavored views and content of the Plaintiff and the Putative Class Members.

69.     These additional measures included convening public hearings, issuing subpoenas, dragging in the CEOs of the largest social media companies to testify publicly before Congress, and subjecting those CEOs to lengthy, embarrassing questioning.

70.     Upon information and belief, Democrat legislators knew or had reason to know that implicit or express coercion of one of the largest social media platforms would be perceived as a threat against all of the large social media platforms.

71.     Some specific examples of these coercive actions that were exerted on Defendants:

On July 29, 2020, Four Big Tech CEOs testified before the House in an antitrust hearing. Amazon Founder and CEO Jeff Bezos, Facebook Founder and CEO Mark Zuckerberg, Apple CEO Tim Cook, and Defendant Pichai attempted to defend their companies against accusations of anticompetitive practices. (Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google | U.S. House of Representatives Judiciary Committee); and

On October 23, 2020, Mark Zuckerberg  Testified on Facebook Cryptocurrency Libra and was Confronted on Child Exploitation on Facebook. (Zuckerberg Testifies on Facebook Cryptocurrency Libra | October 23, 2019); and

On November 17, 2020, Facebook CEO Mark Zuckerberg and Twitter CEO Jack Dorsey testified before the Senate Judiciary Committee on November 17. They were questioned on speech moderation policies. (Censorship, Suppression, and the 2020 Election | Hearings | November 17, 2020); and

On March 25, 2021, Facebook's Mark Zuckerberg, Twitter's Jack Dorsey, and Defendant Pichai appeared virtually before the House Energy and Commerce Committee. (House Hearing on Combating Online Misinformation and Disinformation | March 25, 2021).

72.     With this coercion applied on YouTube by repeatedly requiring appearance at hearings, and reinforcing their ability to impose regulations on YouTube, and strip it of its Section 230 immunity, Democrat legislators intended to force Defendants into permanently banning the Plaintiff's access to his YouTube channel, to his subscribers, and the public at large. The other intended result of the legislators' coercion was to deny the Putative Class Members and the public access to the Plaintiff's content and views.

73.     The coercive message conveyed by Democrat legislators to Defendants was clear: ban the Plaintiff and those Putative Class Members who uploaded content and views contrary to those legislators' preferred points of view or risk losing the competitive protections of Section 230 that were granted by Congress and could be removed by Congress, along with the tens of billions of dollars of market share that came with it.

74.     The legislators who pressured Defendants to censor the Plaintiff, and the Putative Class Members who supported the Plaintiff's views, employed social media themselves

extensively to communicate with their own constituents, promote their accomplishments in office, fundraise, and campaign. For example:



75.     In order to be an effective politician today, one must use social media platforms such as YouTube. In 2020, 92% of Senators and 86% of Congressmen uploaded on YouTube.

76.     Democrat legislators intended to make it considerably more difficult for the Plaintiff to communicate directly with the American public by having him banned from YouTube, while congressional Democrats, candidates, and supporters would have unlimited access to YouTube and other social media platforms.  As a result of Defendants' censorship, our national discourse is becoming immeasurably imbalanced and one-sided on race, medicine, the election process, the economy, immigration, etc.

77.     With the Plaintiff and the Putative Class Members now removed from YouTube and other social media platforms, balanced, direct public discussions between competing political views on national and local issues have ended.

## IV. CONGRESSIONAL LEGISLATION SIGNIFICANTLY ENCOURAGED DEFENDANTS' CENSORSHIP OF PLAINTIFF AND THE PUTATIVE CLASS MEMBERS

78.     YouTube is currently one of the largest social media platforms. Its very existence and growth have been directly fueled by congressional legislation.

79.     In 1996, Congress passed the Communications Decency Act of 1996, included Section 230(c), intending to promote the growth and development of Internet commerce, as well as protect against the transmission of obscene materials over the Internet to children.

80.     YouTube relies upon 47 U.S.C. § 230, commonly referred to as simply "Section 230," or the "Good Samaritan" provision, to censor constitutionally permissible free speech of the Plaintiff and the Putative Class Members.

81.     Section 230(c) provides:

(1).  TREATMENT OF PUBLISHER OR SPEAKER

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

(2).   CIVIL LIABILITY

No provider or user of an interactive computer service shall be held liable on account of—

> A. any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers being obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

      B.  any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

82.    The Internet is a government-created and publicly accessible medium/place, and has been found by Congress to be an important public forum for the expression of economic, social, and political information and business in interstate commerce and is regulated under federal law, including the Communications Decency Act of 1996, and Section 230 thereof.

83.    Section 230(c) has accomplished and exceeded its original purpose in terms of promoting the growth and development of social media platforms.

84.    Section 230(c) is a permissive statute in that it allows, not requires, the social media platforms to take action in "good faith."

85.    The titles under which Section 230 were enacted ("Communications Decency Act" and "Good Samaritan Provision") as well as the context/language for the provision itself, indicates the congressional preference at the time the provision was enacted was that Section 230 be used to prevent the transmission of obscene material, and promote unfettered growth of the social media platforms on the Internet.

86.    As a result, YouTube is one of the largest and most popular video distribution platforms on the Internet. It has more than four (4) billion hours of video views every month, and an estimated five hundred (500) hours of video content are uploaded to YouTube every passing minute.

87.    In 2020 alone, YouTube boasted thirty-seven (37) million channels, and 1.3 billion people used YouTube.

88.     On the other hand, YouTube has failed to adhere to the congressional preference spelled out in initially enacting Section 230(c), which was preventing the transmission of obscene material to youths over the Internet.

89.     Democrat legislators' clearly stated preference for the use of Section 230(c) is to use its grant of immunity as a cudgel to coerce Defendants to censor the viewpoint and content-based speech of the Plaintiff and the Putative Class Members, to achieve an otherwise unconstitutional prior restraint of their right to free speech.

90.     Section 230(c)(2) requires that when a social media platform acts to censor material that it deems objectionable, that it be done so in "good faith."

91.     However, Defendants demonstrated "bad faith" in the manner they have censored viewpoint or content-based speech on their platform.

92.     Defendants have consistently allowed Users to maintain YouTube channels that advocate hateful speech or speech intended to incite or condone violence. For example, a video uploaded to YouTube on April 19, 2021, shows Rep. Maxine Waters inciting protesters to "get more confrontational" with police officers:



93.     This was not the first time that a video of Rep. Waters appeared on YouTube in which she threatened or incited violence.  In a video uploaded on October 27, 2017, Rep. Waters threatened to "take Trump out:"



94.     Both videos of Rep. Waters remain widely available on YouTube.

95.     Other videos inciting violence against the Plaintiff also are currently available on YouTube, including a video from 2017 in which comedian Kathy Griffin notoriously posed with a fake severed head representing the Plaintiff:



96.     Yet the Plaintiff's uploads to YouTube on January 6 and January 12, 2021, which featured nothing more than robust political speech, have been censored, Defendants have de-platformed Plaintiff, and Defendants have suspended, banned or censored other Putative Class Members for uploading videos of Plaintiff's speech.

97.     The Defendants have an "Elections Misinformation Policy" that states:

U.S. presidential election integrity: Content that advances false claims that widespread fraud, errors, or glitches changed the outcome of any past U.S. presidential election (Note: This applies to elections in the United States only). For the U.S. 2020 presidential election, this applies to content uploaded on or after December 9, 2020.

98.     In 2016, after President Trump was sworn in as President of the United States, his opponent, Hilary Clinton, made multiple claims that the election was "stolen" from her—yet the Defendants never censored, banned, or otherwise identified that speech as "election misinformation."

99.     For example, in October of 2019, Hilary Clinton stated in a PBS interview, "maybe there does need to be a rematch. Obviously, I can beat him again." Clinton went on to say that "There was a widespread understanding that this election [in 2016] was not on the level."

100.    In an interview with CBS Sunday Morning in 2019, Clinton challenged the legitimacy of the 2016 election and stated that: "Trump knows he's an illegitimate president."

101.    In August of 2020, Hilary Clinton stated, "Don't forget, Joe and Kamala can win by three million votes, and still lose! Take it from me! We need numbers overwhelming so Trump can't sneak or steal his way to victory."

102.    In June of 2021, Hilary Clinton asserted in an MSNBC interview that Russian President Vladimir Putin helped rig the 2016 election against her to "help elect Trump."

103.    Videos of all of these statements remain widely available on YouTube, notwithstanding Defendants' "Election Misinformation Policy."

104.    As recently as this month, Defendants have been actively censoring any coverage, direct or indirect, of the Plaintiff.

105.    YouTube has censored videos of the Plaintiff's political rallies uploaded by Right Side Broadcasting Network ("RSBN") as "[s]pam, deceptive practices and scams:"

**Strike on July 2, 2021**  Expires Sep 30

| Type | Content | Policy | Actions |
|------|---------|--------|---------|
| ((•)) | 🔴 LIVE: President Donald Trump, Others Speak at the 2021…<br>Saturday June 5, 2021: Please join RSBN at the North Carolina … | Spam, deceptive practices and scams | APPEAL |
| ((•)) | President Trump Full Speech at Wellington, OH Rally 6/26/2…<br>Note: Video will be in full quality once it finishes processing. Ra… | Spam, deceptive practices and scams | APPEAL |
| ((•)) | 🔴 President Donald Trump Rally LIVE in Wellington, OH - 6/…<br>Saturday, June 26, 2021: Join the RSBN crew for all day LIVE c… | Spam, deceptive practices and scams | APPEAL |

106.     These actions by Defendants are targeted viewW and content censorship, including prior restraint, of public political speech.

