**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

Civil Action No. 1:21-cv-22445-KMM-LFL

DONALD J. TRUMP, the Forty-Fifth President
of the United States, KELLY VICTORY,
AUSTEN FLETCHER, AMERICAN
CONSERVATIVE UNION, ANDREW
BAGGIANI, MARYSE VERONICA JEAN-
LOUIS, NAOMI WOLF AND FRANK
VALENTINE, INDIVIDUALLY AND ON
BEHALF OF THOSE SIMILARLY SITUATED,

Plaintiffs,

v.

YOUTUBE, LLC and SUNDAR PICHAI

Defendants.

**MOTION FOR PRELIMINARY INJUNCTION WITH MEMORANDUM OF LAW**
**IN SUPPORT OF PLAINTIFF'S MOTION INCORPORATED HEREIN**

i

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................ii
TABLE OF AUTHORITIES .......................................................................................... iv
INTRODUCTION ........................................................................................................... 1
FACTUAL STATEMENT .............................................................................................. 2

    A.  The Donald J. Trump YouTube Channel.................................................................. 2
    B.  Defendant's Censorship And Prior Restraint Of Plaintiff ........................................ 2

ARGUMENT ................................................................................................................... 3

    LEGAL STANDARD APPLICABLE TO MOTIONS FOR A PRELIMINARY
    INJUNCTION................................................................................................................ 3
    POINT I: PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF HIS FIRST
    AMENDMENT CLAIM................................................................................................ 3
    A.  Legal Standards Applicable To A State Action Finding ........................................... 4
    B.  Federal Actors Repeatedly And Coercively Pressured Defendant To Censor Speech And
    To De-Platform Plaintiff .............................................................................................. 6
    C.  Defendant's Censorship Of Plaintiff Resulted From Significant Encouragement By The
    Federal Government...................................................................................................... 9
    D. ..Defendant Has Willfully Participated In Joint Activity With Federal Governmental Actors
    To Censor Plaintiff's Constitutionally Protected Speech ............................................ 12
    E.  Defendant's Acts Violated The First Amendment................................................... 13
    POINT II....................................................................................................................... 15
    SECTION 230, AS APPLIED TO THESE FACTS, VIOLATES THE FIRST
    AMENDMENT............................................................................................................ 15
    A.  Neither Section 230(c)(1) Nor Section 230(c)(2) Protects YouTube From Its
    Discriminatory Treatment Of Plaintiff In Violation Of The First Amendment...................... 15

        1.      Section 230(c)(1) Does Not Protect YouTube From Liability For Its Unlawful
        Deprivation Of First Amendment Rights And Unfair Trade Practices............................... 16
        2.      Section 230(c)(2) Does Not Protect YouTube From Liability For Its Unlawful
        Deprivation Of Plaintiff's First Amendment Rights And Unfair Trade Practices............... 17

    B.  Section 230 Offers No Protection For Defendant's Own Unlawful Speech ................... 18
    C.  Section 230 Is Unconstitutional As Applied........................................................... 19
    POINT III: PLAINTIFF IS LIKELY TO SUCCEED ON HIS FLORIDA DECEPTIVE AND
    UNFAIR TRADE PRACTICES ACT CLAIM ............................................................. 20
    A.  Florida Deceptive And Unfair Trade Practices Act Standards ......................................... 20
    B.  Defendant Has Inconsistently Applied Its Standards.............................................. 21

        1. Election Integrity ................................................................................................. 21
        2. COVID-19........................................................................................................... 22
        3. Violence .............................................................................................................. 23

    C.  Defendant's Inconsistent Application Of Its Standards Demonstrates Plaintiff's
    Entitlement To Preliminary Injunctive Relief ............................................................. 24
    PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF HIS STOP SOCIAL
    MEDIA CENSORSHIP ACT CLAIM ......................................................................... 25

POINT IV: PLAINTIFF WILL SUFFER IRREPARABLE HARM IF AN INJUNCTION IS
NOT GRANTED ........................................................................................................ 27

POINT V: THE BALANCE OF HARDSHIPS FAVORS PLAINTIFF ................................ 28

POINT VI: AN INJUNCTION WOULD NOT BE ADVERSE TO THE
PUBLIC INTEREST ................................................................................................ 28

CONCLUSION ............................................................................................................ 29

Request for Relief ...................................................................................................... 29

# TABLE OF AUTHORITIES

## Cases

*Ahearn v. Mayo Clinic*, 180 So. 3d 165 (Fla. 1st DCA 2015) ...................................................... 23

*Airbnb, Inc. v. City of Boston*, 386 F. Supp. 3d 113 (2019) ........................................................ 20

*Alvi Armani Med., Inc. v. Hennessey*, 629 F. Supp. 2d 1302 (S.D. Fla. 2008) ............................ 18

*Amalgamated Food Employees Union v. Logan Valley Plaza*, 391 U.S. 308 (1968) ................... 6

*American Family Association, Inc. v. City & County of San Francisco*, 277 F.3d 1114 (9th Cir.
2002) ................................................................................................................................... 8, 9

*Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015) ............................................... 8, 9, 18

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) ..................................................................... 8

Barrios-Velazquez v. Associcion De Empleados Del Estado Libre Asociado, 84 F.3d 487 (1st
Cir. 1999) ................................................................................................................................ 7

*Bass v. Parkwood Hosp.*, 180 F.3d 234 (5th Cir. 1999) ................................................................ 7

*Bendiburg v. Dempsey*, 909 F.2d 463 (11th Cir. 1990) .............................................................. 14

*Biden v. Knight First Amendment Institute*, 141 S. Ct. 1220 (2021) ........................................... 6

*Boos v. Barry*, 485 U.S. 312 (1988) ........................................................................................... 16

*Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961) .......................................................... 6

*Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961) .......................................................... 6

*Carlin Communications, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291 (9th Cir. 1987) . 8

*Corley v. United States*, 556 U.S. 303 (2009) ............................................................................ 18

*Dobyns v. E-Systems, Inc.*, 667 F.2d 1219 (5th Cir. 1982) ......................................................... 7

*Domen v. Vimeo*, 991 F.3d 66 (2d. Cir. March 11, 2021) ........................................................... 28

*Domen v. Vimeo, Inc.*, 2021 WL 3072778 (2d Cir. July 21, 2021) ............................................ 28

*Elrod v. Burns*, 427 U.S. 347 (1976) .......................................................................................... 29

*Evans v. Valero Energy Corp.*, No. CV F 07-0130, 2007 U.S. Dist. Lexis 21402 (E.D. Cal. Mar.
6, 2007) .................................................................................................................................. 7

*e-ventures Worldwide, LLC v. Google, Inc.*, No. 2:14–cv–646–FTM–PAM–CM, 2017 WL
2210029 (MD Fla., Feb. 8, 2017) .......................................................................................... 17

*Fairley v. Andrews*, 578 F.3d 518 (7th Cir. 2009) ...................................................................... 9

*Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263 (11th Cir. 2003) . 6, 11, 15

*Gastaldi v. Sunvest Cmtys. USA, LLC*, 637 F. Supp. 2d 1045 (S.D. Fla. 2009) ......................... 23

*George v. Edholm*, 752 F.3d 1206 (9th Cir. 2014) ................................................................ 7, 13

*Goddard v. Google, Inc.*, No. C 08-2738 JF, U.S. Dist. Lexis 101890 (N.D. Cal. Dec. 17, 2008)
.......................................................................................................................................... 12, 19

*Gonzalez v. Governor of Ga.*, 978 F.3d 1266 (11th Cir. 2020) .................................................... 5

*Gonzalez v. Governor of Georgia*, 978 F.3d 1266 (11th Cir. 2020) ............................................ 5

*Google, Inc. v. MyTriggers.com*, 2011-2 Trade Cases ¶ 77,662, 2011 WL 3850286 (Ohio Ct.
Com. Pl.) .................................................................................................................... 12, 17, 20

*Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33 (2d Cir. 1983) .......................................... 8

*Hibbs v. Winn*, 542 U.S. 88 (2004) ............................................................................................ 18

*Howard Morris v. ADT Sec. Servs.*, 2009 U.S. Dist. LEXIS 150309 (S.D. Fla. Sept. 11, 2009) 23,
28

*Iancu v. Brunetti*, 139 S. Ct. 2294 (2019) ................................................................. 16

*Jacobs v. The Fla. Bar*, 50 F.3d 901 (11th Cir. 1995) .............................................. 21