107.     In passing Section 230(c), Congress permitted but did not mandate censorship action by social media platforms.  Section 230(c) permits YouTube to take down or block speech deemed "objectionable . . . whether or not such material is constitutionally protected."  Section 230(c) also preempts all conflicting state laws, preventing such censorship from being "made illegal . . . by any provisions of the laws of a State."

108.     Democrat legislators and Executive Branch Officials have made it clear that they have a "strong preference" as to what views should and should not be expressed on YouTube, and have coerced Defendants to censor and prohibit the Plaintiff and the Putative Class Members from expressing their views, including any speech relating to:

- so-called COVID-19 "misinformation," including the lack of safety and efficacy of hydroxychloroquine and the use of face masks;

- that COVID-19 originated from a government laboratory in Wuhan, China; and

- questioning the integrity and results of the 2020 Presidential election.

109.    Federal actors are sharing the fruits of their collusion with YouTube in censoring the Plaintiff and the Putative Class Members. These benefits include:

- The Centers for Disease Control and Prevention ("CDC") and the current administration have used Defendants to inexpensively and effectively promote their directives, messages, and policies concerning COVID-19; and suppress contradictory medical views and content;

- Suppression of information suggesting or showing flaws in CDC and/or other federal governmental policy;

- Increasing the number of visitors to the CDC's website;

- Boosting the CDC's highly questionable reputation as reliable and authoritative in its factual and policy determinations;

- Creating a false impression of unequivocal support in the scientific community for the CDC and other governmental directives; and,

- Suppression of opinions and information that might lead people to take actions contrary to the federal government's preferences.

## V.  DEFENDANTS WILLFUL PARTICIPATION IN JOINT ACTIVITY WITH FEDERAL ACTORS TO CENSOR PLAINTIFF AND THE PUTATIVE CLASS MEMBERS

110.    The CDC has publicly stated that it works with "social media partners," including YouTube, to "curb the spread of vaccine misinformation."  In a document dated October 11, 2019, the CDC expressly stated that it was "engaging . . . partners" to "contain the spread of [vaccine] misinformation" and specifically states that the CDC would "work with social media companies" to that end.

111.    YouTube is among the social media "partners" referred to by the CDC.



112.    As is often the case within the medical community, experts disagree.  Leading experts even within the CDC have had sharp disagreements with CDC policy.

113.    For example, Dr. Martin Kulldorff, nationally renowned infectious disease epidemiologist and biostatistician of Harvard Medical School, was removed as a member of the CDC's vaccine safety advisory committee as soon as he publicly disagreed with the agency's pause of the Johnson and Johnson COVID vaccine. The committee accused him of "bias."

114.    Four days after he was removed, the CDC once again allowed the Johnson and Johnson vaccine to be administered, effectively adopting Dr. Kulldorff's stated position for which he was punished.

115.    Dr. Pierre Kory was the medical director for the Trauma and Life Support Center, in the outpatient pulmonary medicine clinic, at UW Health at the University of Wisconsin, where he performed a bronchoscopy and pleural procedures. Dr. Kory is an expert in critical care ultrasonography, winning the British Medical Association's 2015 President's Choice award in medical textbooks for his work on Point-of-Care Ultrasound, along with his co-editors.

116.    Dr. Kory is also the president of the Front Line COVID-19 Critical Care

("FLCCC") Alliance.  The FLCCC Alliance describes itself on its website as the following:

> [A] group of highly published, world renowned Critical Care physician/scholars – with
> the academic support of allied physicians from around the world – to research and
> develop lifesaving protocols for the prevention and treatment of COVID-19 in all stages
> of illness.

117.    In December of 2020, Dr. Kory was called to testify before the Senate Homeland

Security Committee and spoke about Ivermectin, which the FLCCC Alliance describes as an

"FDA-approved anti-parasitic agent" that "had been shown in numerous controlled trials around

the world to prevent and treat COVID-19."

118.    YouTube censored FLCCC's upload of Dr. Kory's congressional testimony

because he promoted Ivermectin:

> Hi FLCCC Alliance,
>
> We have reviewed your appeal for the following content:
>
> **Video:** DR PIERRE KORY – US Senate Statement – Dec 8 2020
>
> We reviewed your content carefully, and have confirmed that it violates our
> medical misinformation policy. We know this is probably disappointing news,
> but it's our job to make sure that YouTube is a safe place for all.

119.    The FLCCC Alliance condemned YouTube's censorship in a press release: "It is

arguably more dangerous for social media giants like YouTube to indiscriminately discredit and

summarily remove official government information given under oath by world-renowned

medical experts." Kory told Fox News that, "[This is] not only a slippery slope but in contradiction to one of our most valued founding principles as a country."

120. Another instance of YouTube working directly with government actors to censor free speech occurred when the Plaintiff and the Putative Class Members supported the view that hydroxychloroquine might be an effective, preventative option to protect against the coronavirus.

121. The Plaintiff and the Putative Class Members' uploads about hydroxychloroquine were censored by YouTube, as only the narrative crafted by Dr. Fauci, the National Institute of Allergy and Infectious Diseases, and the CDC was allowed on YouTube regarding best practices for treating COVID-19.

122. Well-known American journalist Sharyl Attkisson from CBS states that she was censored: "YouTube has removed the 'Full Measure' investigation that followed the money regarding hydroxychloroquine and the IV medicine Remdesivir, calling the story 'dangerous.'"

123. The following is her lead-in to her interview with the Plaintiff: "If you've watched the news lately, you might be under the impression that a medicine President Trump touted as a possible game-changer against coronavirus—has been debunked and discredited. Two divergent views of the drug hydroxychloroquine have emerged."

124. The Plaintiff also expressed the view on YouTube that COVID-19 originated in a laboratory in Wuhan, China, and would specifically refer to it as the "China virus."

125. In censoring uploads onto its platform that challenged Dr. Fauci's claims that COVID-19 did not originate in the Wuhan Laboratory, Defendants were willing participants with the federal government in censoring the protected free speech of the Plaintiff and the Putative Class Members.

126.    Subsequently, YouTube Users posting comments discussing that the laboratory in Wuhan, China, may have been the origin of COVID-19 or referring to COVID-19 as the "China virus" were similarly censored (flagged, demonetized, banned, etc.).

127.    For example, Jennifer Zeng, who blogged about the Wuhan lab leak theory and posted about it on YouTube, was censored. YouTube sent her a message stating, "We've determined that your channel is no longer eligible for monetization."

128.    Recently, the Wuhan laboratory origin theory has been given credence by government actors, including the current administration, which announced an investigation into the theory on May 26, 2021. President Joe Biden announced that he ordered a closer intelligence review of what he said were two equally plausible scenarios of the origins of the Covid-19 pandemic:

> "[W]hile two elements in the IC [Intelligence Community] leans toward the [human contact] scenario and one leans more toward the [lab leak scenario] – each with low or moderate confidence – the majority of elements do not believe there is sufficient information to assess one to be more likely than the other," Biden said.

129.    Uploads concerning a lack of integrity in the 2020 Presidential election were similarly censored.

130.    RSBN has 1.5 million subscribers as of early 2021 and has had credentials to access the James S. Brady White House Press Briefing Room since 2017.

131.    RSBN currently describes itself as a place viewers can go for coverage of Plaintiff and other political commentary: "We offer original programming from some of the biggest and most upcoming names in the political spectrum."

132.    In September of 2019, YouTube censored RSBN for livestreaming the Plaintiff's political rallies when he was the sitting President. After amassing over three hundred (300) million views since the network started and having been funded through "super chats" by the live

viewers of the broadcasts, YouTube informed RSBN of the following, "Your ability to livestream has been revoked."

133.    More recently the Plaintiff gave a speech at the Conservative Political Action Committee ("C-PAC") Convention on February 28, 2021. It was the first time he had given a live, prepared speech since leaving Washington, D.C., on January 20, 2021. YouTube suspended RSBN for two weeks after it streamed the Plaintiff's speech.

134.    In a March 4, 2021, statement, RSBN stated: "Any further violations may result in the permanent suspension of our YouTube channel, which has amassed over 1.5 million subscribers.  We told you all that we had to be careful, and this is why.  It's a new world."

135.    On July 2, 2021, RSBN was preemptively censored from broadcasting on YouTube for seven days, shortly before the Trump rally in Sarasota, Florida, scheduled for July 3, 2021, which the network planned to broadcast.

136.    YouTube stated that RSBN violated their "election-related misinformation" policy for broadcasting President Trump's most recent rally on June 26, 2021.

137.    On or about July 9, 2021, YouTube suspended the ACU for seven (7) days because the ACU had uploaded a video of the press conference at which the Plaintiff announced the instant lawsuit.