*Lee v. Macon County Board of Education*, 267 F.Supp. 458 (M.D. Ala. 1967) .................... 22, 0

*Madsen v. Women's Health Ctr.*, 512 U.S. 753 (1993) .............................................. 16

*Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 17 (2020) .................... 17

*Marx v. Gen. Revenue Corp.*, 568 U.S. 371 (2013) .................................................... 18

*Millennium Communications & Fulfillment, Inc. v. Office of the Attorney Gen.*, 761 So.2d 1256
(Fla. 3d DCA 2000) ................................................................................... 23

*Mitchum v. Hurt*, 73 F.3d 30 (3rd Cir. 1995) ........................................................ 17

*Nat'l Numismatic Certification, LLC. v. eBay, Inc.*, No. 6:08-CV-42-ORL-19GJK, 2008 WL
2704404 (M.D. Fla. July 8, 2008) .................................................................. 19

*Near v. Minnesota*, 283 U.S. 697 (1931) .............................................................. 15

*Netchoice, LLC, v. Moody* 2021 U.S. Dist. Lexis 121951 (N.D. Fla. June 30, 2021) ................. 28

*New York Times Co. v. the United States*, 403 U.S. 713 (1971) ...................................... 15, 16, 29

*NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969) .................................................... 10

*Norwood v. Harrison*, 413 U.S. 455 (1973) ........................................................... 7, 13, 22

*Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003) .................................................... 9

*Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) ............................................... 5

*Parsons v. Regna*, 847 F. App'x 766 (11th Cir. Mar. 17, 2021) ...................................... 5

*Pasadena Republican Club v. Western Justice Ctr.*, 985 F.3d 1161 (9th Cir. 2021) ................. 6, 7

*Perkins v. Londonderry Basketball Club*, 196 F.3d 13 (1st Cir. 1999) ............................... 7

*Pittsburgh Press Co. v. Human Rel. Comm'n*, 413 U.S. 376 (1973) .................................... 15

*PNR Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773 (Fla. 2003) ................................... 22

*Railway Employees' Dep't v. Hanson*, 351 U.S. 225 (1956) ........................................... 12, 13

Rawson v. Recovery Innovations, Inc., 975 F.3d 742 (9th Cir. 2020) ................................. 7

*Ross v. Duggan*, 402 F.3d 575 (6th Cir. 2004) ....................................................... 21

*Rowe v. City of Ft. Lauderdale*, 279 F.3d 1271 (11th Cir. 2002) .................................... 15

*Rubenstein v. Fla. Bar*, 72 F. Supp. 3d 1298 (S.D. Fla. 2014) ...................................... 21

*Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223 (11th Cir. 2005) .............................. 5

*Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989) .................................. 6, 12, 13, 21, 22

*Song fi Inc. v. Google, Inc.*, 108 F. Supp. 3d 876 (N.D. Cal. 2015) ................................ 19

*Southeastern Promotions v. Conrad*, 420 U.S. 546 (1975) ............................................ 15, 16

*Sun v. Girardot*, 237 Fed. Appx. 415 (11th Cir. 2007) .............................................. 14

*United Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n.* 531 U.S. 288 (2001) .............. 3

*United States v. Alvarez*, 567 U.S. 709 (2012) ..................................................... 16

*Whitney Info. Network, Inc. v. Xcentric Venture, LLC,* 199 Fed. Appx. 738 (11th Cir. 2006) .... 18

*Writers Guild of America, West, Inc. v. FCC*, 423 F. Supp. 1064 (1976) ............................ 9

## Statutes

47 U.S.C. §230 ........................................ ii, 7, 10, 11, 12, 13, 17, 18, 19, 20, 21, 22, 25, 28, 29, 32

Federal Railway Safety Act .......................................................................... 22

Fla. Stat §501.211(1) ................................................................................ 23

Fla. Stat. § 501.204(1) .......................................................................... 22, 27

Florida Deceptive and Unfair Trade Practices Act .................................. 17, 22, 23, 26, 27, 28, 30
Florida Social Media Platforms Act, SB 7072, 2021 Leg. (Fla. 2021)........................................... 3
Florida Statutes § 501.2041 ........................................................................................................ 27
Florida Stop Social Media Censorship Act.................................................................................... 4
Rule 65 of the Federal Rules of Civil Procedure ......................................................................... 3

**Other Authorities**

Dawn Nunziato, *The Death of the Public Forum in Cyberspace*, 20 BERK. TECH. L.J. 1115, 1129
(2005) ...................................................................................................................................... 12
GEORGE ORWELL, NINETEEN EIGHTY-FOUR (1949) ................................................................. 16

**Constitutional Provisions**

First Amendment to the United States Constitution .. ii, 3, 5, 6, 8, 9, 15, 16, 17, 18, 19, 20, 21, 29,
30, 31, 32

## <u>INTRODUCTION</u>

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff Donald J. Trump respectfully moves for a preliminary injunction directing, inter alia, Defendant YouTube, LLC, and all persons acting in privity, in concert, or on YouTube's behalf, to reinstate Plaintiff's access to Defendant's social media platform.

Coerced by members of the United States Congress, operating under an unconstitutional immunity granted by a permissive federal statute, and acting directly with federal officials, Defendant is censoring Plaintiff, a former President of the United States. On January 12, 2021, Defendant indefinitely banned Plaintiff from its platform, a major avenue of public discourse. Defendant's censorship and prior restraint of Plaintiff's speech violate the First Amendment to the United States Constitution and likewise violates Florida's newly enacted Social Media Platforms Act.

Defendant YouTube is one of many companies exercising a degree of power and control over public political discourse in this country that is immeasurable, historically unprecedented, and profoundly dangerous to open democratic debate. Defendant not only banned Plaintiff from its platform but has extended its prior restraint to innumerable Subscribers who post videos of or discuss the views of Plaintiff. Such total censorship continues to cause Plaintiff irreparable harm, endangers democracy, stifles public debate, and may well tip the balance of the 2022 Congressional Elections and the 2024 Presidential Election.

Defendant's censorship of Plaintiff becomes state action for First Amendment purposes when it is a result of "the State's exercise of 'coercive power;' the State's 'significant encouragement, either overt or covert,' in Defendant's censorship conduct; and when Defendant acted as a 'willful participant in joint activity'" with the government in censoring Plaintiff. *United Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n.* 531 U.S. 288, 296 (2001) (Thomas, J.

1

dissent (citations omitted).  All three factors—coercion, significant encouragement, and willful participation in a joint activity—are in operation here. Defendant's censorship of Plaintiff evidences a pattern of viewpoint-based prior restraint, carrying the heaviest presumptions against constitutional validity, and violates Florida's newly enacted Stop Social Media Censorship Act.

Thus, on both constitutional and state law grounds, Plaintiff is entitled to an injunction requiring YouTube to reinstate Plaintiff's access to his channel(s) on YouTube.

## FACTUAL STATEMENT

### A.    The Donald J. Trump YouTube Channel

Plaintiff established the Donald J. Trump channel in May of 2015 and initially used the channel to engage with the general public. (Ibrahim Decl. Exh. A ¶¶ 14, 15, 16).) When Defendant indefinitely suspended the Donald J. Trump channel on January 26, 2021, that channel had approximately 2.79 million Subscribers. (Ibrahim Decl. Exh. A ¶¶ 6, 17, 24.)

### B.    Defendant's Censorship And Prior Restraint Of Plaintiff

During Plaintiff's presidency, often without any explanation, Defendant targeted Plaintiff's YouTube channel with restrictions, removals, and other forms of censorship. In late 2019, Defendant removed over 300 Trump Campaign advertisements from YouTube. (Ibrahim Decl. Exh. A ¶¶ 17, 18) An egregious example of censorship occurred on or about July 9, 2021, when Defendant removed an episode of the American Conservative Union's ("ACU") "America UnCanceled" program on the Conservative Political Action Conference ("CPAC") Now channel. (Ibrahim Decl. Exh. A ¶¶ 7, 19, 20.)

The most severe and fundamental prior restraint imposed by Defendant on Plaintiff was its decision on January 26, 2021, to permanently suspend Plaintiff's YouTube channel.  (Ibrahim Decl. Exh. A ¶ 22.)   Defendant never identified any content uploaded by Plaintiff that putatively justified its action. [Id.] Instead, in its public statements, YouTube stated, "In light of concerns

about the ongoing potential for violence, the Donald J. Trump channel will remain suspended." (Ibrahim Decl. Exh. A ¶ 23.)   This permanent suspension not only prevents Plaintiff from uploading new content, it prevented his Subscribers from posting comments. (Ibrahim Decl. Exh. A ¶ 24.)   Plaintiff's remarks on January 6, 2021, in Washington, D.C., are a matter of public record, and Defendant's ban of Plaintiff's speech is a prior restraint of his First Amendment right that persists to this day. (Ibrahim Decl. Exh. A ¶ 25.)