138.    YouTube's suspension of the ACU prevented it from streaming C-PAC on July 11, 2021, including a speech by the Plaintiff.  The ACU stated as follows:

> YouTube issued a strike against ACU's YouTube account on July 9th and banned the organization from posting for one week. ACU believes YouTube was offended by sound medical research conducted by the Smith Center for Infectious Diseases & Urban Health and Saint Barnabas Medical Center. Former President Donald Trump referenced the study in the video that YouTube removed, saying, 'doctors and medical groups have been barred from these platforms for posting about therapeutics such as hydroxychloroquine . . . now, most recent studies say [the drug is] effective in combating the virus.

139.     YouTube responded to the ACU's allegations, claiming to have based its decision

to censor the Plaintiff's press conference announcing this lawsuit and suspend the ACU,

exclusively on COVID-19. A YouTube spokeswoman told Breitbart News that the platform took

the aforementioned actions because of alleged "medical misinformation," stating:

> At YouTube, we enforce our Community Guidelines equally for everyone, regardless of
> the speaker . . . .  Based on guidance from the **CDC, FDA and other local health
> authorities, our COVID-19 misinformation policy doesn't currently allow content
> recommending Hydroxychloroquine (HQN)** as an effective treatment or prevention
> method for the virus. In accordance with this policy, we removed several videos of the
> press conference that contained the claim that HQN is effective in combating COVID-19.

140.     While the Defendant's suspended the ACU's account for posting the full press

conference on July 7, 2021, they have left it up on multiple other channels.

141.     When using the search function on the Defendant's platform (on Monday, July

26, 2021), the search term "President Trump announces lawsuit against big tech" pulls results of

at least 15 channels where the press conference has remained posted.

142.     On July 15, 2021, White House Press Secretary Jennifer Psaki confirmed that

Executive Branch officials regularly "engage" with social media platforms at the highest levels

to promote speech preferred by the government and to identify and censor the content of other

speech related to COVID-19, which the government views as false. The transcript from the

White House press briefing held on July 15, 2021, reads as follows:

> Q   Can you talk a little bit more about this request for tech
> companies to be more aggressive in policing misinformation? Has
> the administration been in touch with any of these companies and
> are there any actions that the federal government can take to ensure
> their cooperation, because we've seen, from the start, there's not a
> lot of action on some of these platforms.
>
> MS. PSAKI: Sure.  Well, first, we are in regular touch with these
> social media platforms, and those engagements typically happen
> through members of our senior staff, but also members of our
> COVID-19 team, given, as Dr. Murthy conveyed, this is a big issue
> of misinformation, specifically on the pandemic.

32

We've increased disinformation research and tracking within the Surgeon General's office. We're flagging problematic posts for Facebook that spread disinformation. We're working with doctors and medical professionals to connect — to connect medical experts with popular — with popular — who are popular with their audiences with — with accurate information and boost trusted content. So we're helping get trusted content out there.

We also created the COVID-19 — the COVID Community Corps to get factual information into the hands of local messengers, and we're also investing, as you all have seen in the President's, the Vice President's, and Dr. Fauci's time in meeting with influencers who also have large reaches to a lot of these target audiences who can spread and share accurate information.

You saw an example of that yesterday. I believe that video will be out Fri- — tomorrow. I think that was your question, Steve, yesterday; I did a full follow-up there.

There are also proposed changes that we have made to social media platforms, including Facebook, and those specifically are four key steps.

One, that they measure and publicly share the impact of misinformation on their platform. Facebook should provide, publicly and transparently, data on the reach of COVID-19 — COVID vaccine misinformation. Not just engagement, but the reach of the misinformation and the audience that it's reaching.

That will help us ensure we're getting accurate information to people. This should be provided not just to researchers, but to the public so that the public knows and understands what is accurate and inaccurate.

Second, that we have recommended — proposed that they create a robust enforcement strategy that bridges their properties and provides transparency about the rules. So, about — I think this was a question asked before — there's about 12 people who are producing 65 percent of anti-vaccine misinformation on social media platforms. All of them remain active on Facebook, despite some even being banned on other platforms, including Facebook — ones that Facebook owns.

Third, it's important to take faster action against harmful posts. As you all know, information travels quite quickly on social media

platforms; sometimes it's not accurate. And Facebook needs to move more quickly to remove harmful, violative posts — posts that will be within their policies for removal often remain up for days. That's too long. The information spreads too quickly.

Finally, we have proposed they promote quality information sources in their feed algorithm. Facebook has repeatedly shown that they have the levers to promote quality information. We've seen them effectively do this in their algorithm over low-quality information and they've chosen not to use it in this case. And that's certainly an area that would have an impact.

143.    At the same press conference, Surgeon General Vivek H. Murthy, explicitly stated that the CDC desired to limit speech related to COVID-19 by requesting technology companies to take action against those it considers to be spreading misinformation:

[W]e're saying we expect more from our technology companies. We're asking them to operate with greater transparency and accountability. We're asking them to monitor misinformation more closely. We're asking them to consistently take action against misinformation super-spreaders on their platforms.

The misinformation that we're seeing comes from multiple sources. Yes, there is disinformation that is coming from bad actors. But what is also important to point out is that much of the misinformation that is circulating online is often coming from individuals who don't have bad intentions, but who are unintentionally sharing information that they think might be helpful.

We know that the dramatic increase in the speed — speed and scale of spreading misinformation has, in part, been enabled by these platforms. So that's why in this advisory today, we are asking them to step up. We know they have taken some steps to address misinformation, but much, much more has to be done. And we can't wait longer for them to take aggressive action because it's costing people their lives.

The problem right now is that the voices of these credible health professionals are getting drowned out, and that's one of the reasons we are asking technology companies to help lift up the voices of credible health authorities. It's also why they have to do more to

reduce the misinformation that's out there so that the true voices of experts can shine through.

144.    On July 16, 2021, White House Press Secretary Jennifer Psaki again confirmed

that government representatives regularly communicate with social media platforms to promote

its goal to limit speech related to COVID-19:

> Q    And just — you went through kind of the topline details of this yesterday, but can you elaborate a little bit on the Facebook . . . the administration to Facebook flagging of disinformation.  And there's also some reporting that we've had that Facebook maybe hasn't been as proactive as the White House would like it to be in response to some of the flagging.  So, the process of how the flagging works, and then whether Facebook has been amenable to those requests.
>
> MS. PSAKI:  Well, I would say first, it shouldn't come as any surprise that we're in regular touch with social media platforms — just like we're in regular touch with all of you and your media outlets — about areas where we have concern, information that might be useful, information that may or may not be interesting to your viewers.
>
> You all make decisions, just like the social media platforms make decisions, even though they're a private-sector company and different, but just as an example. So we are . . . regularly making sure social media platforms are aware of the latest narratives dangerous to public health that we and many other Americans seeing — are seeing across all of social and traditional media.  And we work to engage with them to better understand the enforcement of social media platform policies.
>
> So let me give you an example, just to illustrate it a little bit.  The false narrative that remains active out there about COVID-19 vaccines causing infertility — something we've seen out there, flowing on the Internet quite a bit, in other places as well — which has been disproven time and time again.  This is troubling, but a persistent narrative that we and many have seen, and we want to know that the social media platforms are taking steps to address it. That is inaccurate, false information.
>
> If you are a parent, you would look at that information and then that would naturally raise concerns, but it's inaccurate.  And that is an example of the kind of information that we are flagging or raising.

So a couple of the steps that we have — you know, that could be constructive for the public health of the country are providing for — for Facebook or other platforms to measure and publicly share the impact of misinformation on their platform and the audience it's reaching, also with the public, with all of you to create robust enforcement strategies that bridge their properties and provide transparency about rules.

You shouldn't be banned from one platform and not others if you — for providing misinformation out there.

Taking faster action against harmful posts.  As you all know, information travels quite quickly.  If it's up there for days and days and days when people see it, you know, there's — it's hard to put that back in a box.

And, of course, promoting quality information algorithms.  I don't know how they work, but they all do know how they work.

So those are some of the steps that we think could be constructive for public health, for public information, for public — and, you know, the right of the public to know.

Q    Just to quickly follow up on the Facebook aspect of this: You said yesterday that 12 people were producing 65 percent of the misinformation on vaccines on social media platforms.  Do you have a sense of who those people are?  Are they bad actors like Russia?

And Facebook responded yesterday after the press briefing.  They say that they removed 18 million pieces of COVID misinformation; they've connected more than 2 billion people to reliable information.  So does the White House find that sufficient?

MS. PSAKI:  Clearly not, because we're talking about additional steps that should be taken.  And frankly, information that media organizations could detr- — could decide whether you're going to report on or not.  I'm not talking just about the misinformation storyline; I'm talking about these individuals.  I'm talking about, you know, how prevalent the spreading of this information is.

MS. PSAKI:  Our biggest concern here — and I, frankly, think it should be your biggest concern — is the number of people who are dying around the country because they're getting misinformation that is leading them to not take a vaccine —Young people, old people, kids, children — this is all being — a lot of them are being impacted by misinformation.

Q    The big concern though, I think, for a lot of people on Facebook is that now this is Big Brother watching you.

MS. PSAKI:  They're more concerned about that than people dying across the country because of a pandemic where misinformation is traveling on social media platforms?  That feels unlikely to me.  If you have the data to back that up, I'm happy to discuss it.

Q    Okay, and just about things that are on Facebook: I looked this morning, there are videos of Dr. Fauci from 2020, before anybody had a vaccine, and he's out there saying there's no reason to be walking around with a mask.  So, is the administration going to contact Facebook and ask them to take that down?