## ARGUMENT

## LEGAL STANDARD APPLICABLE TO
## MOTIONS FOR A PRELIMINARY INJUNCTION

To obtain a preliminary injunction, Plaintiff must establish: "(1) a substantial likelihood of success on the merits of his claim; (2) an irreparable injury unless the injunction [is] granted; (3) that the harm from the threatened injury outweigh[s] the harm the injunction would cause [defendants]; and (4) that the injunction would not be adverse to the public interest." *Parsons v. Regna,* 847 F. App'x 766, 771 (11th Cir. Mar. 17, 2021) (citing *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270–71 (11th Cir. 2020)). "A substantial likelihood of success on the merits requires a showing of only *likely* or probable, rather than *certain*, success." *Id.* at 1271 n.12 (quoting *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005) (emphasis in original)).

## POINT I
## PLAINTIFF IS LIKELY TO SUCCEED ON THE
## MERITS OF HIS FIRST AMENDMENT CLAIM

The Internet is "the modern public square." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1732 (2017).  For billions of people, it is the most important source and medium for news, information, culture, and communication. *Id*. It is, moreover, "perhaps the most powerful mechanism available to a private citizen to make his or her voice heard." *Id*. at 1738. (Ibrahim Decl. Exh. A ¶¶ 5,26(a).)  Defendant's censorship of Plaintiff's views violated the First

Amendment when Defendant became a state actor because governmental involvement in that conduct took one or more impermissible forms, all of which are present here. *See Biden v. Knight First Amendment Institute*, 141 S. Ct. 1220, 1222 (2021) ("Mr. Trump often used the account to speak in his official capacity. And, as a governmental official, he chose to make the comment threads on his account publicly accessible, allowing any Twitter user—other than those whom he blocked—to respond to his posts.") (Thomas, J. concurrence.) Although discussing Plaintiff's Twitter account, there is a parallel public access to YouTube; *see also Amalgamated Food Employees Union v. Logan Valley Plaza*, 391 U.S. 308, 325 (1968) ("The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it.")

## A.  Legal Standards Applicable To A State Action Finding

The Supreme Court has held that state action exists "when [the private party's conduct] results from the State's exercise of '*coercive power*,' when the State provides '*significant encouragement*, either overt or covert,' or when a private actor operates as a '*willful participant in joint activity*'" with the government. *United Brentwood Acad.,* 531 U.S. at 296 (citations omitted) (emphasis added); *see Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1277 (11th Cir. 2003). Private party conduct can also become state action when the government has passed a statute or regulation immunizing that conduct from state law liability and has made plain its "strong preference" for the immunized conduct to be engaged in. *See, e.g., Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 615 (1989).

Private party conduct is state action when it results from a "symbiotic relationship" between the private party and the government. *See, e.g., Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961); *Focus on the Family*, 344 F.3d at 1278; *Pasadena Republican Club v.*

*Western Justice Ctr.*, 985 F.3d 1161, 1167 (9th Cir. 2021); *Perkins v. Londonderry Basketball Club*, 196 F.3d 13, 18 (1st Cir. 1999); *Dobyns v. E-Systems, Inc.*, 667 F.2d 1219, 1227 (5th Cir. 1982). Moreover, state action always exists when the government deliberately "induces, encourages, or promotes persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973). When government officials violate this principle, state action exists, and the private parties who intentionally assist them may be liable for violating constitutional rights. *See, e.g.*, *George v. Edholm*, 752 F.3d 1206, 1215 (9th Cir. 2014).

Satisfaction of any one of the above tests "is sufficient to find state action." *Pasadena Republican Club*, 985 F.3d at 1167; *Barrios-Velazquez v. Associcion De Empleados Del Estado Libre Asociado*, 84 F.3d 487, 493 (1st Cir. 1999). But courts may also view these indicia of governmental involvement in private conduct as cumulative factors, weighing in favor of finding state action. *See, e.g., Rawson v. Recovery Innovations, Inc*., 975 F.3d 742, 754-55 (9th Cir. 2020). State action is indisputable when all such factors come together in a single case, as they do here.

The determination of whether private party conduct constituted governmental action is "necessarily a fact-bound inquiry," *United Brentwood Acad.*, 531 U.S. at 296, requiring a "totality of the circumstances" analysis. *Evans v. Valero Energy Corp*., No. CV F 07-0130, 2007 U.S. Dist. Lexis 21402 at * 9 (E.D. Cal. Mar. 6, 2007); *Bass v. Parkwood Hosp.*, 180 F.3d 234, 242 (5th Cir. 1999).

Defendant's censorship of Plaintiff resulted from: (a) coercive pressure imposed on Defendant by federal actors, including numerous Democrat members of Congress; (b) significant encouragement, both overt and covert, by the federal government, including the enactment of a statutory provision, Section 230 of the Communications Decency Act of 1996, 47 U.S.C. §230

("Section 230") immunizing social media platforms' suppression of constitutionally protected speech; and (c) Defendant's willful participation in joint activity with federal actors, including a federal agency and the White House.

### B. Federal Actors Repeatedly And Coercively Pressured Defendant To Censor Speech And To De-Platform Plaintiff

While government officials are permitted to express their, or the government's, preferences about what a private company should or should not do, they cannot exert coercive pressure on private parties to censor others' speech. *E.g., Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66-67 (1963). Such coercion converts private party conduct into state action. *United Brentwood Acad.*, 531 U.S. at 298; *Carlin Communications, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291, 1295 (9th Cir. 1987) (finding state action in private telephone company's suspension of account due to coercive threats made by state official).

The test in such cases is whether the "comments of governmental officials can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow failure to accede to the officials' request." *E.g., Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983). When governmental actors have exerted such coercive pressure, state action exists regardless of whether the officials' threat "was the real motivating force" behind the private party's conduct and even if the private party "would have acted as he did independently." *Carlin Communications*, 827 F.2d at 1295.

"[A] public official who tries to shut down an avenue of expression of ideas and opinions through 'actual or threatened imposition of government power or sanction' is violating the First Amendment." *Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015) (citing, *American Family Association, Inc. v. City & County of San Francisco*, 277 F.3d 1114, 1125 (9th Cir. 2002)). Written and verbal threats of the kind in *Backpage*, similar to those in this case, create an irreparable injury

because they are designed to coerce, not persuade. *Id*. at 239.  Judge Richard Posner, writing for the Court in *Backpage*, found that the sheriff's threatening statements constituted prior restraint, "'[t]hreatening penalties for future speech goes by the name of 'prior restraint,' and a prior restraint is the quintessential first amendment violation.'" *Id*. at 235 (*citing*, *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009)).

In *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003) (per curiam), the Second Circuit made clear that subtle or soft language does not obviate the threat, reasoning, "[w]hat matters is the distinction between attempts to convince and attempts to coerce." *Id*. at 344. The "intent" of the letter [threat] controlled, not its formal language. *Id.*  Further, in *Okwedy*, the Court reasoned, "[b]ased on this letter, [Plaintiff] could reasonably have believed that [the official] intended to use his official power to retaliate against it if it did not respond positively to his entreaties. . . . [Plaintiff] could reasonably have feared that [the official] would use whatever authority he does have, as Borough President, to interfere with the 'substantial economic benefits' [Plaintiff] derived from its billboards." *Id*.

Courts have long held that threats by government officials violate the First Amendment, which "unquestionably constitutes irreparable injury" to the victim or recipient of the threat. *Backpage.com, LLC*, 807 F.3d at 239. The Ninth Circuit described this form of impermissible state action as follows: "If the First Amendment means anything, however, the Commission has no right to accompany its suggestions with vague or explicit threats of regulatory action should broadcasters consider and reject them. The Commission has no right whatsoever to demand or secure commitments from broadcasters to accept its suggestions. It has no right to launch orchestrated campaigns to pressure broadcasters to do what they do not wish to do." *Writers Guild of America, West, Inc. v. FCC*, 423 F. Supp. 1064, 1150 (1976) (*rev'd on other grounds*). Using

7

nearly identical analysis, employer speech cases are treated substantially the same.  For example, because employers oversee employees, courts "must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up *intended implications* of the latter that might be more readily dismissed by a more disinterested ear." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969) (emphasis added).