MS. PSAKI:  Well, first, I think what Dr. Fauci has said himself — who's been quite public out there — is that science evolves, information evolves, and we make that available in a public way to the American people.

Q    Exactly —

145.    While a portion of the comments at the press conference by Ms. Psaki and Dr. Murthy specifically reference Facebook, it is also clear that the comments equally apply more broadly to all social media platforms, including YouTube.

146.    The White House press conference held on July 15, 2021, indicates that YouTube acts as an agent of the Executive Branch in censoring the uploads of the Plaintiff and the Putative Class Members regarding COVID-19.

147.    As admitted by Ms. Psaki at her press conferences on July 15 and July 16, the federal government is in possession of social media information related to twelve (12) individuals that it is claimed spread 65% of the "misinformation" related to COVID-19 and that federal actors have increased tracking of what it deems to be the spread of COVID-19 misinformation.

148.    As stated by Ms. Psaki, the federal government has proposed that social media platforms act on certain information, explicitly stating that Facebook in particular should manipulate its internal algorithms to promote what the government deems to be quality information or preferred speech.

149.     As stated by Surgeon General Murthy, the CDC has asked the social media platforms "to do more to reduce the misinformation that's out there so that the true voices of experts can shine through."

150.     As stated by Ms. Psaki, it is a goal of the federal government to ensure uniformity in the restriction of speech related to COVID-19 across social media platforms: "You shouldn't be banned from one platform and not others if you — for providing misinformation out there."

151.     Members of Congress also have advocated restricting speech on the Internet related to the COVID-19 virus, including Senator Amy Klobuchar, who, on February 5, 2021, announced the SAFE TECH Act, which threatens to remove certain legal immunities that social media platforms enjoy under Section 230.

152.     On May 14, 2021, Senator Klobuchar stated that "[g]etting Americans vaccinated is critical to putting this pandemic behind us.  Vaccine disinformation spread online has deadly consequences, which is why I have called on social media platforms to take action against the accounts propagating the majority of these lies[.]"

153.     On March 25, 2021, Representative Mike Doyle called upon Mark Zuckerberg, Jack Dorsey, and Defendant Pichai to immediately remove the twelve (12) individuals dubbed the "Disinformation Dozen" from their platforms during a congressional session on misinformation.

154.     On July 20, 2021, White House Communications Director, Kate Bedingfield, responded to a question from Mika Brzezinski of MSNBC regarding the repeal of the immunity granted by Section 230 to for Facebook, Twitter, and other social media platforms from lawsuits from liability in the following exchanges:

MS. BRZEZINSKI: As a candidate, the president said he was open to getting rid of Section 230. And I'm just wondering if he's open to amending 230 when Facebook and Twitter

and other social media outlets spread false information that cause Americans harm, shouldn't they be held accountable in a real way? . . . Shouldn't they be liable for publishing that information and then open to lawsuits?

MS. BEDINGFIELD: We're reviewing that and certainly they should be held accountable. And I think you heard the president speak very aggressively about this . . . .

155.    Upon information and belief, representatives of the federal government, including the current administration, the U.S. Department of Health and Human Services, the CDC and Members of Congress, have contacted YouTube to discuss the implementation of the government's goals of restricting and censoring the content of speech related to the COVID-19 virus on YouTube's platform.

156.    The White House Press Conference of July 15, 2021, also indicates that YouTube is functioning as an agent of the Executive Branch in censoring uploads of the Plaintiff, and/or the Putative Class Members, that challenged the integrity of the 2020 Presidential Election.  On December 9, 2020, shortly after the election, YouTube acknowledged that from September to December of 2020, it had removed over 8,000 channels "for violating our policies" concerning the election:



157.    Such censoring by Defendants of the Plaintiff and the Putative Class Members resulted in censorship of their right to free speech.

158.    Defendants' ban on the Plaintiff and the Putative Class Members continues to this day. The ban has directly impacted the Plaintiff's ability to communicate personally with family and friends and politically, including (1) daily communications necessitated by his unquestioned

position as head of the Republican Party; (2) campaigning for Republican 2022 candidates; (3)

fundraising for the Republican Party; (4) laying a foundation for a potential 2024 Presidential

campaign; and (5) expressing their views and opinions related to the COVID-19 virus.

## VI. PRESIDENT TRUMP AND THE PUTATIVE CLASS MEMBERS DE-PLATFORMED

### A. __Donald J. Trump__

159.    On February 28, 2011, the Plaintiff began posting videos titled "From the Desk of

Donald Trump," expressing his views on then-current news and various pop culture and political

items. There were anywhere from 83 to 96 videos posted until around 2013.

160.    On March 16, 2015, the Donald Trump YouTube channel, used by the Plaintiff

until January 12, 2021, was created.

161.    YouTube played a significant role in the Plaintiff's 2016 Presidential campaign,

then as a public forum during his presidency, and for his 2020 re-election campaign.

162.    YouTube prevented the Plaintiff from running a number of ads on its platform

prior to the 2020 presidential election. On December 2, 2019, YouTube confirmed it had

removed Trump campaign ads. The exact reasons for that decision are unclear. As a result, over

three hundred (300) advertisements for the Plaintiff's re-election campaign were taken down by

Defendants.

163.    Defendant YouTube issued a blog post on December 9, 2021, stating that they

will be removing election-related content that, in Defendants' judgment, violates their

Community Guidelines:

> Our Community Guidelines prohibit spam, scams,
> or other manipulated media, coordinated
> influence operations, and any content that seeks
> to incite violence. Since September, we've
> terminated over 8000 channels and thousands of
> harmful and misleading elections-related videos
> for violating our existing policies. Over 77% of
> those removed videos were taken down before
> they had 100 views.

164.     On January 6, 2021, YouTube removed the Plaintiff's video addressing the

Capitol attack. The video was removed because the Plaintiff allegedly "repeats false information

about the outcome of the election." The removal came after YouTube had instituted its new

policy update in December of 2020 that forbids any type of content that alleges widespread voter

fraud impacted the results of the 2020 presidential election.

165.     On January 12, 2021, another upload of the Plaintiff to his YouTube channel was

taken down. YouTube removed content from the Plaintiff's channel for allegedly violating its

policies against inciting violence. Two videos were on the White House's official YouTube

page; one where the Plaintiff was speaking to reporters, and another where he was making

remarks at the border wall, were removed.

166.     YouTube also has indefinitely disabled comments on the Plaintiff's channel due

to "ongoing concerns about violence," which it says it has done in the past to other channels with

"safety concerns found in the comments section." For example:



167.    On January 13, 2021, YouTube gave the following statement to Axios, a news

organization:

> After careful review, and in light of concerns about the ongoing potential for violence, we
> removed new content uploaded to the Donald J. Trump channel and issued a strike for
> violating our policies for inciting violence," YouTube said in a statement to Axios." As a
> result, in accordance with our long-standing strikes system, the channel is now prevented
> from uploading new videos or livestreams for a minimum of seven days—which may be
> extended.

168.    On January 26, 2021, YouTube extended the suspension of President Trump's

channel. In USA Today, YouTube stated:

> In light of concerns about the ongoing potential for violence, the Donald J. Trump
> channel will remain suspended . . . . Our teams are staying vigilant and closely
> monitoring for any new developments.

169.    The suspension of the Plaintiff prevents the uploading of new videos or

livestreams to the channel. Comments on the channels , which had nearly 2.8 million subscribers,

were also disabled indefinitely. The general public no longer had internet access to the Plaintiff's

YouTube uploads, and the Plaintiff's subscribers no longer had the benefit of comments on the

Plaintiff's prior uploads.

170.     On February 20, 2021, YouTube deleted a Newsmax interview with the Plaintiff. The video was deleted because it "violated YouTube's community guidelines."

171.     While YouTube's censoring of the Plaintiff was the most widely publicized action taken by Defendants, countless other Putative Class Members have had their views or content similarly de-platformed or censored by Defendants for arbitrary reasons, or no reason at all.

172.     These Putative Class Members censored by Defendants lost not only a primary means of income but also their ability to access wide-ranging views and content on the most pressing issues of the day.

**B.  Andrew Baggiani**

173.     Putative Class Member Andrew Baggiani ("Mr. Baggiani") is a United States citizen residing in Venice, Florida.

174.     In May 2020, Mr. Baggiani opened a personal YouTube account. Mr. Baggiani used the Defendant's platform to share his beliefs, fight big tech, the deep state, and the influence of mainstream media. Mr. Baggiani monetized his account. At the time of removal, his channel had 20,000 subscribers.

175.     Mr. Baggiani received his first strike on March 9, 2021. Defendants suspended his channel for a week due to a video discussing election fraud in the state of Georgia.

176.     When Mr. Baggiani attempted to appeal this accusation, the Defendants rejected the appeal and issued his second strike on March 24, 2021, even though he had not posted any new content other than short trailers redirecting his audience.  Defendants issued a two-week suspension due to a 17-second video flagged by YouTube as "inciting violence or glorifying a violent act." This video, showing a clip of the Irish Prime Minister at a COVID-19 press conference, was the reason stated for the second suspension.

44

177.   Beginning in April of 2021, every video posted on Mr. Baggiani's channel was flagged by Defendants. Accordingly, the views on his videos significantly began to decrease during this time.