Since 2019, Democrat members of the United States Congress, as well as now-President Joe Biden and Vice President Kamala Harris, have subjected the social media companies and their CEOs, including Defendant, to systematic and increasing pressure to censor disfavored online speech, and to promote favored speech, or else face catastrophic legislative and/or regulatory consequences. (Ibrahim Decl. Exh. A ¶¶ 26(b), 27,28, 29,30, 31, 32, 33, 34.)

On or about April 10-11, 2019, Speaker of the House Nancy Pelosi warned that a "new era" of regulating social media was coming and that Section 230 could be "in jeopardy." (Ibrahim Decl. Exh. A ¶28.)   Speaker Pelosi further commented that "the era of self-regulation" in this country for social media companies is "probably" over, and that "[w]hen we come to 230, you really get their attention . . . it is not out of the question that that could be removed" because "for the privilege of 230, there has to be a bigger sense of responsibility on it." (Ibrahim Decl. Exh. A ¶ 32.) (See examples of coercive statements by Chairman Schiff, President Biden, Speaker Pelosi, Congressman Raskin, and Sen. Blumenthal) (Ibrahim Decl. Exh. A ¶¶ 29, 30, 31, 32, 35, 36, 37, 38, 39, 41, 43.)

These coercive methods had the desired results. By early January of 2021, the Federal Trade Commission and the U.S. Department of Justice were investigating social media companies

for antitrust violations and had launched an antitrust action against Facebook, which Facebook CEO Mark Zuckerberg described as an "existential threat."  (Ibrahim Decl. Exh. A Decl. ¶ 42.)

Chairman Frank Pallone, Jr.'s publicly released "memorandum" from a March 25, 2021, House Energy and Commerce Committee hearing indicated that a principal topic of the hearing was the "role" of "Facebook, Google, and Twitter" in "the dissemination and amplification of misinformation and extremist content." (Ibrahim Decl. Exh. A ¶ 44.) (See additional examples of coercive statements at Ibrahim Decl. Exh. A ¶¶ 8, 45.)

As a result of the coercive pressure created by Congress and the Executive Branch, Defendant censor Plaintiff. Such censorship would have been an unconstitutional deprivation of Plaintiff's free speech if federal officials had taken that action directly. (Ibrahim Decl. Exh. A ¶¶ 45, 46.)

### C.    Defendant's Censorship Of Plaintiff Resulted From Significant Encouragement By The Federal Government

Private party conduct also becomes governmental action "when the State provides 'significant encouragement, either overt or covert.'" *United Brentwood Acad.*, 531 U.S. at 296 (citations omitted); *see also Focus on the Family* 344 F.3d at, 1278.  The coercive and threatening statements made by congressional and executive branch members described above in Point I B, applying pressure on and threatening consequences against YouTube if it failed to censor, amounted at a minimum to significant encouragement.  Democrat members of Congress, as well as President Biden himself, repeatedly encouraged Defendant to censor and restrain Plaintiff's views or face catastrophic legal and regulatory consequences. (Ibrahim Decl. Exh. A ¶ 45.)

Section 230 (c) itself is a significant encouragement to censor constitutionally protected speech.  Section 230 (c)(2) immunizes social media companies from liability for any action taken in good faith to "restrict" speech they or their Subscribers deem "objectionable," even if that

speech is "constitutionally protected." 47 U.S.C. § 230 (c)(2)(A). The express "intent of Congress in enacting § 230 (c)(2) was to *encourage* efforts by Internet service providers to eliminate ['objectionable'] material by immunizing them from liability." *Goddard v. Google, Inc.*, No. C 08-2738 JF, U.S. Dist. Lexis 101890 at *6 (N.D. Cal. Dec. 17, 2008) (emphasis added); *see also, e.g.*, Dawn Nunziato, *The Death of the Public Forum in Cyberspace*, 20 BERK. TECH. L.J. 1115, 1129 (2005) (through Section 230 (c)(2), "Congress *encouraged* private Internet actors to do what it could not do itself" (emphasis added)). Every act by YouTube in censoring Plaintiff's speech was significantly encouraged by, and in reliance upon, the immunity granted by Section 230 (c)(2).

In at least two cases, the Supreme Court has held that federal statutes immunizing private conduct from liability turned what would otherwise be private action into state action. *See Skinner*, 489 U.S. at 614-15; *Railway Employees' Dep't v. Hanson*, 351 U.S. 225, 232 (1956). In *Hanson*, the Court found state action in private employers' closed-shop agreements—contracts between the employer and a union requiring all employees to be union members—because a federal statute, superseding all conflicting state laws, prevented such agreements from being "made illegal . . . by any provisions of the laws of a State." *Id*. The statute did not require employers to have such agreements; it merely permitted them. *Id*. Similarly, Section 230 permits (but does not require) companies like YouTube to censor speech deemed "objectionable" and preempts all conflicting state laws, preventing such censorship from being "made illegal . . . by any provisions of the laws of a State." *Id.*

In *Skinner*, the Court found state action in certain employee urine and breath tests to be conducted by private railroad companies after the federal government enacted regulations immunizing those companies from liability if they performed such tests. Again, the pertinent regulations (called Subpart D) were, like Section 230, "permissive"—they did not compel such

testing but merely permitted it.  *Skinner*, 489 U.S. at 611.  Nevertheless, the Court held that these regulations turned the private companies' conduct into state action, emphasizing that: (1) the regulations "removed all legal barriers" to such testing by preempting any conflicting state laws (immunizing the railways from liability); and (2) the government had "made plain" a "strong preference" for such testing.  *Id*. at 615. Similarly, Section 230 (c)(2) "remove[s] all legal barriers" to YouTube's refusal to carry content it deems to be hate speech, or "misinformation," or dangerous, by preempting conflicting state laws and immunizing social media companies from liability for such censorship.

The federal government has "made plain" a "strong preference" for the censoring of COVID-19 "misinformation," or other content Congressional Democrats deem dangerous, and of Plaintiff himself. On July 17, 2021, President Biden excoriated social media companies for carrying so-called COVID-19 "misinformation," stating that they are "killing people" and demanded that they block it.  (Ibrahim Decl. Exh. A ¶ 46.)

Thus, under *Hanson* and *Skinner*, the delegation of permissive activity and immunity in Section 230 weighs heavily in favor of a finding of state action in the regulation of the content of speech on the Internet. Indeed, Section 230(c)(2) violates the "axiomatic" constitutional principle set forth by the Supreme Court almost 50 years ago: that the government "may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood*, 413 U.S. at 465. When the government violates this "axiomatic" rule, state action exists, and private parties who intentionally assist the government may be liable for constitutional violations. *George*, 752 F.3d at 1215.

11

**D.      Defendant Has Willfully Participated In Joint Activity With Federal Governmental Actors To Censor Plaintiff's Constitutionally Protected Speech**

Defendant's censorship of Plaintiff's speech, including its censorship of his July 11, 2021 CPAC speech announcing the instant lawsuit, were based on the putative ground that Plaintiff was disseminating COVID-19 related "misinformation." (Ibrahim Decl. Exh. A ¶ 9, 21.) In censoring Plaintiff's COVID-19 related speech, Defendant was acting as a willful participant in joint activity with federal actors, including the Department of Health and Human Services ("HHS"), and the White House. White House Press Secretary Jennifer Psaki acknowledged this joint activity, stating that White House senior staff were engaging with social media platforms to combat the spread of misinformation, specifically on the pandemic, and playing an active role in flagging content deemed by the Biden Administration to be problematic. The next day, Psaki stated that the Biden Administration's goal is to ban individuals who spread COVID-19 misinformation from all social media platforms. (Ibrahim Decl. Exh. A ¶¶ 9, 50.) The Centers for Disease Control ("CDC") and Defendant have openly admitted this collaboration between social media companies and the CDC. The CDC has publicly stated that it acts with "social media" "partners" to "curb the spread of vaccine misinformation." (Ibrahim Decl. Exh. A ¶¶ 9, 47, 48, 49.)