178.   Due to monetization, Mr. Baggiani received approximately $6,000 in his first full month of monetization, beginning February 18, 2021. With the continued censorship and suppressive tactics from the Defendant, Mr. Baggiani's revenue began to decrease on a monthly basis. In June 2021, Mr. Baggiani realized $2,300 in income from his YouTube monetization.

179.   Due to the loss of income and the anticipated future growth of revenue associated with the demonstrated rapid growth rate of his channel, Mr. Baggiani and his family are on the verge of losing their home.

180.   Mr. Baggiani was indefinitely suspended from the platform on June 3, 2021, and the appeal was denied.

## C.  Maryse Veronica Jean-Louis

181.   Putative Class Member Maryse Veronica Jean-Louis ("Ms. Jean-Louis") is a United States citizen residing in Miami-Dade County.

182.   In May 2018, Ms. Jean-Louis created a YouTube account: "Higher Realm Holistics," where she regularly posted to share her advice and expertise relating to her education as a Registered Nurse and Certified Holistic Healer. "Higher Realm Holistics" had 18,000 subscribers at the height of the channel.

183.   In 2019, Ms. Jean-Louis began noticing increased censorship taking place, mostly in the form of demonetization and video removal from the platform.

184.   Ms. Jean-Louis filed an appeal with the Defendants over the demonetization of her account.  The Defendants rejected her appeal.

185.   During the height of the COVID-19 Pandemic, Ms. Jean-Louis created and shared videos discussing various respiratory infections, masks, and the medical benefits of alternative healing methods. All of which were flagged or removed from the platform by the Defendants.

186.   Due to the Defendants' flagging and removal of her videos, the monetization and overall viewership decreased, creating further damage to Ms. Jean-Louis's professional career and overall livelihood.

187.   Ms. Jean-Louis used the Defendants' platform as a way to earn income and elevate her business. Ms. Jean-Louis had a steady revenue income of approximately $1,500 a month prior to her videos being demonetized.

188.   Due to Defendants' censorship of "Higher Realm Holistics," Ms. Jean-Louis has lost a significant number of followers, the ability to advertise and monetize her videos, which forced her permanently to close her business and find alternative methods of income.


**D.   Dr. Naomi Wolf**

189.   Putative Class Member Dr. Naomi Wolf ("Dr. Wolf") is a United States citizen residing in Millerton, New York. In about 2017, Dr. Wolf opened a YouTube account (@DailyClout) to share civic engagement information and primary sources related to current events. Dr. Wolf's account currently has over 7,770 subscribers and approximately 330,000 views.

190.   On May 31, 2021, Dr. Wolf shared a video of an Oregon citizen, Luna Singer, explaining how citizens could lobby their state representatives. Ms. Singer discussed how being wheelchair-bound and disabled did not prevent her from successfully lobbying for State Sen. Kim Thatcher (R-OR) to sponsor SB 872, a bill to ban vaccine passports and mask mandates.

191.   The Defendants suspended Dr. Wolf's account for a month after May 31, 2021, preventing her from adding new content. When her account briefly unfroze, YouTube removed two videos of former United States Department of Health and Human Services ("HHS") official Dr. Paul Alexander discussing Dr. Anthony Fauci's team. Dr. Wolf's account remains suspended.

192.   Dr. Wolf has lost more than half her business model (social media discussions), investors in her business, and sources of income due to the actions of the Defendant.

**E.  Frank Valentine**

193.   Putative Class Member Frank Valentine ("Mr. Valentine") is a United States citizen residing in Lee County, Florida.

194.   Mr. Valentine established his YouTube channel in December 2018, called "Firearms of America." Mr. Valentine's YouTube channel currently has 15,500 subscribers.

195.   Mr. Valentine created his channel to help everyday Americans understand the importance of the Second Amendment.

196.   The first time Mr. Valentine had a video removed by Defendants was on February 24, 2021.  Mr. Valentine has had thirty-three (33) videos removed in 2021 alone.

197.   Mr. Valentine has had 123 videos flagged or labeled between 2018 and the present.

198.   On June 1, 2021, Mr. Valentine's YouTube account was demonetized. Defendants also flagged Mr. Valentine's entire channel as "displaying harmful content."

199.   The Defendants did not, and have not, paid Mr. Valentine for the month of May of 2021.  Mr. Valentine's appeal to have his account reinstated was immediately denied by Defendants.

200.   Since being demonetized, Mr. Valentine has lost approximately $2,000 in monthly income. While Mr. Valentine is not banned from posting videos, he can no longer earn an income from his channel.

201.

**F.  Dr. Colleen Victory, M.D.**

202.   Putative Class Member Dr. Colleen Victory ("Dr. Victory") is a United States citizen residing in Colorado.

203.   Dr. Victory is a residency-trained trauma and emergency specialist and has worked as a hospital-based physician for more than 15 years.

204.   Dr. Victory subsequently served as the Chief Medical Officer of the company that provided healthcare services for employees (and their families) of multiple Fortune 100 and Fortune 500 companies, as well as more than a dozen federal agencies. Dr. Victory managed the healthcare services for these companies' employees during the SARS epidemic in 2003 and the Avian Flu epidemic in 2006-2007.  Her specialty work in mass casualty situations includes pandemic planning and response.

205.   Dr. Victory is an alumnus of the National Preparedness Leadership Initiative, a combined program of the Harvard School of Public Health and the Kennedy School of Government to train "meta-leaders" for times of national crisis.

206.   In June of 2020, Dr. Victory opened an account on the Defendants' platform. Dr. Victory's account, Victory Health, Inc., was intended to share information relating to COVID-19, including video interviews recorded with television stations and other media/reporters.

207.     Prior to launching her own YouTube channel, Dr. Victory made a video for the parishioners of a large evangelical church in Texas, explaining COVID-19, how to mitigate risks and giving assurances that once risks were mitigated, it would be safe to attend church services and get children back to school.  Dr. Victory's video was shared on YouTube by many parishioners.  The video went viral on YouTube and received over seventeen (17) million views in six (6) weeks. YouTube censored the video and removed it from the accounts where it was posted.

208.     When Dr. Victory opened her personal account in June of 2020, she posted the video. Within six (6) hours of posting, Defendants deleted the video and sent an email to Dr. Victory stating that the video violated Defendants' "community standards."

209.     Despite the strong medical background and extensive experience of Dr. Victory, the Defendants advocated the government's position on COVID-19 and censored professionals in the medical field when they tried to discuss the pathophysiology of respiratory viral transmission, the basics of the immune response, the efficacy of face masks, the concept of social distancing, the safety and efficacy of existing medications, or their experience with other pandemics, such as SARS.

210.     In censoring Dr. Victory, the Defendants made it clear that her opinions on the different treatment methods of COVID-19 and their success rates would not be tolerated on YouTube.

**G. Austen Fletcher**

211.     Putative Class Member Austen Fletcher ("Mr. Fletcher") is a United States citizen residing in St. Petersburg, Florida.

212.    In 2012, Mr. Fletcher opened a personal YouTube account. In 2017, Mr. Fletcher created the Fleccas Talks channel, where he regularly posts videos that are conservative-leaning and which investigate a wide variety of topics. Fleccas Talks currently has over 569,000 subscribers.

213.    In 2018, the Plaintiff began noticing increased censorship taking place, mostly in the form of demonetization and suspected shadow banning by YouTube. Many videos were immediately demonetized upon being uploaded.  Defendants' demonetizations would sometimes be overturned following an "appeal." By the time monetization was reinstated, usually, days later, Mr. Fletcher had already accumulated a majority of his views, missing approximately 40-60% of his potential ad revenue. This occurred multiple times between 2018 through 2021 and allowed YouTube, in effect, to slow down Mr. Fletcher's ability to make money.

214.    Demonetization of "Fleccas Talks" by Defendants reduced his viewership to approximately 15,000 views per video uploaded. When demonetization took place, the Defendants sent a notice that they had taken the action because the Plaintiff's account was passing along misinformation.

215.    When the Defendants were likely shadow-banning the Plaintiff's account, they would not notify him, but he suspected his posts had been manipulated by the Defendants because his viewership decreased.

216.    Mr. Fletcher expended time and resources in developing a manner to use the Defendants' platform as a way to generate income. Mr. Fletcher lost more than $50,000 over the course of the past four years due to YouTube's censorship.

In addition to demonetization, Mr. Fletcher also had multiple videos removed entirely by Defendants. Those videos included opinions on COVID-19, the lockdown, and the vaccine from

world-renowned doctors. This not only affected the monetization of Mr. Fletcher's content, but it also affected his credibility and reputation by removing the videos above and deeming them "misinformation," even though the information presented in the videos was eventually proven to be true. One of the removals resulted in the Plaintiff's channel receiving a strike, resulting in a one (1) week ban from posting.

## H.  American Conservative Union

217.    Putative Class Member ACU is a social welfare organization organized under section 501(c)(4) of the Internal Revenue Code and was established in 1964 in the District of Columbia.

218.    The mission of ACU is to advance conservative policy concepts and foster political action in support of such concepts.

219.    ACU and the American Conservative Union Foundation ("ACUF") co-host the CPAC Conference, one of the largest gatherings of conservative political activists in the nation. CPAC was first held in 1974 and is a key component of both ACU and ACUF's respective efforts to organize, activate, and energize activists in furtherance of conservative principles.