Not a hair's breadth separates "direct engagement" between governmental and private actors to achieve an objective from "willful participation in joint activity."   By their own admissions, the White House and social media companies reached a mutual understanding, agreeing to "work together" to "get rid" of disfavored speech. Therefore, state action exists under *United Brentwood Acad. See also*, *e.g.*, *Bendiburg v. Dempsey*, 909 F.2d 463, 468 (11th Cir. 1990) ("[P]rivate defendants can be held liable [as state actors] if they act in concert with [government] officials in depriving a plaintiff of constitutional rights."); cf. *Sun v. Girardot*, 237 Fed. Appx. 415, 417 (11th Cir. 2007) (defendants are state actors if they "reached an understanding" with

government officials "to violate [plaintiff's] rights"); *Rowe v. City of Ft. Lauderdale*, 279 F.3d
1271, 1283 (11th Cir. 2002) (defendants are state actors if there was an "agreement" with
government officials). Moreover, the federal government reaps and knowingly accepts substantial
benefits from this partnership. These benefits include, without limitation: the "effective and
inexpensive" communication, as the CDC puts it, of government-approved health information to
large numbers of people; suppression of information suggesting or showing flaws in federal
government policy and orthodoxy; boosting the CDC's reputation as reliable and authoritative in
its factual and policy determinations; creating a false impression of unequivocal support in the
scientific community for governmental directives; and suppression of opinions and information
that might lead people to take actions contrary to the government's preferences. *See, e.g.*, *Focus
on the Family*, 344 F.3d at 1278. Where coercive governmental pressure, significant governmental
encouragement, and joint governmental activity are all present in a single case, state action must
be found; otherwise, every constitutional right could easily be circumvented.

      **E.**     **Defendant's Acts Violated The First Amendment**

      The First Amendment paradigmatically prohibits prior restraints. *Near v. Minnesota*, 283
U.S. 697, 713-14 (1931). "Any system of prior restraints of expression comes to this Court bearing
a heavy presumption against its constitutional validity." *New York Times Co. v. the United States*,
403 U.S. 713, 714 (1971). Because prior restraints are presumptively unconstitutional, the burden
to show that Plaintiff's speech is unprotected by the First Amendment rests heavily on Defendant:
"the burden . . . of proving that the material is unprotected, must rest on the censor." *Southeastern
Promotions v. Conrad*, 420 U.S. 546, 560 (1975); *See Neb. Press Ass'n v. Stuart*, 427 U.S. 539
(1976), citing, *Pittsburgh Press Co. v. Human Rel. Comm'n*, 413 U.S. 376, 396 (1973) (Courts
have long "condemn[ed] prior restraint as presumptively unconstitutional").

Further, prior restraint present an injury that occurs repetitively until remedied, *New York Times Co., 403 U.S. at 715* (prior restraint "amounts to a flagrant, indefensible, and continuing violation of the First Amendment"). The existence of other venues for Plaintiff to speak does not cure the First Amendment violation. *Conrad*, 420 *U.S.*, at 560. In addition, the First Amendment does not permit governmental actors to discriminate against speech on the basis of the viewpoints, ideas, or opinions they express. *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019) (identifying as a "core postulate of free speech law" that the "government may not discriminate against speech based on the ideas or opinions it conveys"). Injunctions cannot facilitate the suppression of speech from one side of a political debate, but instead must serve to promote as much speech as possible since public debate, rather than partisan government objectives, serves the national interest. in *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 774 (1993) ("As a general matter, we have indicated that in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment.") (citing *Boos v. Barry*, 485 U.S. 312, 322 (1988)).

The First Amendment prohibits establishing a "Ministry of Truth," blocking speech that the government deems false.  *See United States v. Alvarez*, 567 U.S. 709, 723 (2012) (plurality opinion) (citing GEORGE ORWELL, NINETEEN EIGHTY-FOUR (1949)).  "The mere potential for the exercise of that power casts a chill, a chill the First Amendment cannot permit if free speech, thought, and discourse are to remain a foundation of our freedom."  *Id*.  Yet, Defendant, working jointly with a federal agency and the White House, has converted its platform into a Ministry of Truth, particularly with respect to COVID-19.

As a government actor, Defendant's prior restraint of Plaintiff is a violation of the First Amendment, and Plaintiff is therefore entitled to injunctive relief under the federal courts'

14

longstanding power to "grant equitable relief for constitutional violations." *Mitchum v. Hurt*, 73 F.3d 30, 35 (3rd Cir. 1995) (Alito, J.)

## POINT II
## SECTION 230, AS APPLIED TO THESE
## FACTS, VIOLATES THE FIRST AMENDMENT

Section 230 is not a valid defense to this action and is unconstitutional as applied to the facts of this case. Section 230 only protects YouTube for (1) causes of action in which third-party speech is an element and (2) its content moderation for specific reasons outlined in 47 U.S.C. § 230 (c)(2). Here, Plaintiff's constitutional claims against YouTube involve neither third-party speech nor the sorts of content specified in Section 230. Further, a binding precedent has determined Section 230 offers platforms no protection from suits brought under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")

### A.   Neither Section 230(c)(1) Nor Section 230(c)(2) Protects YouTube From Its Discriminatory Treatment Of Plaintiff In Violation Of The First Amendment

The Supreme Court has confirmed this essential structure: Section 230(c)(1) relieves platforms of liability from third-party speech, and Section 230(c)(2) relieves platforms for removing or moderating content. This precedent recognizes that if Section 230(c)(1) protects removal decisions, it would "swallo[w] the more specific immunity in (c)(2)[.]". *Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 17 (2020) (referencing and quoting to *e-ventures Worldwide, LLC v. Google, Inc.*, No. 2:14–cv–646–FTM–PAM–CM, 2017 WL 2210029, *3 (MD Fla., Feb. 8, 2017). "[B]y construing § 230 (c)(1) to protect *any* decision to edit or remove content, courts have curtailed the limits Congress placed on decisions to remove content . . . ." *Id.*(internal citation omitted).

Allowing Section 230(c)(1) to swallow Section 230(c)(2) violates the fundamental canon of statutory construction against surplusage. This interpretive rule requires courts to give effect to

all portions of a statute, particularly provisions that follow one another. *Corley v. United States,* 556 U.S. 303, 314 (2009) ("[A] statute should be construed so that effect is given to all its provisions so that no part will be inoperative or superfluous, void or insignificant…") (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)). The Supreme Court emphasizes that the canon "is strongest when an interpretation would render superfluous another part of the same statutory scheme." *Marx v. Gen. Revenue Corp*., 568 U.S. 371, 386 (2013).

To read Section 230(c)(1) to protect Defendant's decision to censor Plaintiff would eliminate Congress's express limitations. Thus, Florida federal courts have recognized Section 230's specific structure: Section 230(c)(1) protects against liability from causes of action which have as their elements platforms publishing or speaking third party content.  Section 230(c)(2) protects content moderation for specified reasons. Neither provision applies to this case.

### 1. Section 230(c)(1) Does Not Protect YouTube From Liability For Its Unlawful Deprivation Of First Amendment Rights And Unfair Trade Practices

Where a platform works or "materially contributes' to create unlawful content or pursue unlawful schemes, Section 230 does not apply. *Florida Abolitionist v. Backpage.com LLC*, No. 6:17-CV-218-ORL-TBS, 2018 WL 1587477, at *5 (M.D. Fla. March 31, 2018). The Eleventh Circuit states, "where a complaint contained allegations illustrating defendant's involvement in creating or developing the alleged" unlawful content, Section 230 immunity is inappropriate. *Whitney Info. Network, Inc. v. Xcentric Venture, LLC,* 199 Fed. Appx. 738, 744 (11th Cir. 2006). Here, it is alleged that YouTube worked with the government to violate Plaintiff's First Amendment rights. YouTube's actions are at issue—not the speech of third-party Subscribers of its platform. Such claims have no "immunity under the [Section 230]." *Alvi Armani Med., Inc. v. Hennessey*, 629 F. Supp. 2d 1302, 1306–07 (S.D. Fla. 2008).

## 2.    Section 230(c)(2) Does Not Protect YouTube From Liability For Its Unlawful Deprivation Of Plaintiff's First Amendment Rights And Unfair Trade Practices

As Florida federal courts have ruled, consistent with most courts, Section 230(c)(2) is not a carte blanche to remove content for any reason. Rather, these terms refer to specific types of content regulable in 1996, and "otherwise objectionable" is a catchall term that, under the *ejusdem generis* canon of statutory construction, refers to types of content Congress thought regulable in 1996. *See Nat'l Numismatic Certification, LLC. v. eBay, Inc.*, No. 6:08-CV-42-ORL-19GJK, 2008 WL 2704404, at *25 (M.D. Fla. July 8, 2008) ("One may find an array of items objectionable; for instance, a sports fan may find the auction of a rival team's jersey objectionable. However, Congress provided guidance on the term 'objectionable' by providing a list of seven examples and a statement of the policy behind Section 230.").