220.    In addition to content from CPAC, ACU, and ACUF regularly post other video content, including a four-times-a-week interview show called "CPAC-Now."  Taken together, these activities leverage the YouTube platform in furtherance of both ACU and ACUF's respective efforts to organize, educate, activate and energize activists in furtherance of conservative principles.

221.    During the CPAC conference, CPAC/ACU generates in excess of 1 billion impressions across its social media platforms.  CPAC-Now generates in excess of 200,000 viewers and over a million impressions each week.

222.   Video content related to ACU, ACUF and CPAC is uploaded and posted on YouTube under the name "@ACUConservativeUSA."  This account was created on June 22, 2009.

223.   Presently, the @ACUConservativeUSA account has approximately 37,800 YouTube subscribers. Since its creation in 2009, the @ACUConservativeUSA YouTube channel has been viewed 9.8 million times, with 1.6 million hours of ACU-related programming having been streamed on the platform.

224.   On or about March 10, 2021, ACU was informed by employees of YouTube that it had been cited for allegedly violating a YouTube policy regarding election integrity issues.  The video at issue was of Plaintiff discussing the 2020 elections.  It was taken down by YouTube.

225.   On or about July 6, 2021, ACU was informed that it was being sanctioned for allegedly violating the YouTube policy regarding posting erroneous information on the pandemic and treatment of COVID.  The video at issue was of remarks given by Plaintiff in July of 2021, where he mentioned in passing the treatment of COVID using the drug hydroxychloroquine.

226.   The July 6, 2021 notice received by ACU regarding this alleged violation explained that the video was removed from YouTube.

227.   In addition to the removal of the video, YouTube personnel further sanctioned ACU by suspending this Putative Class Member from either posting new content for seven days, including both pre-recorded and live videos.

228.   There is significant debate about the value of hydroxychloroquine as a COVID treatment. A simple search on Google, for example, brings up an interview with Yale School of

Medicine Professor of Epidemiology Harvey Risch, MD, Ph.D., about his research published in

the *American Journal of Epidemiology*. The article, published in May 2020, explained:

> Professor Harvey Risch, M.D., Ph.D., is a researcher at the Yale School of Public Health with a specialty in cancer etiology, prevention and early diagnosis, and epidemiologic methods.
>
> He recently studied the efficacy of hydroxychloroquine (used in conjunction with two other drugs) to treat people infected with COVID-19 and concluded that the approach should be "widely available" in the fight against the current pandemic.

229.   YouTube's suspension of ACU resulting from ACU's posting of a video of

Plaintiff mentioning hydroxychloroquine was inconsistent with other Google practices, such as

continuing to permit access to scholarly articles discussing the positive value of

hydroxychloroquine in treating COVID.

230.   This suspension was intended to run from July 6, 2021, through July 13, 2021.

ACU and ACUF hosted CPAC-Texas from July 9, 2021, through July 11, 2021. Plaintiff spoke

at CPAC-Texas on July 11, 2021.

231.   While it is Plaintiff's experience that content related to the Plaintiff generates

spikes in views on ACU's various social media platforms, including YouTube, the entire three-

day CPAC event is a critical component to ACU and ACUF's communication and media

strategy.

232.   Online viewership of CPAC events is exponentially larger than the audience that is

physically present. It is precisely for this reason that ACU and ACUF spend significant sums on

providing access for online viewers of CPAC.

233.   The YouTube sanction for the alleged violation of its policy regarding posting

erroneous medical information had the effect of precluding ACU from posting any content

during one of its most important and widely viewed events in 2021: CPAC-Texas.  This had a

negative impact on viewership, social media growth rates, and ACU and ACUF's ability to

interact with millions of ideological conservatives throughout the country.

234.   Acting as an arm of the current administration, Defendants suppressed Plaintiff's

speech rights and directly harmed Plaintiff by reducing coverage of CPAC in violation of the

First Amendment.

## COUNT ONE

### VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION

235.   The Plaintiff and the Putative Class Members restate the allegations set forth in 1

through 234.

236.   Pursuant to Section 230 of the Communications Decency Act, 47 U.S.C. § 230,

Defendants are encouraged and immunized by Congress to censor constitutionally protected

speech on the Internet.

237.   As such, censorship by Defendants of constitutionally protected free speech on its

platform is unconstitutional on its face.

238.   Using its authority under Section 230(c) together and in concert with federal

government actors, including the current administration, the CDC, and Congress, the Defendants

regulate the content of speech over a vast swath of the Internet.

239.   Defendants are vulnerable to and react to, coercive pressure from the federal

government to regulate specific speech.

240.   In censoring the specific speech at issue in this lawsuit and de-platforming the

Plaintiff, Defendants were acting in concert with federal officials, including officials at the CDC,

Members of Congress, and the current administration.

241.     As such, Defendants' censorship activities conducted in concert with federal actors amount to state action.

242.     Defendants' censoring of the Plaintiff's YouTube channel, as well as the YouTube Channels and posts of the Putative Class Members, violates the First Amendment to the United States Constitution because it eliminates the Plaintiff's and Class Members' participation in a public forum and the right to communicate to others the content of their speech and point of view.

243.     The censorship is being done under the authority, with oversight, and in response to coercion of the federal government in cooperation with YouTube and other social media giants and their agents.

244.     Congress authorized Internet platforms under Section 230(c)(2) to censor and impose a prior restraint on speech that Congress was constitutionally forbidden to censor or restrain, yet congressional committees and congressional leaders took specific steps using YouTube to coerce enforcement of censorship and prior restraint against political opponents in violation of the First Amendment.

245.     These acts by legislators to encourage YouTube to censor or restrain the Plaintiff and the Putative Class Members were malicious, intentional, intended to harm, involved personal misstatements of fact, and made for personal, political, and corporate profit and advantage.

246.     The authority Congress gave to Internet platforms under Section 230(c) was unconstitutional, and Defendants exercised that authority in intentional and reckless disregard to the Plaintiff's and the Putative Class Members First Amendment constitutional right to free speech.

247.    Defendants' censoring of the Plaintiff and the Putative Class Members from their YouTube channels violates the First Amendment as applied in this matter because it imposes viewpoint and content-based restrictions on the Plaintiff's and the Putative Class Members' access to information, views, and content otherwise available to the general public.

248.    Defendants' censoring of the Plaintiff and the Putative Class Members violates the First Amendment as applied in this matter because it imposes a prior restraint on free speech and has a chilling effect on social media Users and non-Users alike.

249.    Defendants' blocking of the Plaintiff and the Putative Class Members from their YouTube channels violates the First Amendment as applied in this matter because it imposes a viewpoint and content-based restriction on the ability of the Plaintiff and Putative Class Members to petition the government for a redress of grievances.

250.    Defendants' censorship of the Plaintiff and Putative Class Members from their YouTube channels violates the First Amendment as applied in this matter because it imposes a viewpoint and content-based restriction on their ability to speak and the public's right to hear and respond.

251.    Defendants' blocking of the Plaintiff and the Putative Class Members from their YouTube channels violates their First Amendment rights to free speech as applied in this matter.

252.    Defendants' censoring of the Plaintiff by banning the Plaintiff from his YouTube channel while exercising his free speech as President of the United States was an egregious violation of the First Amendment as applied in this matter.

253.    Defendant Pichai is sued in his personal capacity and is liable in damages because, upon information and belief, he was personally responsible for YouTube's de-

platforming of the Plaintiff and other Putative Class Members, which violated the First

Amendment as applied in this matter.

254.    Defendant Pichai is also sued in his official capacity, along with YouTube itself,

for injunctive relief to and for the unconstitutional censorship of the Plaintiff and Putative Class

Members, including YouTube's de-platforming of the Plaintiff and other Putative Class

Members.

## COUNT TWO

## DECLARATORY JUDGEMENT OF UNCONSTITUTIONALITY OF SECTION 230 OF THE COMMUNICATIONS DECENCY ACT

255.    The Plaintiff and the Putative Class Members reinstate the allegations set forth in

1 through 254.

256.    In censoring (flagging, demonetizing, etc.) the Plaintiff and the Putative Class

Members, Defendants relied upon and acted pursuant to Section 230(c) of the Communications

Decency Act.

257.    Upon information and belief, Defendants would not have de-platformed the

Plaintiff or similarly situated Putative Class Members but for the immunity purportedly offered

by Section 230(c).

258.    Section 230(c)(2) purports to immunize social media companies from liability for

action taken by them to block, restrict, or refuse to carry "objectionable" speech even if that

speech is "constitutionally protected." 47 U.S.C. § 230(c)(2).

259.    In addition, Section 230(c)(1) also has been interpreted as furnishing an immunity

to social media companies for action taken by them to block, restrict, or refuse to carry

constitutionally protected speech.

260.     Section 230(c)(1) and 230(c)(2) were deliberately enacted by Congress to induce, encourage, and promote social media companies to accomplish an objective—the censorship of supposedly "objectionable" but constitutionally protected speech on the Internet—that Congress could not constitutionally accomplish itself.

261.     Congress cannot lawfully induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish.

262.     Section 230(c)(2) is therefore unconstitutional on its face, and Section 230(c)(1) is likewise unconstitutional insofar as it has been interpreted to immunize social media companies for actions they take to censor constitutionally protected speech.