Accordingly, the Court concludes that 'objectionable' content must, at a minimum, involve or be similar to pornography, graphic violence, obscenity, or harassment." *Song fi Inc. v. Google, Inc.*, 108 F. Supp. 3d 876, 883 (N.D. Cal. 2015) ("Given the list preceding 'otherwise objectionable,'—'obscene, lewd, lascivious, filthy, excessively violent, [and] harassing . . .'—it is hard to imagine that the phrase includes, as YouTube urges, the allegedly artificially inflated view count associated with 'Luv ya.' On the contrary, even if the Court can 'see why artificially inflated view counts would be a problem for . . . YouTube and its Subscribers,' the terms preceding 'otherwise objectionable' suggest Congress did not intend to immunize YouTube from liability for removing materials from its website simply because those materials pose a 'problem' for YouTube."); *Goddard*, 2008 WL 5245490, at *6 (relying on *National Numismatic* to conclude that Google rules requiring various advertisers to "provide pricing and cancellation information regarding their services" "relate to business norms of fair play and transparency and are beyond the scope of § 230(c)(2)"); *Google, Inc. v. MyTriggers.com*, 2011-2 Trade Cases ¶ 77,662, 2011

17

WL 3850286, at *4 (Ohio Ct. Com. Pl.) ("The examples preceding the phrase 'otherwise objectionable' clearly demonstrate the policy behind the enactment of the statute and provide guidance as to what Congress intended to be 'objectionable' content."). Section 230(c)(2) is not a bar to Plaintiff's lawsuit, which alleges that Defendant removed content in violation of the First Amendment and other laws.

### B.   Section 230 Offers No Protection For Defendant's Own Unlawful Speech

YouTube is liable for its own speech as well as its own actions. When YouTube works as a partner with the government to stifle its Subscribers' First Amendment rights, YouTube is legally accountable for its deeds. Similarly, when YouTube speaks and editorializes, Section 230 offers no protection because "[a]n interactive service provider remains liable for its own speech" and for "its own unlawful conduct." *Airbnb, Inc. v. City of Boston*, 386 F. Supp. 3d 113, 119, (2019) (citations omitted). Because it is the Defendant's own speech, YouTube's statements, tags, warnings, and editorializing receive no protection under Section 230. YouTube's false statements deprived Plaintiff of his First Amendment rights.

In addition, these false statements are unfair trade and deceptive practices, as Subscribers joined YouTube with the expectation that they would be treated fairly and without slander. In reasonable reliance upon YouTube's representations and the expectation of fair business dealings, Subscribers built businesses, political careers, entertainment personae, and public reputations on YouTube. YouTube then changed the rules, arbitrarily censoring and de-platforming people in violation of its own representations.  As courts have ruled, section 230 provides no protection for unfair and deceptive trade practices.

C.      **Section 230 Is Unconstitutional As Applied**

Where "plaintiffs seek to vindicate their own rights, the challenge is as-applied." *Rubenstein v. Fla. Bar*, 72 F. Supp. 3d 1298, 1309 (S.D. Fla. 2014) (quoting *Jacobs v. The Fla. Bar*, 50 F.3d 901, 906 (11th Cir. 1995)). "In an as-applied challenge, the plaintiff contends that application of the statute in the particular context in which he has acted, or in which he proposes to act, would be unconstitutional. Therefore, the constitutional inquiry in an as-applied challenge is limited to the plaintiff's particular situation." *Id.* (referencing and quoting to *Ross v. Duggan*, 402 F.3d 575, 583 (6th Cir. 2004)). "When evaluating an as-applied challenge, the court's inquiry and potential relief focuses only on the particular challenged application. . . ." *Id.* at 1309.

Section 230, as applied, encourages Defendant to censor disfavored speech on the basis of viewpoint and is unconstitutional.  The Supreme Court has held that federal statutes immunizing private conduct from liability transform typical private action into state action. *Skinner*, 489 U.S. at 611. Following this precedent, when Section 230 is used to engage in government viewpoint discrimination to stifle First Amendment rights, it is unconstitutional as applied. Section 230 permits, but does not require, companies like YouTube to censor speech deemed "objectionable" and preempts all conflicting state laws, preventing such censorship from being "made illegal . . . by any provisions of the laws of a State." *Ry. Emp. Dep't v. Hanson*, 351 U.S. 225, 232, 76 S. Ct. 714, 718, 100 L. Ed. 1112 (1956).  Like Section 2 of the Railway Labor Act, Section 230 gives firms the choice to impose the law. But its choice, when rendered with government joint action to stifle First Amendment rights, makes Section 230 as applied, unconstitutional viewpoint discrimination.

In *Skinner*, the Court held that the regulations therein turned the private companies' conduct into state action, because the regulations "removed all legal barriers" to such testing by

preempting any conflicting state laws (immunizing the railways from liability); and (2) the government had "made plain" a "strong preference" for such testing. *Id*. at 615. Just as with the Federal Railway Safety Act, Section 230(c)(2) "remove[s] all legal barriers" to YouTube's refusal to carry content it deems "objectionable." *Skinner*, 489 U.S. at 603. Numerous government actors, as with the testing protected in Subpart D of the Act regulations in *Skinner*, "made plain" a "strong preference" for censoring certain types of content, including those of Plaintiff.

Section 230, as applied, violates the fundamental principle the Supreme Court has long recognized: government "may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood,* 413 U.S. at 465. (quoting *Lee v. Macon County Board of Education*, 267 F.Supp. 458, 475-76 (M.D. Ala. 1967).

**POINT III**
**PLAINTIFF IS LIKELY TO SUCCEED**
**ON HIS FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT <u>CLAIM</u>**

The injunctive relief sought by Plaintiff speaks to the purpose of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"): protecting the public from deceptive practices. Defendant has engaged in the systematic practice of limiting the distribution of Plaintiff's content. Other Subscribers—whose content fits the preferred perspective of government actors who have the power to modify Section 230—remain on the platform despite promoting content clearly in violation of the standards applied to Plaintiff.  These inconsistent actions are manifestly deceptive practices.

### A.       <u>Florida Deceptive And Unfair Trade Practices Act Standards</u>

FDUTPA prohibits deceptive acts or practices. Fla. Stat. § 501.204(1).  Deception is "a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."  *PNR Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d

20

773, 777 (Fla. 2003) (referencing and quoting to *Millennium Communications & Fulfillment, Inc.*
*v. Office of the Attorney Gen.*, 761 So.2d 1256, 1263 (Fla. 3d DCA 2000))*.* FDUTPA must be
"construed liberally" to "protect the consuming public and legitimate business enterprises . . ."
from unfair or deceptive business practices. *Howard Morris v. ADT Sec. Servs.*, 2009 U.S. Dist.
LEXIS 150309 at *24424 (S.D. Fla. Sept. 11, 2009).

A party aggrieved by a violation of FDUTPA may seek injunctive relief. Importantly,
Florida courts have held that an aggrieved party need only be one who is "angry or sad on grounds
of perceived unfair treatment." *Ahearn v. Mayo Clinic*, 180 So. 3d 165, 172 (Fla. 1st DCA 2015).);
Fla. Stat §501.211(1). The authority for injunctions under FDUTPA "is broadly worded to
authorize declaratory and injunctive relief even if those remedies might not benefit the individual
consumers who filed the suit." *Gastaldi v. Sunvest Cmtys. USA, LLC*, 637 F. Supp. 2d 1045,1057
(S.D. Fla. 2009) (internal citation omitted). FDUTPA "is designed to protect not only the rights of
litigants but also the rights of the consuming public at large." *Id*.

### B.  Defendant Has Inconsistently Applied Its Standards

Defendant has offered various rationales for removing content uploaded by Plaintiff, but
comments related to election integrity, COVID-19, and violence have been the predominant bases
cited by Defendant for the removal of Plaintiff's content.

#### 1. Election Integrity

Plaintiff had content removed or flagged for videos allegedly in violation of YouTube's
standards regarding election-related content. (Ibrahim Decl. Exh. A ¶ 51.) Defendant's policy
states that it will remove content "that advances false claims that widespread fraud, errors, or
glitches changed the outcome of any past U.S. presidential election." (Ibrahim Decl. Exh. A ¶ 51.)
Defendant's actions show that these standards are inconsistently applied to ensure that only
disfavored content is removed from its platform. All of the speakers incorporated herein by

21

Declaration have not faced disciplinary sanctions from Defendant. (Ibrahim Decl. Exh. A ¶¶ 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64.)