263.     Section 230(c)(2) on its face, as well as Section 230(c)(1), when interpreted as described above, are also subject to heightened First Amendment scrutiny as content and viewpoint-based regulations authorizing and encouraging large social media companies to censor constitutionally protected speech on the basis of its supposedly objectionable content and viewpoint.

264.     Such heightened scrutiny cannot be satisfied here because: (a) Section 230(c) is not narrowly tailored, but rather a blank check issued to private companies holding unprecedented power over the content of public discourse to censor constitutionally protected speech with impunity, resulting in a grave threat to the freedom of expression and to democracy itself; (b) the word "objectionable" in Section 230(c) is so ill-defined, vague and capacious that it results in systematic viewpoint-based censorship of political speech, rather than merely the protection of children from obscene or sexually explicit speech as was its original intent; (c) Section 230(c) purports to immunize social media companies for censoring speech on the basis of viewpoint, not merely content; (d) Section 230(c) has turned a handful of private behemoth

companies into "ministries of truth" and into the arbiters of what information and viewpoints can and cannot be uttered or heard by hundreds of millions of Americans; and (e) the legitimate interests behind Section 230(c) could have been served through far less speech-restrictive measures.

265.    Accordingly, the Plaintiff, and the Putative Class Members, individually and on behalf of those similarly situated, seek a declaration that Section 230(c)(1) and (c)(2) are unconstitutional on their face insofar as they purport to immunize from liability social media companies and other Internet platforms for actions they take to censor constitutionally protected speech.

266.    Accordingly, the Plaintiff and the Putative Class Members, individually and on behalf of those similarly situated seek also seek a declaration that Section 230(c)(1) and Section 230(c)(2) are unconstitutional as applied to this matter insofar as they purport to immunize Defendants from liability for the actions taken against the Plaintiff and the Putative Class Members to censor their constitutionally protected speech.

## COUNT THREE

### FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLORIDA STATUTES § 501.201 *et seq.* (INJUNCTIVE RELIEF, FLORIDA STATUTES § 501.211(1))

267.    Plaintiff and the Putative Class Members restate the allegations in paragraphs 1 through 266 above.

268.    Defendants are engaged in trade or commerce, as defined by Florida Statutes § 501.203(8), within the State of Florida.

269.     Plaintiff and the Putative Class Members have been aggrieved as a result of Defendants' deceptive and misleading practices.

270.     Defendants have repeatedly failed to act in good faith and accordance with their stated policies regarding the removal, demonetization, and moderation of content on their platform.

271.     While Defendants' policies ostensibly proclaim objective, uniform standards by which content may be censored (flagged, demonetized, etc.) and content providers suspended or banned from the platform, in practice, the Defendants have engaged in a subjective pattern of discriminating against disfavored parties, such as the Plaintiff and the Putative Class Members.

272.     Defendants' actions are motivated by coercion of government actors who have the capacity to remove or alter the protections currently offered by Section 230 of the Communications Decency Act, 47 U.S.C. § 230.

273.     Defendants' actions demonstrate that their standards omit that content may be removed by Defendants because government actors desire its removal.

274.     These deceptive practices are likely to deceive consumers acting in a reasonable manner.

275.     As detailed above, a reasonable consumer, acting under the mistaken belief that the Defendants are equally and fairly applying their content standards, would be left to presume that the Plaintiff has said something worse than Rep. Waters whose comments to "take Trump out" and "get confrontational" remain on the platform.

276.     Similarly, Defendants' prohibition of RSBN and ACU for broadcasting Plaintiff's' speech at C-PAC and the press conference announcing the instant lawsuit, respectively, could well be presumed by a reasonable consumer as having spared them an

experience worse than watching Kathy Griffin hold on high a bloody replica of the head of President.

277.    These examples clearly demonstrate that reasonable consumers who rely on the Defendants' good faith application of their own standards would likely be deceived and to their detriment.

278.    Consumers relying on Defendants' good faith application of their standards for "hate speech" and "incitement of violence" would have the false impression that the viewpoints excluded from the platform violate these standards, rather than simply running afoul of the Defendants' preferred viewpoints and desire to please government actors with outsized influence over the Defendants' business.

279.    Consumers relying on Defendants to honor their content moderation standards and provide a full range of viewpoints are, accordingly, acting to their detriment given that the Defendants have their "finger on the scale" and filter out inconvenient content.

280.    Consumers are not the only parties affected by Defendants' policies, as advertisers and content providers are also acting in reliance on the Defendants' stated policies.

281.    Plaintiffs and the Putative Class Members are aggrieved by the Defendants' failure to act in good faith and apply their stated policies to the Plaintiffs' content.

282.    Accordingly, Plaintiff and the Putative Class Members respectfully request that the Court enter judgment in their favor and grant injunctive relief, allowing Plaintiff and the Putative Class Members to return to the platform; compelling Defendants to honor YouTube's own policies; impose a monitor to ensure Defendants' compliance with this Court's order consistently to apply Defendants' own standards, only apply Defendants' published standards

when evaluating content on the platform; for such other equitable relief as the Court deems

appropriate and for costs and reasonable attorneys' fees.

**COUNT FOUR**
**FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT,**
**FLORIDA STATUTES § 501.201 _et seq._**
**(INCONSISTENT APPLICATION OF STANDARDS,**
**FLORIDA STATUTES § 501.2041)**

283.     Plaintiff and the Putative Class Members restate the allegations in paragraphs 1

through 282 above.

284.     Defendants own and operate a social media platform, as defined in Florida

Statutes § 501.2041(1)(g).

285.     Defendants' platform does business within the State of Florida, has annual gross

revenues in excess of $100,000,000.00, and has over 100,000,000 monthly Users.

286.     As detailed above, Defendants have acted in ways contrary to their published

standards regarding censorship (flagged, demonetized, etc.).

287.     These actions have resulted in inconsistent application of these standards, wherein

content produced by the Plaintiff and the Putative Class Members have been removed from the

platform, while other content, which by any reasonable standard must be viewed as more clearly

in violation of the Defendants' standards is allowed to remain on the platform.

288.     Defendants have engaged in this activity since July 1, 2021, the date Florida

Statutes § 201.2041 came into effect.

289.     Florida Statutes § 201.2041(2)(a) requires Social Media Platforms to publish their

standards for moderating content on their platforms.

290.     Florida Statutes § 201.2041(2)(b) requires Social Media Platforms to apply the

standards required in Section 201.2041(2)(a) in a consistent manner.

291.    Defendants have, since July 1, 2021, failed to apply their standards in a consistent manner.

292.    As of July 26, 2021, the Defendants have a Treatment Misinformation Policy that states the following content cannot be posted due to "treatment misinformation" and "prevention misinformation":

Treatment Misinformation:

## What this policy means for you

### If you're posting content

Don't post content on YouTube if it includes any of the following:

**Treatment misinformation:**

- Content that encourages the use of home remedies, prayer, or rituals in place of medical treatment such as consulting a doctor or going to the hospital
- Content that claims that there's a guaranteed cure for COVID-19
- Content that recommends use of Ivermectin or Hydroxychloroquine for the treatment of COVID-19
- Claims that Ivermectin or Hydroxychloroquine are effective treatments for COVID-19
- Other content that discourages people from consulting a medical professional or seeking medical advice

Prevention Misinformation:

**Prevention misinformation:** Content that promotes prevention methods that contradict local health authorities or WHO.

- Claims that there is a guaranteed prevention method for COVID-19
  - Claims that any medication or vaccination is a guaranteed prevention method for COVID-19
- Content that recommends use of Ivermectin or Hydroxychloroquine for the prevention of COVID-19
- Claims that wearing a mask is dangerous or causes negative physical health effects
- Claims that masks do not play a role in preventing the contraction or transmission of COVID-19
- Claims about COVID-19 vaccinations that contradict expert consensus from local health authorities or WHO
  - Claims that an approved COVID-19 vaccine will cause death, infertility, miscarriage, autism, or contraction of other infectious diseases
  - Claims that an approved COVID-19 vaccine will contain substances that are not on the vaccine ingredient list, such as biological matter from fetuses (e.g. fetal tissue, fetal cell lines) or animal products
  - Claims that an approved COVID-19 vaccine will contain substances or devices meant to track or identify those who've received it
  - Claims that an approved COVID-19 vaccine will alter a person's genetic makeup
  - Claims that COVID-19 vaccines do not reduce risk of contracting COVID-19
  - Claims that any vaccine causes contraction of COVID-19
  - Claims that a specific population will be required (by any entity except for a government) to take part in vaccine trials or receive the vaccine first
  - Content that promotes the use of unapproved or homemade COVID-19 vaccines
  - Instructions to counterfeit vaccine certificates, or offers of sale for such documents

293.     The Defendants then have a page that provides examples of content that is not allowed. Below are a few examples:

## Examples

Here are some examples of content that's not allowed on YouTube:

- Denial that COVID-19 exists
- Claims that people have not died from COVID-19
- Claims that any vaccine is a guaranteed prevention method for COVID-19
- Claims that a specific treatment or medicine is a guaranteed cure for COVID-19
- Claims that hydroxychloroquine saves people from COVID-19

294.     On July 21, 2021, Don Lemon of CNN hosted a Town Hall with Joe Biden where he stated, "you're not going to get COVID if you have these vaccinations."