If Defendant was committed to a consistent application of their standards regarding election integrity issues, Defendant would have taken similar disciplinary action against the YouTube channels belonging to the third parties listed above.

### 2. COVID-19

Plaintiff had content removed or flagged for alleged violations of Defendant's standards related to COVID-19.[1]  YouTube's policies state that it prohibits content in contradiction of the standards promulgated by the World Health Organization ("WHO"), content that discourages people from seeking medical advice, content that guarantees a prevention method for COVID-19, or content that disputes guidance regarding physical distancing to reduce transmission of COVID-19.  Defendant's practices reflect the inconsistent application of each of these specific provisions. (Ibrahim Decl. Exh. A ¶¶ 65, 66, 67, 68, 69, 70.)

Numerous news organizations have made inconsistent reports about the effects of large protests on the spread of COVID-19.  Specifically, in relation to the large gatherings during the protests of the summer of 2020, several news organizations' articles incorporated herein by Declaration have all run articles suggesting these events would not cause an increase in virus infections.  Contrariwise, these exact same national media organizations each ran articles suggesting the events of January 6, 2021, would cause an increase in virus infections. (Ibrahim Decl. Exh. A ¶¶ 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81.) (See Also: Ibrahim Decl. Exh. A ¶ 82.)

The suggestions contained within these articles—that large gatherings are unlikely to cause an increase in virus infections—run contrary to general guidance related to COVID-19.  This

---

[1] YouTube's policies related to COVID-19-19 can be found here:
https://support.google.com/youtube/answer/9891785?hl=en

inconsistency reflects Defendant's efforts to placate government actors who generally approved of the protests of the summer of 2020, generally disapproved of the events of January 6, 2021, and have expressed a great desire and willingness to affect Defendant's fortunes through manipulation of the protections afforded by Section 230.

The true thread behind all of Defendant's censorship decisions is whether the content being discussed was favored by Democrats about to take control of Congress and the White House. Defendant makes no effort to apply an objective standard for COVID-19, and thus it is deceptively misleading its Subscribers as to the reliability of the content they might find on YouTube.

### 3. Violence

Defendant claims to prohibit content when it incites, "others to commit violent acts against individuals or a defined group of people," when it encourages "others to go to a particular place to commit violence," or targets "specific individuals or groups with violence." However, as detailed in the incorporated Declaration, YouTube has taken no disciplinary action against speakers that maintain YouTube channels and whose statements clearly run afoul of Defendant's standards (Ibrahim Decl. Exh. A ¶¶ 10, 11, 12, 13, 84, 85, 86, 87.) Defendant also engages in selective enforcement of age-gating restrictions for politically disfavored viewpoints. (Ibrahim Decl. Exh. A ¶¶ 89, 90.)

In 2020, the city of Portland, Oregon, witnessed over one hundred (100) nights of riots, burning of the federal courthouse, arrests, vandalism, and even the death of a supporter of Plaintiff. (Ibrahim Decl. Exh. A ¶ 88.) Despite the fact that Defendant's policies state that it prohibits the use of its platform to encourage parties to go to a particular place to commit violence, Defendant permitted its platform to be used to livestream the violence at the courthouse.

If Defendant's standards as applied to Plaintiff were objectively applied to all content providers, none of the speakers referenced in the Declaration would be allowed to upload content

to YouTube.  This disparate treatment is reflective of Defendant's desire to remove politically disfavored content.  The determination of what is or is not "politically disfavored" is dictated by the calls from government actors for Defendant to take action or face punitive regulatory or legislative action *supra* .1, Part 2, pg. 13-14.

###### C.    Defendant's Inconsistent Application Of Its Standards Demonstrates Plaintiff's Entitlement To Preliminary Injunctive Relief

By publishing its standards on its website, Defendant is promising its Subscribers that it will live up to them. Defendant has failed to do so, thus deceiving its Subscribers into thinking that Defendant applies these standards with total viewpoint neutrality.

The failure of Defendant to state that it modifies its content moderation standards to placate government actors is a material misrepresentation.  Subscribers might think that parties who have been suspended, age-restricted, demonetized, or otherwise have run afoul of Defendant's standards are somehow less trustworthy than the content they do find across the platform. Conversely, Subscribers may think that the content they see on the platform is consistent with an objective application of Defendant's standards.

Plaintiff is ideally suited to bring this action for injunction relief.  Plaintiff invested time and money in developing a presence on YouTube— which was mutually beneficial to Defendant. On the other hand, Defendant cannot possibly reconcile the punitive censorship of Plaintiff with the favored treatment of other speakers who violated the same norms. Defendant has systematically removed politically disfavored content on pretextual grounds. Plaintiff has been aggrieved by these actions, and Plaintiff respectfully submits that he has established a substantial likelihood of success on the merits of his FDUTPA claim.

24

**PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS
OF HIS STOP SOCIAL MEDIA CENSORSHIP ACT CLAIM**

In Count IV of the Amended Complaint, Plaintiff seeks relief under the provisions of the Stop Social Media Censorship Act. While housed within FDUTPA, the elements for a Stop Social Media Censorship Act claim have a subtle but significant variation from the elements of the injunction claim in Count III.  Specifically, Count III alleges that the discriminatory practices of Defendant were based on a policy of removing politically disfavored content and that this policy was deceptively omitted from its statements to Subscribers.  Plaintiff's allegations in Count IV, however, rest on the very straightforward premise that—regardless of any deceptive practice— Defendant inconsistently applied its own standards.

Under the provisions of the Florida Statutes § 501.2041(2)(b), the inconsistent application of censorship, de-platforming, and shadow banning standards—regardless of any deception—is a violation of FDUTPA.  Subsection (2)(b) of the Stop Social Media Censorship Act states that:

> A social media platform must apply censorship, deplatforming, and shadow banning standards in a consistent manner among its users on the platform.[2]

Plaintiff asserts that the allegations raised in the Amended Complaint and detailed above demonstrate that Defendant has failed to enforce its standards for censoring, de-platforming, and shadow banning content in a consistent manner.

As noted above, the provisions of Subsection (2)(b) hold that a social media company's inconsistent application of standards is a violation of Florida Statutes § 501.204. As the Stop Social Media Censorship Act is housed within FDUTPA, the corpus of FDUTPA law detailed above in Point II, Subsection I A, is equally applicable to the Stop Social Media Censorship Act.  The same

---

[2] Censorship, deplatforming, and shadow banning are defined at Florida Statutes § 501.2041(1)(b), (c), and (f), respectively

principles hold that FDUTPA must be "construed liberally" to "protect the consuming public and legitimate business enterprises" from unfair or deceptive business practices. *Howard Morris* 2009 U.S. Dist. LEXIS 150309 at *24424 (S.D. Fla. Sep 11, 2009).

The law was challenged in an action brought in the Northern District of Florida by technology industry trade associations. In a decision dated June 30, 2021, Judge Hinkle of the Northern District enjoined several state agencies from enforcing provisions of the Stop Social Media Censorship Act —it does not address private litigation. *Netchoice, LLC, v. Moody* 2021 U.S. Dist. Lexis 121951 (N.D. Fla. June 30, 2021). Moreover, in a decision 31 pages long, only about five paragraphs were directed to the provision under which Count IV is brought. *Id.*

While Judge Hinkle held that Section 230 preempted the Stop Social Media Censorship Act, he relied on a Second Circuit opinion that, since the entry of his order, was vacated and replaced. Relying on *Domen v. Vimeo*, 991 F.3d 66 (2d. Cir. March 11, 2021) (amended and superseded on rehearing by *Domen v. Vimeo, Inc.*, 2021 WL 3072778 (2d Cir. July 21, 2021)), which was entered March 11, 2021, Judge Hinkle stated that Section 230 preempts claims based on the inconsistency of content removal. *Netchoice* at 20. However, the March 2021 *Vimeo* opinion was vacated and replaced with a decision issued on July 21, 2021. The revised opinion states that the "imperfect exercise of content-policing discretion does not, without more, suggest that enforcement of content policies was not done in good faith;" the necessary implication is that Section 230 immunities disappear when a plaintiff can establish bad faith. *Domen,* 2021 WL 3072778 at *17. Further, the Second Circuit stated, "Our decision should not be read to confer immunity on providers acting in circumstances far afield from the facts of this case. Courts have rejected Section 230 defenses against claims for false advertising, deceptive trade practices, and tortious interference." *Id*. at 18.