295.     The Defendants have left a video of this interview posted on multiple channels and do not have flags that alert Users of this "treatment misinformation."

296.     Additionally, the Defendants have not suspended CNN's account or the account of President Joe Biden for violating their policy.

297.     Prior to the 2020 Presidential election, there were also violations that would qualify as "prevention misinformation." Below are examples:

> During a press conference held on September 24, 2020, New York Governor Andrew Cuomo said he "won't trust Trump Administration's opinion on the vaccine." Governor Cuomo went on to say "I'm not going to trust the federal government's opinion. I wouldn't recommend [the vaccine] to New Yorkers, based on the federal government's opinion." Below are two screen shots of a video of the Governor's September 24, 2020 press conference on YouTube:



298.    President Joe Biden and Vice President Kamala Harris repeatedly undermined the public's confidence in the vaccine during the 2020 elections. All statements made by the current President and Vice President casting doubt on the efficacy of the vaccine remain active and uncensored on various YouTube channels:

- On July 28, 2020, Joe Biden, then a candidate for the presidency, questioned whether a vaccine would be "real" and whether there would be a "consensus" that "this is a safe vaccine."

- On July 27, 2020, Joe Biden demanded that new "principles of integrity" needed to be adapted in order for Americans to have confidence in the vaccine, suggesting the FDA was not operating independently.

- On August 6, 2020, Joe Biden claimed, "if and when the vaccine comes, it's not likely to go through all the tests and trials that are needed to be done."

- On September 2, 2020, Joe Biden again tried to undermine the public's confidence in the vaccine, saying, "who's going to take the shot? Are you going to be the first one to say sign me up?"

- On September 5, 2020, Kamala Harris, then a candidate for the vice presidency, stated: "If Donald Trump tells us not to take [the vaccine] it then I'm not taking it."

299. Plaintiff and the Putative Class Members have accounts with the Defendants' platform and therefore qualify as Users as that term is defined in Florida Statutes § 501.2041(1)(b).

300. Florida Statutes § 201.2041(6)(a) allows for Users to bring a private cause of action against Social Media Platforms, which fail consistently to apply their standards for content moderation.

301. Accordingly, Plaintiff and the Putative Class Members respectfully request that the Court enter judgment in their favor and grant an Order for statutory damages of $100,000.00, actual damages to be established at trial, punitive damages as the acts in violation of this statute were perpetrated in knowing and willful violation of the Defendants' obligation to honor their own standards, injunctive relief allowing Plaintiffs to resume posting content to the Defendants' platform, compelling Defendants to honor their own policies, impose a monitor to ensure Defendants' compliance with this Court's order consistently to apply Defendants' own standards, only apply Defendants' published standards when evaluating content on the platform, such other relief as the Court deems appropriate, and for costs and reasonable attorneys' fees.

**CLASS ACTION ALLEGATIONS**

302.     Plaintiff and the Putative Class Members that bring this lawsuit pursuant to Rule

23(b)(2) and (3) of the Federal Rules of Civil Procedure on behalf of the

following proposed class (the "Class"):

*All YouTube platform Members who reside in the United States, and between June 1, 2018, and today, had*

*their access to their social media accounts wrongly restricted or curtailed by these Defendants and who were*

*damaged thereby.*

303.     Subject to additional information obtained through further investigation and

discovery, the foregoing definition of the Class may be expanded or narrowed by amendment

or amended complaint.

304.     Specifically excluded from the Class are Defendants, its officers, directors,

agents, trustees, parents, children, corporations, trusts, representatives, employees, principals,

servants, partners, joint venturers, or any entities controlled by Defendants, and their heirs,

successors, assigns, or other persons or entities related to or affiliated with Defendants and/or

their officers and/or directors, the judge assigned to this action, and any member of the judge's

immediate family.

305.     ***Numerosity***. The Members of the Class are so numerous that individual joinder is

impracticable. Upon information and belief, Plaintiff and the Putative Class Members alleges

that the Class contains hundreds of thousands of members. Although the precise number s is

unknown, the true number of   is known by Defendants, and thus, may be notified of the

pendency of this action by first class mail, electronic mail, social media, and/or published notice.

306.     ***Existence and predominance of common questions of law and fact***. Common

questions of law and fact exist as to all members of the Class and predominate over any

questions affecting only individual members of the Class. These common legal and factual questions include, but are not limited to, the following:

(a)whether  the Defendant's conduct violated the First Amendment of the Constitution of the United States

(b) whether Section 230 is an unconstitutional delegation of power Congress cannot exercise.

(c)  whether the Defendants conduct violates any other state or federal statutes.

307.    ***Typicality***.  Plaintiff and the Putative Class Members' claims are typical of the claims of the other members of the Class in that Defendants arbitrarily prevented Plaintiff, and Putative Class Members and those similarly situated from using their social media accounts or curtailed or limited Plaintiff, Putative Class Members, and the Class' use of their accounts to inhibit or prevent Plaintiff, Putative Class Members and the Class from engaging in speech that Defendants disliked or contrary to Defendants' opinions or beliefs, in violation of the First Amendment of the U.S. Constitution

308.    ***Adequacy of representation***. Plaintiff and the Putative Class Members will fairly and adequately protect the interests of the Class. Plaintiff and the Putative Class Members have retained counsel highly experienced in complex consumer class action litigation and intend vigorously to prosecute this action. Further, Plaintiff and the Putative Class Members have had no interests that are antagonistic to those of the Class.

309.    ***Superiority***. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually

impossible for the Class, on an individual basis, to obtain effective redress for the wrongs committed against them. Furthermore, even if class could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the Court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single Court and presents no unusual management difficulties under the circumstances here.

310.    The Class may also be certified because:

(a)     the prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudication with respect to individual putative class members that would establish incompatible standards of conduct for the Defendants;

(b)     the prosecution of separate actions by individual class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c)     Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

## DEMAND FOR JURY TRIAL

311.    Plaintiff and the Putative Class Members demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Donald J. Trump and the Class respectfully request that the Court enter an Order certifying this case as a class action, appointing Plaintiff as Class Representative and appointing Plaintiff's counsel as Lead Class Counsel and that the Court Order, adjudge, and decree in favor of Plaintiff and the Class against the Defendants for:

A. An award of Compensatory and Punitive damages to the Plaintiff and the Class in an amount to be determined at trial;

B. An injunction and declaratory judgment ordering YouTube to immediately reinstate access of Plaintiff and Putative Class Members to their YouTube accounts;

C. An injunction and declaratory judgment ordering YouTube to remove its warning labels and misclassification of all content of the Plaintiff and the Class and to desist from any further warnings or classifications;

D. Adjudgment declaring Sections 230(c)(1) and (c)(2) of the Communications Decency Act of 1996 unconstitutional;

E. An injunction imposing a monitor to ensure Defendants' compliance with this Court's Order to consistently apply Defendants' own standards, and only apply Defendants' published standards when evaluating content on the platform,

F. Damages and punitive damages pursuant to Florida Statutes § 501.2041.

G. An award of attorneys' fees and costs to Plaintiff and the Class in an amount to be determined at trial;

H. An award of punitive damages to Plaintiff and the Class in an amount to be determined at trial; and

I. An award of such other and further relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Matthew Lee Baldwin
Matthew L. Baldwin, Esq.
Florida Bar No. 27463

VARGAS GONZALEZ
BALDWIN DELOMBARD, LLP
815 Ponce De Leon Blvd.,
Third Floor
Coral Gables, FL  33134
Telephone: (305) 631-2528
Email: Matthew@VargasGonzalez.com
E-service: Service8@VargasGonzalez.com

/s/ Carlos Trujillo
Carlos Trujillo, Esq.
Florida Bar No. 42697
*Of Counsel*
Email: CTrujillo@VargasGonzalez.com
E-service: Service8@VargasGonzalez.com

JOHN P. COALE
(*Pro Hac Vice*)
2901 Fessenden St. NW
Washington, D.C. 20008
johnpcoale@aol.com
Telephone: (202) 255-2096

FRANK C. DUDEHEFER, JR.
THE DUDEHEFER LAW FIRM L.L.C
(*Pro Hac Vice*)
fcdlaw@aol.com
2721 St. Charles Ave, Suite 2A
New Orleans, LA 70130
Telephone: (504) 616-5226

RICHARD P. LAWSON, ESQ.
Florida Bar No. 165085

LUIS MARTINEZ-MONFORT, ESQ.
Florida Bar No. 0132713

Gardner Brewer Martinez-Monfort P.A.
400 North Ashley Drive, Ste. 1100
Tampa, FL  33602
(813) 221-9600 Telephone
(813) 221-9611 Fax
E-mail:
rlawson@gbmmlaw.com
lmmonfort@gbmmlaw.com
litigation@gbmmlaw.com

JOHN Q. KELLY
(*Pro Hac Vice*)
jqkelly@ibolaw.com

MICHAEL J. JONES
(*Pro Hac Vice Forthcoming*)
mjones@ibolaw.com

RYAN S. TOUGIAS
(*Pro Hac Vice Forthcoming*)
rtougias@ibolaw.com

IVEY, BARNUM & O'MARA
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000
Facsimile: (203) 661-9462