26

Judge Hinkle's decision should at most be read to state that Section 230 might be a defense that could be raised by a defendant, not that it preempts the law. Section 230 remains a fact-based defense, and the Defendants, in this case, are not entitled to its protections.

**POINT IV**
**PLAINTIFF WILL SUFFER IRREPARABLE**
**HARM IF AN INJUNCTION IS NOT GRANTED**

By its own admission, YouTube is an essential platform for communicating in today's global environment. With the volume of content on the platform combined with the power of their search functions, YouTube is a premier destination for Subscribers seeking information. As important as YouTube is for commercial branding, it is no less important for those engaged in political speech. For candidates, it offers outstanding outreach to potential voters. YouTube states that "YouTube Ads uses Google data to match your message to the right people at the right moment."

The continuing irreparable harm to Plaintiff, absent an injunction, is indisputable as a matter of law. *Elrod v. Burns,* 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") Here, the wisdom expressed in *New York Times Co.*, *supra*, comes to bear as "[e]very moment's continuance of the injunctions against [those censored] amounts to a flagrant, indefensible, and continuing violation of the First Amendment" 403 U.S. at 715 (Black, J., concurring with *aff'* 446 F.2d 1327 and *rev'* 444 F.2d 544).

Defendant has placed "its finger on the scale" by eliminating Plaintiff's views and content from voters, and "led to the demise of the Trump Campaign merchandising and fundraising program." (Corey Decl. Exh. B ¶ 27 and Mahfouz Decl. Exh. C ¶ 25) The First Amendment rights of Plaintiff's millions of YouTube Subscribers—to receive his messages and to comment to one

another thereon—will be irreparably injured as well. At the same time, by de-platforming the presumptive head and most popular member of the Republican Party, cutting him off from one of the most effective, direct forms of communication with potential voters, Defendant is threatening irreparable damage to the Republican Party's prospects in the 2022 and 2024 elections.

Similarly, a preliminary injunction on Plaintiff's FDUTPA and Stop Social Media Censorship Act claims will benefit many more parties than just Plaintiff.  Billions of Subscribers rely on Defendant's statements regarding the criteria by which content is permitted to remain on YouTube or removed.

## POINT V
## THE BALANCE OF HARDSHIPS FAVORS PLAINTIFF

While YouTube faces no harm from the reinstatement of Plaintiff's access to its platform, Plaintiff faces irreparable injury; thus, the balance of hardships manifestly favors a preliminary injunction. Plaintiff faces loss of his donor and merchandising platforms and ability to communicate his views, content, and endorsements of local candidates.  (Mahfouz Decl. Exh. C ¶ 16 and Corey Decl. Exh. B ¶¶ 14, 15) Defendant's First Amendment freedoms will not suffer if this Court orders it to reinstate Plaintiff's access to its platform(s). Defendant was and is operating as a governmental actor in censoring Plaintiff, and governmental actors do not have First Amendment rights.  While Defendant undoubtedly has the First Amendment right to express its own opinion and carry messages its favors, the First Amendment does not protect Defendant when it functions as a censorship arm of federal lawmakers and officials.

## POINT VI
## AN INJUNCTION WOULD NOT
## BE ADVERSE TO THE PUBLIC INTEREST

Defendant cannot seriously argue that access to its platform is not an issue of public interest.  The terms of access to YouTube require clear and transparent disclosure to Defendant's

Subscribers, who need to know if the terms of service they have agreed to are, in fact, the terms applied by Defendant to leave up, or pull down, content.  YouTube's elimination of Plaintiff's views and content creates a "significant and negative impact on political debate" and "constituents a prior restraint in the vitality of the 'marketplace of ideas' in American politics" (Corey Decl. Exh. B ¶ 27.)

The country does not benefit from attempts to suppress political speech. Still less does it benefit from attempts to muzzle political speakers.  Even those most passionately antagonistic to Plaintiff's views are not well-served by attempts to silence him. Such, at least, has always been the fundamental principle of the First Amendment. "That Amendment rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public. . . ." *Associated Press v. United States*, 326 U.S. 1, 20 (1945). Although this principle is under assault today throughout the United States, it can still be saved by—and perhaps only by—the Nation's courts. Accordingly, granting this preliminary injunction will manifestly be in the public interest.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court grant the injunctive relief prayed for above.

## **Request for Relief**

Plaintiff respectfully requests the Court to issue a preliminary injunction at the earliest possible date and enter the following Order:

A.     Enjoining and restraining Defendant and its officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with anyone falling under the direct or general control or supervision of Defendant from enforcing the suspension of Plaintiff's access to its platform.

29

B.      Directing Defendant immediately, and no later than forty-eight (48) hours following the issuance of the Court's Order, to reinstate Plaintiff's access to his YouTube channel and lift all temporary or permanent bans on Plaintiff's YouTube channel.

C.      Directing Defendant immediately, and no later than forty-eight (48) hours following the issuance of the Court's Order, to lift the ban recently imposed on certain uploaded videos identified in greater detail in the Memorandum of Law submitted herewith.

D.      Enjoining and declaring that Section 230 (c) of the Communications Decency Act of 1996 is unconstitutional as applied to the facts of this case, as it violates Plaintiff's right to free speech under the First Amendment.

E.      Directing Defendant to permit Plaintiff's sale of merchandise on his channel in the normal course as it was conducted for years before the unlawful censorship occurred.

F.      Granting such other and further relief as the Court may deem just, proper, and equitable.

Date: August 23, 2021

Signature of Counsel

<u>/s/ Matthew Lee Baldwin</u>
Matthew L. Baldwin, Esq.
Florida Bar No. 27463
**VARGAS GONZALEZ**
**BALDWIN DELOMBARD, LLP**
815 Ponce De Leon Blvd., Third Floor
Coral Gables, FL  33134
Telephone: 305.631.2528
Email: Matthew@VargasGonzalez.com
E-service: Service8@VargasGonzalez.com

<u>s/ Carlos Trujillo</u>
Carlos Trujillo, Esq.
Florida Bar No. 42697
**VARGAS GONZALEZ**
**BALDWIN DELOMBARD, LLP**
815 Ponce De Leon Blvd., Third Floor
Coral Gables, FL  33134
Telephone: 305.631.2528
Email: Ctrujillo@VargasGonzalez.com
E-service: Service8@VargasGonzalez.com

*Of Counsel*

JOHN P. COALE *(Pro Hac Vice)*
2901 Fessenden St. NW
Washington, D.C. 20008
Telephone: (202) 255-2096
Email: johnpcoale@aol.com

JOHN Q. KELLY *(Pro Hac Vice)*
E-mail: jqkelly@ibolaw.com
IVEY, BARNUM & O'MARA, LLC
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000
Facsimile: (203) 661-9461

RYAN S. TOUGIAS *(Pro Hac Vice)*
E-mail: rtougias@ibolaw.com
IVEY, BARNUM & O'MARA, LLC
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000
Facsimile: (203) 661-9461

RICHARD P. LAWSON, ESQ.
Florida Bar No. 165085
Gardner Brewer Martinez-Monfort P.A.
400 North Ashley Drive, Ste. 1100
Tampa, Florida 33602
(813) 221-9600 Telephone
(813) 221-9611 Fax
Primary Email: rlawson@gbmmlaw.com
Secondary
Email:  litigation@gbmmlaw.com

LUIS MARTINEZ-MONFORT, ESQ.
Florida Bar No. 0132713
Gardner Brewer Martinez-Monfort P.A.
400 North Ashley Drive, Ste. 1100
Tampa, Florida 33602
(813) 221-9600 Telephone
(813) 221-9611 Fax
Primary Email: rlawson@gbmmlaw.com
Secondary
Email:  litigation@gbmmlaw.com

## <u>CERTIFICATE OF SERVICE</u>

Motion for Preliminary Injunction and Memorandum of Law Incorporated Herein and the

Amended Complaint will be served on Defendants YouTube, LLC, and Sundar Pichai, as soon as

possible. Proof of service will be filed with this Honorable Court when service is completed.

<u>/s/ Matthew Baldwin, Esq</u>
Matthew L. Baldwin, Esq.
Florida Bar No. 27463
**VARGAS GONZALEZ**
**BALDWIN DELOMBARD, LLP**
815 Ponce De Leon Blvd., Third Floor  Coral
Gables, FL  33134
Telephone: 305.631.2528
Email:Matthew@VargasGonzalez.com
E-service: Service8@VargasGonzalez.com
